IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| TMT PROCUREMENT CORPORATION, et al., | § | Case No. 13-33763 |
| | § | |
| Debtors.[1] | § | Jointly Administered |

_____

# Statement of Secured Creditors in Support of Appeal as of Right and Motion in the Alternative for Leave to Appeal

_____

**NOTICE UNDER BLR 9013-1(b)**
**as modified by FRBP 8003(a)**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN **14** DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

---

[1] The Debtors in these Chapter 11 cases are: (1) A Whale Corporation; (2) B Whale Corporation; (3) C Whale Corporation; (4) D Whale Corporation; (5) E Whale Corporation; (6) G Whale Corporation; (7) H Whale Corporation; (8) A Duckling Corporation; (9) F Elephant Inc.; (10) A Ladybug Corporation; (11) C Ladybug Corporation; (12) D Ladybug Corporation; (13) A Handy Corporation; (14) B Handy Corporation; (15) C Handy Corporation; (16) B Max Corporation; (17) New Flagship Investment Co., Ltd.; (18) RoRo Line Corporation; (19) Ugly Duckling Holding Corporation; (20) Great Elephant Corporation; and (21) TMT Procurement Corporation.

Pursuant to 28 U.S.C. § 158(a) and Rules 8001(b) and 8003 of the Federal Rules of Bankruptcy Procedure, Mega International Commercial Bank Co. Ltd.; Cathay United Bank; Shanghai Commercial & Savings Bank; First Commercial Bank Co. Ltd. (collectively, "Movants" or the "Secured Creditors"), through their respective undersigned counsel, hereby file this Statement in Support of Appeal as of Right and Motion in the Alternative for Leave to Appeal to the District Court from the Order of the Bankruptcy Court dated July 23, 2013, denying in part the Secured Creditors' motion to dismiss these cases (the "Dismissal Order").[2]

## Preliminary Statement

The Secured Creditors believe that the Dismissal Order is a final order, appealable as of right.  *See In re Brown*, 916 F.2d 120 (3d Cir. 1990) (concluding that an order denying a motion to dismiss a Chapter 11 case for bad faith is final and appealable as of right).  *But cf. In re Phillips*, 844 F.2d 230, 235-36 (5th Cir. 1988) (holding that an order denying dismissal of a Chapter 7 case on the basis of alleged debtor ineligibility pursuant to 11 U.S.C. § 109(g) was non-final).  Out of an abundance of caution, however, the Secured Creditors file this statement and motion in the alternative for leave to appeal.

Even if the Court believes that the Dismissal Order is interlocutory, the Secured Creditors respectfully submit that the Court should grant leave to appeal pursuant to 28 U.S.C. § 158(a) and Rules 8001(b) and 8003 of the Federal Rules of Bankruptcy Procedure.  The Bankruptcy Court's ruling is truly extraordinary.  The court found that certain loosely related, select entities

---

[2] The court dismissed the cases of TMT USA Shipmanagement LLC (No. 13-33740) and F Elephant Corporation (No. 13-33749), but refused to dismiss the following cases: (1) A Whale Corporation; (2) B Whale Corporation; (3) C Whale Corporation: (4) D Whale Corporation; (5) E Whale Corporation; (6) G Whale Corporation; (7) H Whale Corporation; (8) A Duckling Corporation; (9) F Elephant Inc.; (10) A Ladybug Corporation; (11) C Ladybug Corporation; (12) D Ladybug Corporation; (13) A Handy Corporation; (14) B Handy Corporation; (15) C Handy Corporation; (16) B Max Corporation; (17) New Flagship Investment Co., Ltd.; (18) RoRo Line Corporation; (19) Ugly Duckling Holding Corporation; (20) Great Elephant Corporation; and (21) TMT Procurement Corporation. Doc. 134; Tr. 294-324 [07-18-13].

of an entirely foreign shipping enterprise—with no meaningful U.S. connections but with substantial foreign assets; overwhelmingly (if not entirely) foreign creditors; and a foreign national as sole indirect or direct equity security holder—had filed for bankruptcy protection in the United States with both subjective and objective good faith.  The Bankruptcy Court made that ruling even though it found that the debtor entities were substantially undercapitalized without the infusion of a significant sum of money from third-party sources, and even though the debtors had attempted in bad faith to manufacture a basis for bankruptcy jurisdiction by creating a Texas limited liability company on the eve of bankruptcy.

The Secured Creditors' collateral is at substantial risk of irreparable harm as a result of the filing of these Chapter 11 cases, the duration of which will place significant administrative burden on the Debtors' estates (*e.g.*, through the retention of bankruptcy counsel and financial advisors to the Debtors and to the Official Committee of Unsecured Creditors).  The Dismissal Order deprives the Secured Creditors of their rights to proceed against their collateral pursuant to their lawful loan documentation, under foreign law, in a depressed and dropping shipping market.  An immediate appeal is also the most efficient way to proceed because a ruling in favor of the Secured Creditors on the threshold issues of jurisdiction, venue, good faith filing, and the likelihood of rehabilitation would result in dismissal of the cases.  And, as discussed below, there plainly is a substantial ground for difference of opinion with respect to several controlling rulings of law made by the Bankruptcy Court.  Indeed, as we discuss *infra* pp. 5-6, the Bankruptcy Court has acknowledged the exceptional circumstances here and has invited immediate review of its decision by this Court.

Accordingly, leave to appeal should be granted if the Court finds that the Dismissal Order is interlocutory.

**Motion in the Alternative for Leave to Appeal**

**Statement of Facts**

This litigation began when 23 loosely-affiliated foreign companies filed for Chapter 11 bankruptcy in these jointly administered bankruptcy cases (Docs. 29, 126; Tr. 203 [06-24-13]; Tr. 188 [07-17-13]).  These debtor companies (collectively, "Debtors") are part of the Taiwanese "Today Makes Tomorrow" shipping enterprise (the "TMT Group").  They are owned directly or indirectly by Taiwanese businessman Hsin Chi Su (a/k/a Nobu Su).  Tr. 187-88 [06-24-13]; Tr. 109-10, 186 [07-16-13].  All of the Debtors are headquartered in Taiwan (Tr. 115 [07-16-13]).

Seventeen of the Debtors are akin to single-asset real estate companies:  each owns an ocean-going cargo ship that transports oil, ore, vehicles, or bulk cargo.  The other debtor companies provide administrative, financial, or operational support.  Doc. 15 at 3-4; Tr. 120-28, 135 [07-16-13].  The Debtors' most valuable assets are the seventeen vessels themselves.  Doc. 15 at 3; Tr. 358 [07-16-13].  Each of the Secured Creditors has loaned money to one or more debtors in exchange for a security interest in one or more of the seventeen ships in the TMT fleet Tr. 119, 157, 353 [07-16-13]; Tr. 160-61 [07-17-13].

In the last several months, the Debtors had difficulty servicing this debt and financing their operations generally.  Doc. 3 at 7.  When it appeared that a mediation in Taiwan among the Debtors and the Secured Creditors might not yield a favorable result for the Debtors, they filed Chapter 11 petitions in the Bankruptcy Court for the Southern District of Texas.  Doc. 29, 126; Tr. 155-59, 343 [07-16-13]. As noted above, the cases are jointly administered.  Docs. 29, 126.

All of the Debtors (save the two whose cases have already been dismissed by the Bankruptcy Court) were organized under foreign law:  each of the ships operates under the flag of Panama, Liberia, or the Marshall Islands.  None had offices, employees, or property in the

U.S. Tr. 190, 354-58 [07-16-13]; Tr. 213-14 [07-17-13]. Shortly before filing for bankruptcy protection, the Debtors hired U.S. counsel in Houston to advise them about debt restructuring. Tr. 160-61, 190 [06-24-13].  The debtors' principal also formed TMT USA Shipmanagement LLC, a Texas limited liability company; arranged for that company to sign a "management contract" with certain of the Debtors; and leased a small, empty Houston office.  Tr. 39-40, 137, 173-74 [06-24-13]; Tr. 316 [07-16-13]; Tr. 112 [07-17-13]. In addition, law firms the Debtors had hired as U.S. counsel represented that the firms held a *de minimis* amount of unearned retainer fees of the Debtors as of the petition date—though both firms still had unpaid balances in excess of the retainers.  Tr. 105-09, 131, 133-35, 138, 169, 201, 206 [06-24-13].

The Secured Creditors filed a joint motion to dismiss the bankruptcies.[3]  Each filed a brief in support, arguing that dismissal was proper on various grounds. Docs. 67, 91, 92, 94, 95. The Secured Creditors argued (*inter alia*) that the bankruptcy cases had been filed in bad faith; that jurisdiction and venue had been manufactured; and that there was no reasonable likelihood of rehabilitation in a bankruptcy, especially given the various Debtors' debt load and the evident inability of the TMT group to manage that debt.

The Bankruptcy Court held a three-day hearing on the joint motion to dismiss, ultimately denying the motion except as to two of the Debtors, TMT USA Shipmanagement LLC and F. Elephant Corporation. Doc. 134; Tr. 294-324 [07-18-13].  The Bankruptcy Court found that the other Debtors' bankruptcy filings were made in both subjective and objective good faith.  The latter ruling rested principally on the fact that—only *after* the filings and on the first day of the evidentiary hearing, with no prior notice to the Secured Creditors—Mr. Su stated an intention to deposit in escrow with the Bankruptcy Court more than $40 million in assets of other, non-debtor entities in the TMT group of companies, as security for compliance with court orders and as

---

[3] BHP Billiton Marketing A.G. joined the motion with the Secured Creditors but does not join this appeal.

collateral for loans or working capital. Tr. 269-96 [07-16-13]; Tr. 309-11 [07-18-13]. Those assets consisted of 25 million shares of stock in an entity called Vantage Drilling Company; the stock was owned by a company controlled by Mr. Su, F3 Capital, which is not a Debtor. Doc. 121; Tr. 269-74, 296 [07-16-13].

The Secured Creditors contended that the Vantage stock could not validly be used as security or as collateral because Vantage had sued Mr. Su in Texas state court months earlier, alleging fraud and seeking to impose a constructive trust on the stock held by F3 Capital. That case has been removed to this District Court and is presently pending before the Honorable Lynn Hughes. *Vantage Drilling Co. v. Hsin-Chi-Su*, No. 4:12-CV-3131 (S.D. Tex. filed Oct. 22, 2012). Tr. 350 & Exhibit 190 [07-17-13]. Vantage has intervened in these bankruptcy cases, warning that the stock in question cannot be sold, pledged, or transferred. Doc. 151.

The Bankruptcy Court acknowledged the risk facing the Secured Creditors, stating that it would be necessary to "determine whether the estates will take shares subject to a constructive trust," and that the court would need Judge Hughes' approval of the proposed escrow arrangement. Tr. 291-93 [07-16-13]; Tr. 311 [07-18-13]. The Debtors likewise recognized that there was a risk of a constructive trust. Tr. 262 [07-18-13]. The U.S. Trustee expressed similar concerns about this "problematic" escrow proposal, stating: "I'm concerned with the mechanism, I'm concerned with how that would work." Tr. 277 [07-18-13]. Neither the Bankruptcy Court nor the Debtors proposed a precise mechanism for effecting the escrow. Tr. 315-19 [07-18-13].

The Bankruptcy Court suggested that an appeal is the best way to resolve the uncertainty surrounding the use of the Vantage shares as collateral or security, stating: "I'm not going to get stuck in a position where I say, 'Well, that's a good offer,' and where a year later Judge Hughes says, 'I was here first' . . . [Y]ou need to get this resolved up front . . ." Tr. 291-93 [07-16-13].

5

## Questions Presented and Relief Sought

The central questions to be presented by the appeal include, but are not limited to, the following:

1.      Whether the Bankruptcy Court has subject matter jurisdiction.

2.      Whether venue in the U.S. is proper.

3.      Whether each of the Debtors has "property in the United States" under 11 USC § 109(a); and if not, whether there is any other basis for a finding of "debtor" status under section 109(a).

4.      Whether the Bankruptcy Court should have dismissed the remaining Debtors' bankruptcy cases for cause under 11 U.S.C. § 1112(b).

5.      Whether the Bankruptcy Court erred in declining to dismiss the remaining Debtors based on improper venue pursuant to 28 USC § 1406(a).

6.      Whether the cases should be dismissed on grounds of international comity.

7.      Whether the findings of fact underlying the Bankruptcy Court's decision were clearly erroneous.

## Reasons Why Appeal Should Be Granted

### A.   Standard For Leave To Appeal.

The Secured Creditors seek leave to appeal under 28 U.S.C. § 158(a). "'Section 158 does not establish any standards to guide the district courts' discretion' whether to grant leave to appeal an interlocutory order." *Speer v. Tow (In re Royce Homes LP)*, 466 B.R. 81, 93 (S.D. Tex. 2012).  Nevertheless, in deciding whether to grant leave, in the Fifth Circuit the district courts commonly apply the standard of 28 U.S.C. § 1292(b), under which an order may be certified for appeal if it "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

However, no rule, statute, or case law expressly limits the scope of this court's discretion to section 1292(b) standards. *See In re Ichinose*, 946 F.2d 1169, 1177 (5th Cir. 1991) ("We have not previously considered whether it is proper for a district court to adopt the § 1292(b) standard for § 158(a) purposes, and we do not do so here."); *Balestri v. Hunton & Williams LLP (In re Hallwood Energy, LP)*, No. 3:12–CV–1902, 2013 WL 524418, at *2 (N.D. Tex. Feb. 11, 2013) (noting that standard for leave to appeal under section 158(a) "is not articulated in the statute"). Indeed, in other circuits that discretion is "guided and instructed, but not constrained, by" section 1292(b) standards. *See, e.g., Cousins Properties, Inc. v. Treasures Isles HC, Inc.* (*In re Treasure Isles HC, Inc.*), 462 B.R. 645, 647 (6th Cir. BAP 2011); *Moix-McNutt v. Coop (In re Moix-McNutt)*, 215 B.R. 405, 408 n.6 (8th Cir. BAP 1997).

Ultimately, then, this court has discretion whether to grant leave to appeal. *See Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 399–400 (5th Cir. 2001) (noting that the decision "is

committed to the district court's discretion"). Thus, this court may properly consider other bases for granting leave to appeal, especially in the "exceptional circumstances" presented here.

### B.  Controlling Questions Of Law Warrant Immediate Review.

#### 1.  Substantial grounds exist for differing opinions on controlling questions of law.

The Bankruptcy Court's Order rests on several separate controlling questions of law.   As to each of those legal issues, there is – at an absolute minimum – substantial ground for difference of opinion.

*Relevance of non-debtor assets in assessing the debtor's "financial condition and motives."*   In considering whether a bankruptcy petition was filed in bad faith—and thus that "cause" for dismissal exists under 11 U.S.C. § 1112(b)—courts consider (among other things) "the debtor's financial condition, motives, and the local financial realities." *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73 (5th Cir. 1986).   There is no case law to support the Debtors' argument that the court may consider the financial condition of ***non-debtors*** whose assets are pledged ***after the filing*** in support of the debtor's reorganization.   At a minimum, substantial ground for difference of opinion exists on this point, given the complete absence of authority in support of the position taken by the Debtors and adopted by the Bankruptcy Court.

*Standard for determining whether there is a "reasonable likelihood of rehabilitation."*  Another § 1112(b) factor is "the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). The Debtors contended – and the Bankruptcy Court agreed – that a "relaxed standard" should be applied "in early stages of bankruptcy." Doc. 93 at 43-52; Tr. 304 [07-18-13].   But the Fifth Circuit case law does not support such a "relaxed standard." *See, e.g.*, *In re Humble Place Joint Venture*, 936 F.2d 814, 816-18 (5th Cir. 1991).

There is also substantial ground for difference of opinion regarding the extent to which the Vantage stock escrow proposal may support such a finding, given its speculative nature and the Bankruptcy Courts' general aversion to "visionary schemes for rehabilitation." *See, e.g.*, *In re Great Am. Pyramid Joint Venture*, 144 B.R. 780, 791 (Bankr. W.D. Tenn. 1992) (citing *Tenn. Publ'g Co. v. Am. Nat'l Bank*, 299 U.S. 18 (1936)); ; *In re Wentworth*, 83 B.R. 705, 708 (Bankr. D.N.D. 1988) ("It would be manifestly inequitable, for example, to require the Bank to lengthen the repayment period on its loan pursuant to a plan of reorganization when neither the Bank, the Debtor, nor the court have complete control over the use of the collateral.").

*Whether venue or jurisdiction can be established with de minimis assets.* No controlling case law supports the right of a foreign debtor to obtain bankruptcy relief based on insubstantial assets; assets acquired or placed in the U.S. immediately prior to commencement; or other evidence of manufactured venue or jurisdiction. The Bankruptcy Court effectively held that a debtor contemplating bankruptcy can ensure venue or jurisdiction by structuring its dealings artificially to create a basis for jurisdiction (and venue), without any business purpose, so long as the transactions themselves are valid.  Tr. 301-02 [07-18-13].  That holding conflicts with *In re Head*, 223 B.R. 648, 652 (Bankr. W.D. N.Y. 1998), which held (in the alternative) that "debtor" status under 11 U.S.C. § 109(a) cannot be so manufactured.  It also conflicts with *In re Yukos Oil Co.*, 321 B.R. 396, 411 (Bankr. S.D. Tex. 2005), which held that cause existed for dismissal pursuant to 11 U.S.C. § 1112(b), in part, based on property transferred for the primary purpose of attempting to create jurisdiction.

## 2.    Immediate appeal will materially advance ultimate termination of the litigation.

The Rules of Bankruptcy Procedure "shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding." Fed. R. Bankr. P. 1001.  The Secured

Creditors' assets are placed at serious risk by the Dismissal Order, which deprives them of their ability to enforce their contractual right to seize their collateral.  And an immediate appeal will materially advance ultimate termination of the litigation:   acceptance of any of the Secured Creditors' arguments would result in dismissal of the remaining Debtors' bankruptcies, ending the litigation.

## Request for Relief

The Secured Creditors believe that the Dismissal Order constitutes a final order that can be appealed as of right.  If this Court disagrees, however, it should grant the Secured Creditors leave to appeal under 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8003.

Respectfully submitted,

**MAYER BROWN LLP**

By:   */s/ Charles S. Kelley*
      Charles S. Kelley
      Texas Bar No. 11199580
      S.D. Texas Bar No. 15344
700 Louisiana Street, Suite 3400
Houston, Texas 77002-2730
Tel:   713.238.3000
Fax:   713.238.4888
Email:  ckelley@mayerbrown.com

*and*

Frederick D. Hyman (admitted pro hac vice)
Michael F. Lotito (admitted pro hac vice)
Mayer Brown LLP
1675 Broadway
New York, New York 10019-5820
Tel:  212.506.2500
Fax:  212.262.1910
Email:  fhyman@mayerbrown.com
Email:  mlotito@mayerbrown.com

*Attorneys for Mega International*
*Commercial Bank Co., Ltd.*

**BAKER & McKENZIE LLP**

By:   */s/ David W. Parham*
      David W. Parham
      Texas Bar No. 15459500
      S.D. Texas Bar No. 7991
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Tel:  214.978.3000
Fax:  214.978.3099
Email:  david.parham@bakermckenzie.com

*Attorneys for Cathay United Bank*

**GARDERE WYNNE SEWELL LLP**

By:   */s/ John P. Melko*
      John P. Melko
      State Bar No. 13919600
1000 Louisiana Street, Suite 3400
Houston, Texas 77002
Tel:  713.276.5500
Fax:  713.276.5555
Email:  jmelko@gardere.com

*Attorneys for Shanghai Commercial & Savings*
*Bank*

**WINSTEAD PC**

By:   */s/ Eli O. Columbus*
      Eli O. Columbus
      State Bar No. 24028062
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Tel:  214.745.5400
Fax:  214.745.5390
Email:  ecolumbus@winstead.com

*Attorneys for First Commercial Bank Co., Ltd.*

## Certificate of Service

I hereby certify that on August 6, 2013 a copy of this document was served through the court's ECF system on all parties entitled to receive electronic notice in these cases, including counsel for the Debtors, the Official Committee of Unsecured Creditors, the U.S. Trustee, and all parties who have filed a notice of appearance requesting such service, as indicated below:

John R Ashmead on behalf of Creditor Offical Committee of Unsecured Creditors of TMT USA Shipmanagement LLC, et al.
ashmead@sewkis.com

John R Ashmead on behalf of Creditor Committee Official Committee of Unsecured Creditors of TMT Procurement Corporation, et al.
ashmead@sewkis.com

John R Ashmead on behalf of Creditor Committee Seward & Kissel LLP
ashmead@sewkis.com

Bradley Benoit on behalf of Witness HSIN-CHI aka NOBU SU SU
brad.benoit@bgllp.com, elizabeth.miller@bgllp.com

Benjamin Blaustein on behalf of Creditor Offical Committee of Unsecured Creditors of TMT USA Shipmanagement LLC, et al.
blaustein@sewkis.com

Jason Lee Boland on behalf of Interested Party Vantage Drilling Company, Inc.
jboland@fulbright.com

James S Carr on behalf of Attorney Co-Counsel for the Official Committee of Unsecured Creditors of TMT USA Shipmanagement LLC, et al.
KDWBankruptcyDepartment@kelleydrye.com

James S Carr on behalf of Creditor Offical Committee of Unsecured Creditors of TMT USA Shipmanagement LLC, et al.
KDWBankruptcyDepartment@kelleydrye.com

Eli Omar Columbus on behalf of Creditor First Commercial Bank Co., Ltd.
ecolumbus@winstead.com, lbayliss@winstead.com

Sean B Davis on behalf of Creditor First Commercial Bank Co., Ltd.
sbdavis@winstead.com, pschneller@winstead.com

Matthew T Ferris on behalf of Creditor First Commercial Bank Co., Ltd.
mferris@winstead.com, lbayliss@winstead.com

William R Greendyke on behalf of Interested Party Vantage Drilling Company, Inc.
wgreendyke@fulbright.com

Weiting Hsu on behalf of Creditor First Commercial Bank Co., Ltd.
whsu@winstead.com

Charles Stephen Kelley on behalf of Creditor Mega International Commercial Bank Co., Ltd.
ckelley@mayerbrown.com, sswihart@mayerbrown.com;courtnotification@mayerbrown.com

Charles Stephen Kelley on behalf of Defendant Mega International Commercial Bank Co., Ltd
ckelley@mayerbrown.com, sswihart@mayerbrown.com;courtnotification@mayerbrown.com

Christine A March on behalf of U.S. Trustee US Trustee
christine.a.march@usdoj.gov

Peter A McLauchlan on behalf of Creditor Shanghai Commercial & Savings Bank
pmclauchlan@gardere.com, sbergeron@gardere.com

John P Melko on behalf of Creditor Shanghai Commercial & Savings Bank
jmelko@gardere.com

John E Mitchell on behalf of Creditor Bank Sinopac
john.mitchell@bakermckenzie.com, julia.rogic@bakermckenzie.com

John E Mitchell on behalf of Creditor Cathay United Bank
john.mitchell@bakermckenzie.com, julia.rogic@bakermckenzie.com

John E Mitchell on behalf of Defendant Cathay United Bank
john.mitchell@bakermckenzie.com, julia.rogic@bakermckenzie.com

David William Parham on behalf of Creditor Bank Sinopac
david.parham@bakermckenzie.com, julia.rogic@bakermckenzie.com

David William Parham on behalf of Creditor Cathay United Bank
david.parham@bakermckenzie.com, julia.rogic@bakermckenzie.com

Alfredo R Perez on behalf of Creditor BHP Billiton Marketing AG
alfredo.perez@weil.com, chris.lopez@weil.com;gayle.mitchel@weil.com

Alfredo R Perez on behalf of Defendant BHP Billiton Marketing A.G.
alfredo.perez@weil.com, chris.lopez@weil.com;gayle.mitchel@weil.com

Clinton R. Snow on behalf of Creditor Shanghai Commercial & Savings Bank
csnow@gardere.com

US Trustee
USTPRegion07.HU.ECF@USDOJ.GOV

David R Walker on behalf of Creditor The Shipping Corporation of India
david.walker@roystonlaw.com, robin.gilpin@roystonlaw.com

Craig A Wolfe on behalf of Creditor Committee Official Committee of Unsecured Creditors of
TMT Procurement Corporation, et al.
kdwbankruptcydepartment@kelleydrye.com

William Alfred Wood, III on behalf of the Debtors
Trey.Wood@bgllp.com


*/s/ John P. Melko*
John P. Melko

**Appendix A**

**Order**

**(Bankr. Doc. 134)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
07/23/2013

| | | |
|---|---|---|
| **IN RE:** | § | |
| **TMT USA SHIPMANAGEMENT LLC** | § | **CASE NO: 13-33740** |
| | § | |
| **A WHALE CORPORATION** | § | **CASE NO: 13-33741** |
| | § | |
| **B WHALE CORPORATION** | § | **CASE NO: 13-33742** |
| | § | |
| **C WHALE CORPORATION** | § | **CASE NO: 13-33743** |
| | § | |
| **D WHALE CORPORATION** | § | **CASE NO: 13-33744** |
| | § | |
| **E WHALE CORPORATION** | § | **CASE NO: 13-33745** |
| | § | |
| **G WHALE CORPORATION** | § | **CASE NO: 13-33746** |
| | § | |
| **H WHALE CORPORATION** | § | **CASE NO: 13-33747** |
| | § | |
| **A DUCKLING CORPORATION** | § | **CASE NO: 13-33748** |
| | § | |
| **F ELEPHANT CORPORATION** | § | **CASE NO: 13-33749** |
| | § | |
| **F ELEPHANT INC.** | § | **CASE NO: 13-33750** |
| | § | |
| **A LADYBUG CORPORATION** | § | **CASE NO: 13-33751** |
| | § | |
| **C LADYBUG CORPORATION** | § | **CASE NO: 13-33752** |
| | § | |
| **D LADYBUG CORPORATION** | § | **CASE NO: 13-33754** |
| | § | |
| **A HANDY CORPORATION** | § | **CASE NO: 13-33755** |
| | § | |
| **B HANDY CORPORATION** | § | **CASE NO: 13-33756** |
| | § | |
| **C HANDY CORPORATION** | § | **CASE NO: 13-33757** |
| | § | |
| **B MAX CORPORATION** | § | **CASE NO: 13-33758** |
| | § | |
| **NEW FLAGSHIP INVESTMENT CO., LTD.** | § | **CASE NO: 13-33759** |
| | § | |
| **RORO LINE CORPORATION** | § | **CASE NO: 13-33760** |
| | § | |

| UGLY DUCKLING HOLDING CORPORAITON | § § § | CASE NO: 13-33761 |
|---|---|---|
| GREAT ELEPHANT CORPORATION | § § | CASE NO: 13-33762 |
| TMT PROCUREMENT CORPORATION | § § § | CASE NO: 13-33763 Jointly Administered Order |
| Debtor(s) | § | CHAPTER 11 |

## ORDER

For the reasons stated on the record, the Joint Emergency Motion for Entry of an Order Dismissing with Prejudice the Debtors' Chapter 11 Case Pursuant to Sections 105(a), 305(a), 349, and/or 1112(b) of the Bankruptcy Code, (ECF No. 67), is granted, in part, and denied, in part.

1. The cases of TMT Shipmanagement LLC, (Case No. 13-33740), and F Elephant Corporation, (Case No. 13-33749), are dismissed.

2. No other cases are dismissed.

3. Certain Debtors violated the Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection, (ECF No. 43), by arranging for ECB International LLC ("ECB"), to pay wages in an approximate amount of $750,000 directly to the crews of three Whale vessels.[1] If ECB reduces any amount that it owes to a Debtor on account of all or a portion of this $750,000 advance:

   A. The Debtor receiving less than full payment must cause a non-Debtor entity to deposit, in cash, an amount equal to the reduction (the "Recovery Amount").

   B. The amount received from the non-Debtor entity as the Recovery Amount will be deposited into the Debtor's cash collateral account and be subject to any lien held by the respective lender.

   C. The Debtor must receive the Recovery Amount within 30 days of the date on which the original payment from ECB should have been received.

4. The Debtors must cause non-estate property (the "Good Faith Property") with a fair market value of $40,750,000 to be provided to the Estates:

   A. The Good Faith Property must be provided to the Estates, jointly, not later than August 20, 2013.

---

[1] Pursuant to the Time Charter Party with ECB, the owner of the ship is responsible for paying for the crew wages that were paid with the $750,000. *See* Lender's Exhibit 200, Paragraph 5. If ECB advanced the $750,000 in wages, it may be entitled to a credit for the payments. *See* Lender's Exhibit 200, Paragraph 6.

B.      Not later than August 6, 2013, the Debtors must file a proposed form of Order to establish the Court's control over the Good Faith Property.

C.      If the Debtors cause the Good Faith Property to be property other than cash, then the Good Faith Property must include at least 25,000,000 shares of the common stock of Vantage Drilling Company.

D.      If the Court determines that the initial Good Faith Property has a fair market value of less than $40,750,000, the Debtors will have an additional 30 days after such a determination to supplement the Good Faith Property such that it has a Fair Market Value of at least $40,750,000.

E.      The Good Faith Property will constitute a pool of assets to:

(i)      ensure compliance with court orders;

(ii)      provide a fund for payment of any sanctions ordered by the Court against one or more Debtors or their principals, including any daily coercive sanctions ordered by this Court;

(iii)      serve as collateral for a working capital loan to one or more Debtors, if ordered by the Court;

(iv)      satisfy any amounts arising under § 507(b) of the Bankruptcy Code, including without limitation any failure of adequate protection from the use of cash collateral;

(v)      collateralize an advance of any amounts due under paragraph 3 of this Order; and,

(vi)      serve any other purpose as may be ordered by the Court from time-to-time after notice and hearing.

F.      The Good Faith Property may be withdrawn or applied only after notice and hearing.


SIGNED **July 23, 2013.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

**Appendix B**

**Tr. 294-324 [07-18-13]**

1                    IN THE UNITED STATES BANKRUPTCY COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                            HOUSTON DIVISION

4  IN RE:                      §      CASE NO. 13-33740-H1-11
                               §      HOUSTON, TEXAS
5  TMT USA SHIPMANAGEMENT, LLC,  §    THURSDAY,
                               §      JULY 18, 2013
6      DEBTOR.                 §      8:20 A.M. TO 5:30 P.M.

7

8                   CONTINUED GOOD/BAD FAITH FILING,
                         MOTION TO DISMISS,
                         MOTION TO CONTINUE
9

                   BEFORE THE HONORABLE MARVIN ISGUR
10                   UNITED STATES BANKRUPTCY JUDGE

11

12                          APPEARANCES:

13           FOR DEBTOR:          SEE NEXT PAGE

14           COURT RECORDER:      PAULA CRAWFORD

15           CASE MANAGER:        ANITA DOLEZEL

16           COURT CLERK:         MARIO RIOS

17

18

19

20                   TRANSCRIPTION SERVICE BY:

21              JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                     935 ELDRIDGE ROAD, #144
22                   SUGAR LAND, TEXAS 77478
              Tel: 281-277-5325 ▼ Fax: 281-277-0946
23                 www.judicialtranscribers.com

24

     Proceedings recorded by electronic sound recording;
25       transcript produced by transcription service.

1          MR. FLASCHEN:  Your Honor, I'd only ask if you

2    could speak a little more slowly when you get to the good

3    parts, for Mr. Su's benefit.  Thank you.

4          THE COURT:  Why don't you have Mr. Su come up here

5    with you?

6          MR. FLASCHEN:  Thank you, Your Honor.

7          THE COURT:  I want to begin by expressing my

8    thanks to the lawyers and to the litigants and to the

9    parties who have participated in this proceeding, and who

10   have done so representing the highest degrees of

11   professionalism.

12         But perhaps even more important than thanking you-

13   all is to thank our sister courts around the world who have,

14   in times of distress for a number of vessels, determine to

15   postpone or cancel or wait on certain decisions out of

16   deference to what actions this Court might do.  That is very

17   much appreciated.  And I want to make clear, as we make our

18   decision today, that it is not our duty, in fact it is our

19   duty not to supplant, or supplement or replace the important

20   roles that those courts play both with these businesses and

21   in the maritime industry generally.

22         The role of this Court should be limited to the

23   question of reorganization.  And with respect to the

24   legitimate affairs of those courts, the role of this Court

25   should be to find a way, if possible, to cause the repayment

1    of the very entities that have instigated the arrests in

2    those jurisdictions.  It is my hope that the proceedings

3    that have been conducted here today and those that will be

4    conducted in the future, are taken with the same spirit and

5    purpose of cooperation that those courts have shown to us.

6         I doubt seriously that in proceedings before this

7    Court any issue will arise or that we will reach any

8    decisions regarding claims that have been presented in those

9    courts and allowed by those courts, we're not going to be

10   revisiting things that our sister courts might have done.

11        We earlier reached a decision that we had subject

12   matter jurisdiction over these cases.  As I've indicated in

13   this proceeding I am not revisiting that as part of this

14   decision.  The Congress of the United States has determined

15   that the courts of the United States, the Bankruptcy Courts,

16   will be open to any entity with assets in the United States.

17   These ships, these corporations, these businesses, are

18   maritime businesses and they are closely linked to one

19   another.  The principal assets that we are dealing with in

20   these cases are ships, and they are generally not located

21   within the territory of any nation.

22        That, of course, is not true of the arrested

23   ships.  The arrested ships are in jurisdictions whose

24   interest is in assuring payment to those parties that have

25   legitimate interest in those ships and really is not one of

1   reorganization.

2          It is up to the Congress to determine whether the

3   Courts of the United States will be as open as I believe

4   they have written in the statute.  It is not up to me to

5   determine the wisdom of that.

6          The issue before us today is whether in invoking

7   that jurisdiction it has been invoked in good faith on both

8   a subjective and an objective basis.  The results of this

9   hearing are, frankly, a surprise to me.  I began the hearing

10  believing that the Debtors would fail.  I conclude the

11  hearing by finding that these cases are filed in both

12  subjective and in objective good faith.  This will not,

13  however, be a ruling without a big burden on the Debtors.

14  The Debtors have each consented to our personal jurisdiction

15  over them and over their assets, and I intend to enforce

16  that strictly.

17         I'll make a side comment.  I am quite impressed

18  with Mr. Su and the *A Whale's* involvement in the Macondo

19  spill, and that makes me impressed with him, and it even

20  underscores the interrelated and international scope of

21  these businesses.  I am impressed that Mr. Su is not a

22  stranger to Houston, who regularly conducts businesses here,

23  and that he has, unlike me, visited all 50 states of the

24  United States.

25         But those factors, although interesting, and

1  heartwarming even, establish neither subjective nor

2  objective good faith in these commercial cases.  And so I

3  mention them more to say that I didn't count them.

4          We've already ruled primarily and now I'll rule

5  finally, that both the TMT USA case and the F Elephant case

6  are dismissed.

7          I will now evaluate whether the cases were filed

8  in subjective good faith and then evaluate whether they were

9  filed in objective good faith.

10          First, I must say that I have a great deal of

11  confidence in the bona fides of Mr. Su's testimony.  I saw

12  him testify, I don't know for how many hours, maybe somebody

13  else counted, but for ten hours or so, through very

14  courteous examination by counsel but very probing

15  examination by counsel.  He gave some answers that were

16  incorrect, but I never saw him give an answer that was

17  intentionally correct.  It was my belief that in giving his

18  testimony he was consistently attempting to tell the truth.

19          There may have been times and there were times of

20  confusion.  Some of those are a greater concern then others,

21  but nevertheless I'm absolutely convinced that he did his

22  best to be a truthful and honest witness.  Had he not the

23  case would have ended.

24          As the banks counsel have each agreed, there has

25  been a huge investment by the Su family in these businesses.

1    This is not a case where the burden was quickly shifted over

2    to creditors or where there wasn't an enormous financial and

3    personal commitment made to making these businesses

4    successful.  Tens and perhaps hundreds of millions of

5    dollars of family money was poured into these businesses as

6    they failed to try to make them successful.

7              We began the case out of concern that there had

8    been a diversion of funds from Debtor entities into non-

9    Debtor entities -- or began the hearing.  I agree with

10   Mr. Swick, that those issues continue to need to be

11   investigated and continue to need further inquiry.

12             But after a pretty thorough investigation to date

13   there's simply no evidence of that.  The evidence is to the

14   opposite, that there has been a diversion of a huge amount

15   of funds into the Debtor entities rather than away from

16   them.  I will note that the Debtors have opened their books

17   and their records and their documents with a huge amount of

18   data.  Also note the lenders have had to swallow those like

19   a fire hose.  And so the fact the Debtor may have produced

20   them all doesn't necessarily mean they've all been evaluated

21   and they may subject to many future hearings, but this is a

22   question whether the Debtor is acting in good faith and with

23   lots of documents and lots of requests I can't blame the

24   Debtor for, if you will, overwhelming with documents.  And,

25   frankly, I've heard no complaints from either side as to

1  whether the banks and Mr. Su and his companies were trying

2  to be open with one another.

3          There are allegations that these cases were not

4  commenced in good faith because of the way that the MOE

5  process was handled.  I reject those conclusions based on

6  the testimony that I have heard.  The Debtors did attempt to

7  participate in the MOE process, and that process did not

8  produce a result that was satisfactory either to the banks

9  or to the Debtors.

10          It's a process in which in the meetings the

11  undisputed testimony is that the banks said, no

12  restructuring unless you bring our loans current.  I have no

13  problem that the bank said that.  But when they say it they

14  need to expect that the other side takes them at their word.

15  And if there's no capability of doing that and if that's the

16  standard that's demanded by the banks, a perfectly fair

17  standard, that makes that process fail.

18          So I don't think the MOE process failed in any

19  sense of not acting in good faith.  It may have failed

20  because, you know, maybe -- I don't know how to say this,

21  but maybe Mr. Su shouldn't have believed them, you know,

22  that that was really the absolutely requirement, and maybe

23  the banks would have acted for less than full payment.  But

24  having demanded full payment and the companies not having

25  full payment to bring them current, I just don't see

1 anything other than good faith in the process.

2       The problems are difficult.  There is a subjective

3 good faith problem that is significant to me and that I'm

4 going to deal with.  And that is that we had issued the cash

5 collateral order and I find the cash collateral order was

6 violated.  The cash collateral order was violated when there

7 was approximately $750,000 that was used to pay crew wages,

8 which resulted, maybe, in the diversion of revenues.  I will

9 note the revenues haven't yet been diverted.  But the one

10 contract that has come into evidence, and I'm told that the

11 other contracts are similar, explicitly does give the

12 chartering party the right to deduct out of future revenues

13 amounts that it is required to pay in crew wages.

14       I find that the chartering party was requested by

15 Mr. Su and his company, those working for him, to pay the

16 crew wages.  They're new to the process.  I don't think it

17 was done in bad faith, but I also don't think it was done in

18 compliance with our order.  In a few minutes we're going to

19 get to what's going to happen about that.

20       But the short answer is, that if in the

21 performance of those contracts the party that owes funds to

22 the Debtor entities does deduct money on account of their

23 payment of crew wages, then a non-Debtor entity, whoever

24 that is, will have 30 days to restore those revenues.

25       Basically I'm enforcing the order.  Funds were

1  diverted to pay wages.  That may have been a legitimate

2  thing to do from a business point of view, but everybody's

3  going to understand that the orders are going to be

4  enforced.  If the Debtors can persuade the chartering

5  companies not to make the deduction, this may be a no-harm-

6  no-foul situation.  But if there's a deduction the money's

7  coming back in.

8         In a few minutes we're going to talk about the

9  airplane and the stock, and it can come from those things,

10  but it's going to come in.  It's going to come in in cash

11  and there's going to be 30 days to get it fixed.  And if

12  it's not fixed those cases in which the Court's order was

13  violated will be dismissed for violation of the Court's

14  order.

15         There's been an allegation that the AlixPartners

16  retainer was handled in a manner that was not in good faith.

17  The AlixPartners retainer may be problematic if I miscalled

18  the subject matter jurisdiction question, a question that

19  I'm not revisiting today.  But nothing about the

20  AlixPartners retainer, that I have seen in the evidentiary

21  record, was done in bad faith.  I just reject that.  They

22  got paid a retainer.  That all looked pretty normal to me.

23  We went through about six versions of the AlixPartners

24  documents.  I saw nothing extraordinary or unusual or

25  creative or -- I don't mean that pejoratively -- but I

1  didn't see that facts were being recreated.

2          If you'll notice, the last one of those

3  agreements, prior to the filing of the case, indicated that

4  the retainer would be used for all of the Debtors.

5          The 345 issue by the United States Trustee, you

6  know, we don't get 345 motions in every case, but it's not

7  that the Debtor is saying we're not going to comply with

8  this if the Court orders us to.  The Debtor has asked for

9  relief under section 345.  Section 345 provides that the

10 Court for cause can grant relief.  I don't know whether

11 we're going to grant relief or not, but it's simply not

12 indicative of somebody not acting in good faith to have to

13 show cause under section 345.  It simply doesn't affect our

14 determination.

15         With respect to the *Little Creek* factors.  First,

16 I find that the *Little* Creek case is by analogy applicable

17 to this case, and I reject the Debtor's position that it is

18 inapplicable.  But having applied it to this case, I find

19 that this case was not filed in good faith under the *Little*

20 *Creek* factors.

21         MR. FLASCHEN:  Your Honor, was not filed in bad

22 faith?

23         THE COURT:  Was not filed in bad faith -- excuse

24 me -- under the *Little Creek* factors.  In particular, I note

25 that *Little Creek* dealt with real property that deals with

1   the ship's mortgage.  In this case the principal

2   amortization on these notes is very short.  It's a seven

3   year principal amortization.  The useful life of the vessels

4   is approximately 25 years.  So unlike *Little Creek*, where

5   you had a long principal amortization, here we have a very

6   short one.  And I think when you apply one of the most

7   important factors in *Little Creek* which is, what's the cash

8   flow, I find that on a normalized basis -- if we can get to

9   normalcy and we'll deal with that in a few minutes -- that

10  these ships will have a substantial amount of positive cash

11  flow.  And that substantial positive cash flow runs counter

12  to a negative *Little Creek* finding.

13          Moreover, the principal underlying *Little Creek*

14  is, we don't let you come in here with empty pockets.  You

15  come in and you have a piece of real estate that's

16  underwater and you offer nothing to try and shore things up

17  except we're going to impair the lender.

18          In this case the Debtors jointly, acting through

19  their principal, have offered, and in a few minutes we'll

20  hear, that they will bring substantial collateral in to

21  these cases.  That substantial collateral that's being

22  brought in -- and I'm using the word "collateral" a bit

23  colloquially -- will shore up those cases in some manner.

24  And again, remove the case from *Little Creek* because of the

25  bringing in of other assets to shore up this situation.

1          Is the case filed an object of good faith?  We
2   begin by saying what I think that standard is.  And I
3   appreciated all the bank's counsel recognizing that I think
4   the hearing margin moved to an objective good faith case
5   from a subjective good faith case.  I agree with you-all.  I
6   think this is by far the harder call.  The subjective part
7   was, for me, relatively straight forward that these things
8   were done in good faith.

9          The standard for whether it's filed in good faith
10  at this early stage isn't, have the Debtors shown more
11  likely than not that they will achieve confirmation.  I
12  think the Debtor's brief properly points out that we don't
13  hold Debtors to that standard in the first 30 days of the
14  case.

15         The standard is, however, somewhere more than
16  futility, and probably more like is there a reasonable
17  possibility that the Debtors can reorganize.  So I think
18  it's higher than futility, it's lower than a more likely
19  standard.  It's a totality of the circumstances measure.
20  Was the case filed with a meaningful hope of reorganization,
21  is the way that I will put it.

22         Although I didn't admit Mr. Swick as an expert in
23  maritime transportation industry, I think his testimony is
24  quite persuasive on the difficulties that these Debtors will
25  face and make this a tough decision.  So I am not, by

1 finding that there is objective good faith, in any way

2 finding -- pardon the pun -- that there will be smooth

3 sailing from this point forward.  I don't think there will

4 be.  I think these cases will be difficult.

5          I place a great deal of reliance on the Alix

6 presentations.  I found Alix's presentation of its

7 projections, both of its demonstrative testimony and

8 projections with respect to restart costs, and its

9 normalized projections that came into evidence in Exhibit

10 20, to be thoughtful, helpful, and perhaps even unique in

11 coming up with a way to minimize cash requirements by these

12 various Debtors.

13          I largely accept those two facets of the Alix

14 projections.  They have severe limitations because they

15 omit, as I think Mr. Swick pointed out and as Alix readily

16 admits, the gap period to get from here to there.  I'm going

17 to go into those in more detail in a moment and get into

18 some of the specifics of the numbers.

19          I do reject the LNG concept as having any

20 meaningful hope of being the base of a plan in this case.

21 That may be a meaningful hope for after bankruptcy is over,

22 but it's not a meaningful hope in the case.  It will take

23 too long and be too expensive to expect it to occur in these

24 bankruptcy cases.

25          The segmentation into the three business lines and

1  the use of term charters dramatically reduces the Debtors

2  operating cash requirements.  That was the strategy behind

3  that presentation and if implemented in a plan, appears to

4  me to be a workable approach to reduce those.

5       It obviously is not what is occurring on the

6  RoRos.  The RoRos will need a very large amount of cash to

7  get going, and its cash is somewhat more problematic than

8  the cash for the other entities.  According to the

9  projections that are prepared by Alix on a normalized basis,

10  however, every ship will have positive EBITDA.

11       The restart costs have to be compared to available

12  cash and likely cash to come in.  With respect to the Whale

13  vessels.  Every Whale vessel has cash that dramatically

14  exceeds the amount of the restart costs even with

15  contingencies.  Adequate protection will need to be shown,

16  and that may be a big hurdle, but there is a source of cash

17  that gives a meaningful opportunity to the Whale entities

18  and to the *Fortune Elephant* entity to try and reorganize.

19       I find that for the purpose of this hearing the

20  restart costs of the *A Whale*, the *B Whale*, the *C Whale,* the

21  *D Whale,* the *E Whale*, the *G Whale*, the *H Whale*, and the

22  *Fortune Elephant*, are as set forth in the testimony that is

23  represented by Demonstrative Exhibit 1, that the cash

24  collateral was testified to, and that the excess of cash

25  collateral over the restart costs in the *A Whale* case I

1    estimate to be $4.1 million.  I estimate the excess cash

2    collateral in the *B* Whale case over the restart cost to be

3    $5.2 million.  I estimate the excess cash collateral in the

4    *C Whale* case to be $1.6 million.  I estimate the excess cash

5    collateral in the *D* Whale case to be $5.6 million.  I

6    estimate the excess cash collateral in the *E Whale* case to

7    be $1.2 million.  I estimate the excess cash collateral in

8    the *G* Whale case to be $5.4 million.  I estimate the excess

9    cash collateral in the *H Whale* case to be $5.4 million.  And

10   I estimate the excess cash collateral in the *Fortune*

11   *Elephant* case to be $1.8 million.

12            With respect to the second segmentation, and that

13   is the bulk group, the results are not as consistent.  I

14   continue, however, to accept the Alix estimate of the

15   restart costs along with contingencies.

16            I find the *A Handy* has $900,000 more in cash

17   collateral than it does in estimated restart costs.  With

18   respect to the *B Handy*, I find that it has $700,000 more in

19   cash collateral than it does in restart costs.  I find the

20   *C Handy* has $1.2 million more in restart costs -- excuse me

21   -- in cash collateral than it does in restart costs.  I find

22   the *A* Duckling has inadequate cash collateral to meet its

23   restart costs.  It is short by over $100,000 in having

24   adequate cash to restart.  And I find the *B-Max* has $1.9

25   million in cash collateral in excess of the restart costs.

1        With respect to the *A Ladybug*, the *C Ladybug*, and

2   the *D Ladybug*, I again accept the Alix projections along

3   with contingencies as to the restart costs.  That leaves the

4   *A* Ladybug approximately $1.8 million short of cash to do its

5   restart.  It leaves the *C* Ladybug approximately $2.4 million

6   short of cash to do its restart costs, and it leaves the *D*

7   *Ladybug* approximately $1.8 million short of cash collateral

8   to do its restart costs.

9        The question then on the Ladybug cases, and we'll

10  deal with *A Duckling* in a minute, is whether the *A Ladybug*

11  cases have a meaningful hope of restarting if they don't

12  have the cash collateral.  I find for the purposes of this

13  hearing only that the Debtors have a meaningful chance of

14  pledging the future revenues of the *A Ladybug*, the

15  *C Ladybug*, and the *D Ladybug*, without any need of priming

16  the lenders because it does not appear to me that those

17  revenues will be free of the provisions of section 552 of

18  the Bankruptcy Code.  These are operating businesses, these

19  aren't rental incomes.  Operating revenues that form

20  accounts receivable are in post petition, generally are not

21  going to be subject to a prepetition security interest.

22        However, I may be wrong about that and I recognize

23  that.  That would mean that the Debtors might need to prime

24  the lender on the *A Ladybug*, the *C Ladybug*, and the *D*

25  *Ladybug*.  I find that because of the large amount of

1  revenues that are forecast out of those three, that

2  approximately six months or slightly more than six months of

3  revenue would be sufficient to pay the restart costs, and

4  that it is reasonable to conceive of priming to the extent

5  of future revenue.  You will notice that none of my findings

6  that I'm making find that it is likely that the Debtors will

7  be able to prime the lenders as to their ships.  I continue

8  to believe it is unlikely that the Debtors will prevail on

9  priming the lenders as to their ships.  Obviously I'm not

10 ruling that out as a possibility, but it forms no basis of

11 my findings because I think the possibility is relatively

12 minimal.

13        That still leaves a cash shortage.  It leaves a

14 cash shortage because we still haven't gotten from here to

15 there.  The Whales may have some excess money, some of the

16 Handys may have some excess money, but more money is

17 certainly going to be needed.  Certainly with respect to the

18 *A Duckling*, more money is needed.

19        I find that the Debtors have arranged to bring in

20 an outside value to help bridge those gaps.  The outside

21 value may take the form of restricted stock or unrestricted

22 stock or airplanes or cash or something else.  But I find

23 that by bringing in that additional value the Debtors will

24 create a pool of assets against which borrowings might

25 reasonably be expected to be approved by the Bankruptcy

1  Court on motion.

2         With respect to that, and this is the final part

3  of the ruling, we need to be satisfied that the assets are

4  brought to this case in the form of stock or airplanes or

5  cash or something else of substantial value will provide

6  substantial value.  Mr. Swick is right, this thing is

7  undercapitalized right now, and the only way to have enough

8  capital is going to be to bring some in.  It doesn't

9  necessarily need to be brought in in cash if its collateral

10 can be borrowed against the cash.

11        I will give the Debtor 30 days to bring in an

12 amount that I determine has an estimate value, not an

13 estimated borrowing value but an estimated fair value, of

14 $40,750,000.  It used to say 40 million.  750 is because of

15 the diversion of funds.

16        I recognize that the impairment of the $25 million

17 -- excuse me, the 25 million shares of stock may reduce its

18 value.  So the way that I believe this best gets implemented

19 is that I'm giving the Debtors 30 days to bring in

20 $40,750,000 in value.  If the Debtors bring in their 25

21 million shares of stock and if the Court determines that the

22 25 million shares of stock do not have $40,750,000 of value,

23 I will give the Debtors another 30 days to supplement it

24 with the difference.

25        By way of example, if we determine -- and this is

1  now a totally hypothetical number -- that that stock is

2  worth $35 million, if the airplane is worth $5,750,000

3  you'll have 30 days to bring that into the United States.  I

4  want the assets here.  I want to be able to get them.  The

5  assets that are brought in, and I am going to give the

6  Debtors, again, 30 days, not because the stock isn't in your

7  account, because I want this to be designed correct.  Have

8  to be value that is realizable by the estate and by the

9  Court, either to enforce the law, to enforce misbehavior, or

10  to provide working capital.  It has to be available for all

11  three.

12          In doing so the constructive trust question needs

13  to be addressed to determine whether the estates will take

14  shares subject to a constructive trust.  And if we find that

15  they do it's going to end up reducing the value.  I'm not

16  saying that that can't be there, but we're going to have to

17  have that hearing, because if there isn't enough money there

18  isn't enough money.  And I will then be left without any

19  choice as to what to do in the cases, but there will be an

20  opportunity.

21          I will be happy to make additional findings of

22  fact and conclusions of law if any party believes that

23  additional ones are needed and they can become part of the

24  Appellate Record.  Will -- I don't even know that we need to

25  issue an order -- I guess we do need to issue an order

1  denying the motions to dismiss and we will do that, but it

2  will simply incorporate these oral findings and conclusions.

3  And because of what I assume is the urgency of proceeding,

4  I'll get that order issued this afternoon without written

5  findings and conclusions, and I'll incorporate the oral

6  findings and conclusions.  I may be able to get them

7  committed to writing before an Appellate Court reviews what

8  I've done and I will endeavor to do that if it looks

9  appropriate or if any party requests it or if my findings

10 are incomplete.

11        I'll also allow the parties up to 10 more days --

12 up to 14 more days, rather, to, in writing, request

13 additional findings of fact and conclusions of law, if you-

14 all want to defer that request so that you can think about

15 whether or not I've made some mistakes and you need some

16 additional findings, or you can make them now.  So whatever

17 parties want to do.  I'll start with the Debtor.

18        Do you need any additional findings or

19 conclusions?

20        MR. SU:  No, Your Honor.

21        THE COURT:  Any of the banks today wish to request

22 additional findings or conclusions without prejudice to your

23 right to request those within 14 days?

24        MR. COLUMBUS:  Your Honor, I have just one

25 clarification on one point that know if very important to my

1   client.  Your Honor has represented from your ruling that

2   the retention accounts are cash collateral.  Our lender is

3   still --

4         THE COURT:  I think that's a fair request.

5         MR. COLUMBUS:  -- still taking the position that

6   it's under an assignment under the Republics of China law,

7   that they may actually have a property --

8         THE COURT:  I think that is more than fair.  The

9   findings I'm making today on issues of that nature, that

10  that is cash collateral, for example, are preliminary

11  findings.  They aren't binding because I'm not requiring the

12  cash collateral, for example, to be released.

13        I think under traditional United States case law,

14  you know, *Whiting* Pools most prominently, all of that is

15  cash collateral.  I recognize that parties may need to

16  challenge that when we actually get into the cash collateral

17  motion, and these findings that I'm making today that would

18  characterize property one way or the other, need to be taken

19  in light of the fact that what I'm trying to do is to

20  forecast ultimate findings, and those are not ultimate

21  findings.  So they will not bind when we get to the final

22  hearing on whether to use cash collateral, rather, they are

23  my prediction of what that outcome will be.  And I apologize

24  that I didn't make that clear earlier, but actually had

25  meant to.

1          MR. COLUMBUS:  Thank you, Your Honor.  I'll just

2     note it is a high priority issue for my clients, so I zeroed

3     in on that.

4          THE COURT:  And it should be, and I understand

5     that, and I don't mean to foreclose their ability to fully

6     contest that at a future hearing and it's not foreclosed.

7          MR. COLUMBUS:  Thank you, Your Honor.

8          THE COURT:  Thank you.  Mr. Kelley.

9          MR. KELLEY:  Your Honor, this isn't going to

10    relate to findings as to this but, I'm not trying to create

11    any sort of procedural benefit here.  But at this point in

12    time the Court has not entered a signed order on the first

13    day of hearing on subject matter jurisdiction.

14          Does the Court intend to have this conclude that

15    hearing when it enters this order or is the Court going to

16    enter a written order at all?

17          THE COURT:  I issued a written order that

18    authorized the use of cash collateral.  In doing so I made a

19    finding that I had subject matter jurisdiction.  I could not

20    have issued the order authorizing the use of cash collateral

21    without making, as a predicate finding, not an order but

22    it's a law finding, that we had subject matter jurisdiction.

23    And that's why I require the parties that we had to address

24    that issue on that day because it was a predicate for the

25    ruling.  So I'm not going to issue another order on that.

1          The order authorizing use of cash collateral had a

2    finding that we had subject matter jurisdiction.  If parties

3    need that to be reconsidered then, again, we'll deal with

4    whether that's appropriate or not.  But I'm not going to

5    issue another order on that.

6          I did not give the Committee an opportunity to

7    request additional findings, nor did I give the United

8    States Trustee, and let me see if either of you-all need

9    additional finding --

10          MR. WOLFE:  Your Honor, the Committee has no

11   additional requests for findings.  Thank you.

12          THE COURT:  Ms. March?

13          MS. MARCH:  Your Honor, I would just ask

14   clarification.  With regard to 345, I'm assuming that the

15   Court's rulings today have no effect base on the Debtor's

16   motion.

17          THE COURT:  Absolutely.  Absolutely not.  My only

18   finding is, it's okay to ask.  I didn't find relief will be

19   granted to them, but it's okay for them to ask.

20          MR. MELKO:  Your Honor --

21          THE COURT:  Mr. Melko.

22          MR. MELKO:  -- I've got a question about the form

23   of collateral and what it's available for.  And specifically

24   I heard the reservation of rights under the Republic of

25   China laws that all -- I think all these banks are ROC.

1          THE COURT:  Absolutely.

2          MR. MELKO:  But the question is, if there is a

3    finding that the petition accounts are cash collateral and

4    then the Court authorizes these cash collateral, and then

5    there's a diminution of collateral, is this new form of

6    collateral available for diminution banks?

7          THE COURT:  I'm requiring that by bringing the

8    collateral in they make it available should we order that

9    you're entitled to that protection in a cash collateral

10   order.

11         MR. MELKO:  Thank you.

12         THE COURT:  So if, for example, we order that $3

13   million of your client's cash can be utilized, at that point

14   those assets need to be here so that if it is appropriate,

15   that as a condition of authorizing cash collateral, you

16   would have a right to look to that as adequate protection.

17   It's available for us to order it.

18             I'm not obviously ordering it today because I'm

19   not ordering the use of cash collateral today.  But I think

20   it needs to be there for purposes like this.

21         MR. MELKO:  I understand.  I guess what I was

22   thinking ahead was, if there is -- if the Debtor comes in

23   and with this new pool of collateral, provided they could

24   put it together, then attempts to come in.  Because I

25   noticed, but I heard Your Honor say that this pool of

1  collateral, I'll use that term loosely, is available for

2  borrowing.  So if the Debtor comes in with some new lender

3  that's going to lend against only that pool of collateral,

4  and there's been a use of cash collateral in diminution,

5  we're going to run into a marshaling issue.

6  THE COURT:  And so I think that's why I want to

7  put that off until we deal with those orders.  But the funds

8  they're bringing in have to be available for use in the

9  cases.  As to what that use is, it will be like any other --

10  we'll call it estate property, if you will, although it may

11  not be estate property.  It has to be available the same as

12  estate property would be available to use.

13  Now, obviously if we ordered -- authorized cash

14  collateral and then we subsequently authorized a DIP loan,

15  we'd have exactly those same problems, and we'll confront

16  them at that point.  But I'm not going to give you an

17  interest in that as a cash collateral provider and then take

18  that away and give it to a DIP provider.

19  MR. MELKO:  That was concerning.

20  THE COURT:  Now, as to whether I give it to you as

21  a cash collateral, we'll see.  But I will do my best.  Talk

22  to Mr. Kelley about not giving and then taking away.  He's

23  about to see me in a minute on that, so.

24  MR. MELKO:  Right.  Well, Your Honor -- yeah, I

25  know, and we're in that case as well.  We've very concerned

1  with administratively insolvency.  So it's --

2          THE COURT:  Yeah, I know.  And as I said in the

3  hearing that we interrupted this hearing for and that we're

4  now interrupting that hearing, the integrity of the orders

5  that we issue and the word that we give to people is more

6  important to me than whether one case succeeds or fails, no

7  matter how important that case is.  Because if I don't keep

8  my word it ain't worth much next time.  So I'm not going to

9  give it to you and then take it away.  I'm not promising I'm

10  going to give it to you.

11          MR. MELKO:  But I just wasn't clear on what it

12  would be available for --

13          THE COURT:  It's available for --

14          MR. MELKO:  -- and I think Your Honor's clarified

15  that.

16          THE COURT:  It's available for everything, and

17  they need to make that clear when they bring it in.  As to

18  the form of that and what that looks like, you know, I think

19  it's a little unreasonable for me to say it's going to take

20  the form of, you know, some particular type of instrument.

21  You know, is it a bond, is it a note.  I don't know.

22          I do want to be sure that the pledging entities,

23  the providing entities, take back something that would be

24  junior, you know, probably -- what I've thought about

25  overnight and, you know, we'll deal with it when they make a

1  proposal is, to give them a revolver note back so that if

2  its ever drawn they'll have a revolver note and that

3  revolver note would be subordinate to everything in the case

4  except for equity, so that, you know, they've got good

5  consideration coming back that's senior to equity.

6  Something of that nature, but I'll let you work through the

7  details of that.  But it needs to be real when it comes.

8         Mr. Flaschen.

9         MR. FLASCHEN:  Your Honor, having consumed so much

10  of your wonderful time for three days, only two points, not

11  findings and conclusions, that's why I waited.

12         As Your Honor gets to know Mr. Su better you'll

13  appreciate when he sits in that stand and says those shares

14  are committed, he meant they are committed.  He did not mean

15  we need to sign an agreement, he did not mean he needed to

16  know the details.  Those shares as of then, let alone today,

17  are remaining with this case, whatever it should be, until

18  this Court orders otherwise.  They are available for

19  whatever purpose the Court orders otherwise as security for

20  DIP, cash collateral, this Court's bond, whatever it may be.

21  He is a man of his word, he has made his commitment.

22         The second point is a request.  We are pleased

23  with the, at least medium and hopefully long-term

24  implications, of retaining these cases and having an

25  opportunity.  Since I'm not asking relief forgive me if I

1   state facts.

2          The email of course from the Captain of the *A*

3   *Ladybug* was not hypothetical.  That lender does not have

4   cash collateral in the *A Ladybug* account.  If Your Honor

5   considers it appropriate to do so, if Your Honor could make

6   a request on the Record for that lender to consider out of

7   the cash collateral available on the other two Ladybugs to

8   provide some assistance on the *A Ladybug* we'd appreciate it.

9   We're not asking you to order it, we're not asking them to

10  comply with the request, we think the request might be

11  helpful.

12          THE COURT:  I'm not going to make that request but

13  I'll let you make that request and I'll let you schedule it

14  for hearing when you want.  I would like to solve the *A*

15  *Ladybug* problem, but I don't think it's appropriate for me

16  without a written motion to make a request of that nature.

17  So we'll deal with that when we get to it.

18          MR. FLASCHEN:  May I then seek clarification if

19  it's a written motion and we need evidence when the email

20  was, there's no food, they are starving today, how we prove

21  that?

22          THE COURT:  Well --

23          MR. FLASCHEN:  We can never get relief from you

24  that would order compliance with that kind of real need --

25          THE COURT:  I think the first thing you got to do

1  is find some cash.

2         MR. FLASCHEN:  I'm sorry, Your Honor?

3         THE COURT:  You got to find some cash.

4         MR. FLASCHEN:  Thank you, Your Honor.

5         THE COURT:  I've previously found that reasonable

6  business people might rely on emails like that without

7  regard to their truth.  It's what we found in an earlier

8  hearing, is that business people could rely on -- how would

9  a reasonable business person act when it gets an email from

10 the Master of the ship?

11        MR. FLASCHEN:  I understand, Your Honor.

12        THE COURT:  Probably by sending money, and that's

13 without regard to whether there really are people starving

14 on the ship.  Right?  So I don't know that that's important.

15 What I'm worried about is whether there's money.  And the

16 money may need to come from the stock.  I don't know.  There

17 may not be any way to get that money fast enough.

18        MR. FLASCHEN:  The stock cannot be sold that

19 quickly.

20        THE COURT:  I know.  So, you got to find the money

21 first.

22        MR. FLASCHEN:  All right, Your Honor.  Thank you.

23        THE COURT:  Thank you.  Mr. Hyman.

24        MR. HYMAN:  Your Honor, Mr. Hyman on behalf of

25 Mega Bank International.  The *A Ladybug* is one of the Mega's

1  Banks -- one of Mega's vessels.  I remind the Debtors -- I

2  think the Court is aware, these are all separate loan

3  facilities.  We can't just take from one credit facility,

4  use that cash collateral and apply it to another.  Some of

5  them are syndicated loans.  It's not quite that simple.

6            THE COURT:  I understand it may not be simple.  On

7  the other hand, your client has a huge piece of collateral

8  out there and it probably doesn't need a crew in revolt.  So

9  it's probably smart to find a solution to the problem.  And

10  if your client can assist in finding a solution to the

11  problem I'll make myself available quickly to assure that

12  the advances that you client might wish voluntarily to make,

13  are properly protected with a Court order, and I'll give you

14  a hearing on very short notice on it.

15            MR. HYMAN:  They understand, Your Honor.  I think

16  there's also -- there might be some confusion between the A

17  Ladybug and --

18            MR. KELLEY:  Oh, I just couldn't hear.

19            THE COURT:  I just said, if you-all -- if your

20  client sees clear, for example, to choose to make an advance

21  to protect its collateral because of fear of a crew revolt,

22  you should expect a very quick hearing from me to get an

23  order entered so that you don't need to worry about whether

24  you're doing so with a proper advance.

25            I don't even know if you need an order because you

1  probably have the right to make that advance under your

2  documents.  But I'll give you a protective order quickly for

3  that kind of a situation.  Contact Ms. Dolezel and she'll

4  give you an emergency hearing right away.

5         MR. HYMAN:  Thank you, Your Honor.  I can assume

6  you Mega Bank is taking all requests that they're getting

7  from the Debtor very seriously.  I think you've heard

8  they've been operating in good faith throughout the

9  process --

10         THE COURT:  I've only heard good --

11         MY HYMAN:  -- and will continue to do so.

12         THE COURT:  I've only heard very good things about

13  Mega Bank and how it and each bank, not just Mega Bank, have

14  been responding to the case, and I certainly appreciate the

15  way the banks have been handling the matters today.

16         MR. FLASCHEN:  And finally, Your Honor, in a case

17  full of unusual requests from me I have perhaps the most

18  unusual.  Can Mr. Su say a few words to Your Honor?  It is

19  important to him.

20         THE COURT:  Mr. Su, I don't want that to happen.

21  I want you to --

22         MR. FLASCHEN:  On behalf of Mr. Su, may I convey

23  his sincere thank you.

24         THE COURT:  He's welcome, but he earned it.

25         Thank you.

1        (Proceeding adjourned at 5:30 p.m.)

2                          * * * * *

3            I certify that the foregoing is a correct

4    transcript to the best of my ability from the electronic

5    sound recording of the proceedings in the above-entitled

6    matter.

7    /S/ MARY D. HENRY

8    AAERT CET**D-337

9    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

10   JTT INVOICE # 51359

11   DATE:  JULY 22, 2013

12

13

14

15

16

17

18

19

20

21

22

23

24

25