IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| TMT PROCUREMENT CORPORATION, *et al.*, | § | Case No. 13-33763 |
| | § | |
| DEBTORS. | § | (Jointly Administered) |
| | § | |
| | | Related to Dkt. Nos. 203 and 205 |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
OPPOSITION TO SECURED LENDERS' APPEAL AS OF RIGHT
AND MOTION IN THE ALTERNATIVE FOR LEAVE TO APPEAL**

The Official Committee of Unsecured Creditors (the "Committee") of TMT

Procurement Corporation, *et al.*, the above-captioned debtors (collectively, the "Debtors"), by

and through its proposed co-counsel, hereby submits its opposition ("Opposition") to that certain

*Statement of Secured Creditors in Support of Appeal as of Right and Motion in the Alternative*

*for Leave to Appeal*, filed by Mega International Commercial Bank Co. Ltd., Cathay United

Bank, Shanghai Commercial & Savings Bank, and First Commercial Bank Co. Ltd (collectively,

the "Secured Lenders") [Docket No. 205] (the "Motion").[1]  In support of this Opposition, the

Committee respectfully states as follows:

**Preliminary Statement[2]**

There are ample grounds to deny the Motion, which seeks to appeal the Court's

Good Faith Order denying the Secured Lenders' Motion to Dismiss these chapter 11 cases both

as of right under 11 U.S.C. § 158(a)(1), and with leave of court under 11 U.S.C. § 158(a)(3).

---

[1]     On August 12, 2013, the Secured Lenders filed a motion seeking certification of a direct appeal to the Fifth
Circuit [Dkt. No. 240].  The Committee will file a separate response to the certification motion.

The Good Faith Order, however, is not subject to appeal as of right under Fifth Circuit precedent providing that an order denying a motion to dismiss a bankruptcy case is not a final order. A final order generally ends a piece of litigation on the merits and leaves nothing for the court to do but execute a judgment. An order denying a motion to dismiss and otherwise establishing that a debtor is eligible merely allows, as here, the bankruptcy cases to proceed. As a non-final or interlocutory order, the Good Faith Order is not subject to appeal as of right under 11 U.S.C. § 158(a)(1).

The Court should deny the balance of the Motion for two reasons. First, one of the primary purposes of the Secured Lenders' appeal is to challenge the Court's factual findings as to subject matter jurisdiction and venue. But the Good Faith Order does not make any findings or conclusions as to jurisdiction or venue, which were determined much earlier in these cases. This fact alone warrants denial of the Motion as the Secured Lenders impermissibly seek to appeal issues beyond the scope of the Good Faith Order. The Secured Lenders are also untimely. The Bankruptcy Rules require a notice of appeal and/or a motion to seek leave of court to appeal to be filed within 14 days of the entry of the order to be appealed from. The Court found subject matter jurisdiction (and venue) at the "first day" hearing on June 24 as a necessary predicate to entering orders granting certain of the Debtors' requested emergency relief. In doing so the Court bifurcated the Secured Lenders' bad faith filing allegations from subject matter jurisdiction, with the bad faith issues to be tried at trial commencing on July 16. The Court proceeded to conduct an extensive evidentiary hearing and found subject matter jurisdiction (and venue) based on factual findings regarding the Debtors' ownership of property in the United States. The deadline to appeal the Court's emergency orders (entered between June

---

[2] Capitalized terms used but not defined in the "Preliminary Statement" shall have the meanings ascribed to them in the remainder of the Opposition.

24-26) expired nearly four weeks ago and therefore an appellate court is without jurisdiction to hear these issues on appeal.

Second, the Secured Lenders cannot satisfy any of the stringent criteria required to permit an interlocutory appeal of the Good Faith Order, much less demonstrate exceptional circumstances over the bedrock principle that appeals ordinarily should await final judgment rather than being heard piecemeal. The Secured Lenders cannot demonstrate that the Good Faith Order (1) involves a controlling question of law (2) over which there is substantial ground for difference of opinion, and that (3) an immediate appeal would materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b).

The Secured Lenders identify three alleged questions of law that present substantial grounds for difference of opinion. Closer examination reveals the Secured Lenders' allegations not to be true. The first is the "[r]elevance of non-debtor assets in assessing the debtor's "financial condition and motives."" (Motion, p. 8). The Secured Lenders contend there is no authority in the Fifth Circuit supporting the Court's consideration of new collateral in evaluating the Debtors' financial condition, and as a result there is a substantial ground for difference of opinion on this point. But interlocutory appeals cannot be grounded on questions of fact, and the Court made *factual* findings that the Debtors' possessed additional collateral to help shore up their businesses as part of the Court's good faith determination, which as explained by the Court goes to the core of applicable Fifth Circuit precedent in *Little Creek* (discussed in detail below). The dismissal of a chapter 11 case under *Little Creek* is governed by the totality of the circumstances and not confined to the non-exhaustive factors set forth therein. As a result, the Court's consideration of additional collateral and other factors to find that these Chapter 11 Cases were filed in good faith does not present a controlling question of law over which a substantial ground for difference of opinion exists. To hold otherwise is contrary to Fifth Circuit

precedent and would lead to absurd results by effectively relegating all asset inflows to an estate, such as 363 sales or new value plans, as potential grounds for dismissal.

The second question stems from the Court's alleged adoption of a "relaxed standard" unsupported by Fifth Circuit precedent to determine if a debtor has a "reasonable likelihood of rehabilitation." (Motion, p. 8). Again, the Court applied the totality of the circumstances standard to determine whether the Debtors filed their cases in good faith. And based on that totality the Court applied a "higher than futility" but lower than a "more likely than not" factual analysis to determine if the Debtors satisfied section 1112(b)(4)(A) of the Bankruptcy Code. The Secured Lenders do not, because they cannot, point to any contrary authority or Fifth Circuit precedent confining a court only to those factors specifically listed in *Little Creek*, especially where the Fifth Circuit cautioned that such factors were not exhaustive. The Secured Lenders' mere disagreement with the Court's determination does not create a controlling question of law or a substantial ground for difference of opinion.

The third and final question by the Secured Lenders is "[w]hether venue or jurisdiction can be established with *de minimis* assets." (Motion, p. 9). Even if not waived as described above, the Court's findings as to subject matter jurisdiction (and venue) were clearly questions of fact as opposed to pure questions of law eligible for interlocutory appeal. At the first day hearing the Court found that the Debtors possessed eligible property in the United States to establish subject matter jurisdiction, with specific reference to the Debtors' unused retainer with their financial advisor, AlixPartners. The Court made additional factual findings regarding the AlixPartners' retainer as part of its ruling on the Motion to Dismiss and found no evidence of bad faith after extensive evidentiary review.

In sum, the Secured Lenders are unable to identify pure questions of law that in turn create substantial grounds for difference of opinion. Because the section 1292(b) test is a

4

conjunctive test, the failure to satisfy the first two elements mandates denial of the Secured Lenders request for leave to appeal the interlocutory Good Faith Order. But the Secured Lenders are also unable to satisfy the third element. Granting the Motion would not materially advance the termination of litigation because reversal merely shifts proceedings concerning the Debtors' maritime assets from this Court to other venues around the world. Nor would granting the Motion place the Secured Lenders' collateral at less risk which, standing alone, is present in virtually every single chapter 11 case and does not present an exceptional circumstance. The Court has granted the Secured Lenders' adequate protection with respect to every cash collateral order entered to date. The Secured Lenders stand to receive additional adequate protection pursuant to the terms and conditions of the Good Faith Order, which requires the Debtors to post collateral with a value of at least $40,750,000 to backstop their obligations in these Chapter 11 Cases. Therefore, the Motion should be denied in order to permit these Chapter 11 Cases to go forward.

## Background

### A.   The Chapter 11 Cases and Appointment of the Committee

1.   On June 20, 2013 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On the Petition Date the Debtors consisted of 23 entities, including TMT USA Shipmanagement LLC (Case No. 13-33740) ("TMT USA") and F Elephant Corporation (Case No. 13-33749) ("F Elephant

Corporation").[3]  The above-captioned chapter 11 cases (the "Chapter 11 Cases") are jointly administered, with TMT USA as the initial lead case (until dismissed, as discussed below) for all docketing purposes.

2.      On July 9, 2013, the Office of the United States Trustee appointed the Committee consisting of: (i) China Shipping Car Carrier (Hong Kong) Co., Limited; (ii) Hyundai Samho Heavy Industries Co., Ltd.; (iii) KPI Bridge Oil Limited and KPI Bridge Oil Singapore Pte Ltd; (iv) Omega Bunker S.R.L.; (v) China Ocean Shipping Agency Shanghai d/b/a/ Penavico Shanghai; (vi) Songa Shipping Pte, Ltd.; and (vii) Universal Marine Service Co., Ltd.; plus non-voting alternate Scandinavian Bunkering.

**B.      The First Day Hearing and Subject Matter Jurisdiction**

3.      On June 24, 2013, the Court conducted a first day hearing on emergency relief requested by the Debtors including, but not limited to, emergency use of cash collateral [Dkt. Nos. 13, 19 and 22].  The Court authorized the use of cash collateral pursuant to two orders that were signed and docketed later the same day [Dkt. Nos. 33 and 34] ("June Cash Collateral Orders").[4]

4.      But prior to granting any relief the Court advised the Debtors and the Secured Lenders that subject matter jurisdiction was a threshold issue that had to be determined in advance.  (Tr. 62:5-11 [6-24-13]).   As a result, the Court proposed bifurcating the Secured

---

[3]     The Debtors on the Petition Date consisted of the following: (1) A Whale Corporation; (2) B Whale Corporation; (3) C Whale Corporation; (4) D Whale Corporation; (5) E Whale Corporation; (6) G Whale Corporation; (7) H Whale Corporation; (8) A Duckling Corporation; (9) F Elephant Corporation; (10) F Elephant Inc.; (11) A Ladybug Corporation; (12) C Ladybug Corporation; (13) D Ladybug Corporation; (14) A Handy Corporation; (15) B Handy Corporation; (16) C Handy Corporation; (17) B Max Corporation; (18) New Flagship Investment Co., Ltd; (19) RoRo Line Corporation; (20) Ugly Duckling Holding Corporation; (21) Great Elephant Corporation; (22) TMT Procurement Corporation; and (23) TMT USA Shipmanagement LLC.

[4]     The June Cash Collateral Orders were entered on June 26, 2013.

Lenders' bad faith filing allegations from subject matter jurisdiction, with the bad faith filing allegations to be tried at a later date. (Tr. 62:22-63:3; 63:23-64:4 [6-24-13]). Neither the Debtors or Secured Lenders objected to the bifurcation proposal when prompted to do so by the Court. (Tr. 65:13-65:17; 99:24-100:6 [6-24-13]). The Court conducted an extensive evidentiary hearing and found subject matter jurisdiction under 28 U.S.C. § 1334 (Tr. 297:6-8 [6-24-13]), and found that the Debtors satisfied the eligibility requirements set forth in section 109 of the Bankruptcy Code. (Tr. 234:14-18; 240:10-13 [6-24-13]). The Court set July 16 and 17 as the initial trial dates to hear the Secured Lenders' bad faith filing allegations. (Tr. 55:16-24 [6-24-13]).

   **C.**    **The Chapter 11 Cases Were Filed in Good Faith**

   5.    On July 3, 2013, the Secured Lenders and BHP Billiton Marketing A.G. ("BHP") filed an emergency joint motion to dismiss these Chapter 11 Cases [Dkt. No. 205] ("Motion to Dismiss"). On July 15, 2013, briefing in connection with the Motion to Dismiss was filed by the Secured Lenders, Debtors, Committee and BHP. The first in a three-trial commenced the next day on July 16, 2013.

   6.    On July 18, 2013, the Court granted the Motion to Dismiss as to TMT USA and F Elephant Corporation, in each instance finding that the cases were not filed in good faith. (Tr. 182:23-183:17 [7-18-13]). The Court held that the remaining cases were filed with both subjective and objective good faith. (Tr. 296:10-12 [7-18-13]). On July 23, 2013, the Court entered an order granting, in part, and denying, in part, the Motion to Dismiss [Dkt. No. 134] ("Good Faith Order"). With the dismissal of TMT USA, the Court entered an order jointly administering the remaining Chapter 11 Cases with TMT Procurement Corporation (Case No. 13-33763) as the lead case [Dkt. No. 126].

**D.**     **The Secured Lenders' Appeal**

7.     On August 6, 2013, the Secured Lenders filed their *Notice of Appeal* of the Good Faith Order [Dkt. No. 203] ("Notice of Appeal"), followed by the Motion on the same day. On August 7, 2013, the Secured Lenders' appeal was assigned to the United States District Judge Kenneth M. Hoyt [Dkt. No. 210].  The Motion sets forth the following "Questions Presented and Relief Sought": (i) whether the Court has subject matter jurisdiction; (ii) whether venue in the United States is proper; (iii) whether each of the Debtors satisfied section 109(a) of the Bankruptcy Code and, if not, whether there is any other basis for a finding of "debtor" status under section 109(a); (iv) whether the Court should have dismissed the Debtors' remaining cases under section 1112(b) of the Bankruptcy Code; (v) whether the Court erred in declining to dismiss the remaining Debtors based on improper venue pursuant to 28 U.S.C. § 1406(a); (vi) whether the Court erred in declining to dismiss on grounds of international comity; and (vii) whether the findings of fact underlying the Court's decision were clearly erroneous.

8.     The Notice of Appeal and Motion were both filed within 14 days of the Good Faith Order, and 42-44 days after entry of the Court's emergency orders on June 24-26.

## Argument

## I.     The Good Faith Order Is Not Subject To Appeal

### A.     Non-Final Orders Cannot Be Appealed As Of Right

9.     The Secured Lenders base their appeal as of right under provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") permitting direct appeals from a bankruptcy court's "final judgments, orders and decrees."  11 U.S.C. § 158(a)(1); Bankruptcy Rule 8001(b).  The Good Faith Order, however, is not a final order.

10.    In general, a decision is "final" if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945); *see also Cunningham v. Hamilton County*, 527 U.S. 198, 204 (1999) (same). "The requirement of finality precludes consideration of decisions that are subject to revision, and even of 'fully consummated decisions [that] are but steps towards final judgment in which they will merge.'" *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (alteration in original) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)). Although finality is somewhat more flexible in bankruptcy appeals, there remains a "strong federal policy against piecemeal appeals." *In re Fugazy Express, Inc.*, 982 F.2d 769, 775 (2d Cir. 1992).

11.    The Secured Lenders concede, as they must, that the Good Faith Order is not a final order under Fifth Circuit precedent. (Motion, p. 1). In *In re Phillips*, 844 F.2d 230 (5th Cir. 1988), the Fifth Circuit held that an order denying a motion to dismiss a petition under Chapter 7 of the Bankruptcy Code was non-final and thus interlocutory:

> Like an order that determines that the bankruptcy court has jurisdiction, an order determining that a debtor is eligible allows the bankruptcy proceedings to continue. It thus is a preliminary step in some phase of the bankruptcy proceeding, and does not directly affect the disposition of the estate's assets.

*In re Phillips*, 844 F.2d at 236; *see also, Smith v. AET Inc.*, Case Nos. C-07-123, 124 and 126, 2007 WL 1644060, at *4 (S.D. Tex. June 4, 2007) (holding that denial of a motion to dismiss Chapter 7 case was not a final order because it "merely allowed the Chapter 7 case to continue" and "did not resolve any concrete issue" in the proceeding).

12.    The Fifth Circuit and courts therein are not alone in holding that an order refusing to dismiss a bankruptcy case does not constitute a final judgment. *See In re Fox*, 241 B.R. 224, 229-230 (10th Cir. 1999) (holding that an order denying conversion or dismissal of a chapter 11 case was non-final because it "did not conclude the bankruptcy case; instead, it

9

permits the case as a whole to continue," nor did it "resolve a discrete dispute within the larger

bankruptcy case" such as "creditor priorities" or "issues regarding the Debtor's assets."); *In re*

*Jartran*, 886 F.2d 859, 864 (7th Cir. 1989) ("[D]enials of motions to dismiss are generally not

final orders, even in the bankruptcy context."); *In re 405 N. Bedford Dr. Corp.*, 778 F.2d 1374,

1379 (9th Cir. 1985) (holding that "denial of motion to dismiss for bad faith Chapter 11 filing is

not final"); *see also In re Comm. of Asbestos-related Litigants*, 749 F.2d 3, 5 (2d Cir. 1984)

(declining to issue mandamus to review denial of motion to dismiss, explaining in dicta that such

denial was insufficiently final for direct appeal).

13.     The only case cited by the Secured Lenders going against the

overwhelming weight of authority is *In re Brown*, 916 F.2d 120 (3d. Cir. 1990), where the Third

Circuit held that an order denying a motion to dismiss a Chapter 11 case is a final order for

purposes of section 158 of the Bankruptcy Code. (Motion, p. 1).   But even within the Third

Circuit there is support for the rule that denial of a motion to dismiss is interlocutory. *In re*

*American Capital Equip., LLC*, 296 Fed. Appx. 270 (3d Cir. 2008) (Jordan, J. concurring)

("[M]ost of the court of appeals to consider the issue have concluded that the denial of a motion

to dismiss a bankruptcy case is not final.").   The Circuit Judge added that there was "no sound

basis for exercising jurisdiction" in a case where the bankruptcy denies a motion to dismiss for

bad faith.  *In re American Capital*, 296 Fed. Appx. at *4.

14.     The Circuit Judge's rationale in *American Capital* for the non-final label

comports with the Fifth Circuit's binding precedent.  In sharp contrast to an order resolving all

issues to a discrete claim or proceeding within a case, an order denying a motion to dismiss

"does not finally resolve anything," and "certainly does not resolve the case as a whole."  *Id.* at

*5.  "Instead, the denial of a motion to dismiss a bankruptcy case means that the same thing it

does in any other kind of case: the case goes forward."  *Id.*   These Chapter 11 Cases too are

going forward, which serves to confirm the interlocutory nature of the Good Faith Order. Accordingly, the Secured Lenders' appeal as of right under section 158(a)(1) is without merit and should be denied.

**B.     The Appeal Is Partially Untimely And The Secured Lenders Fail To Satisfy Any Of The Requirements For Interlocutory Appeal**

15.     Perhaps aware that it cannot validity characterize the Good Faith Order as final, the Secured Lenders spend the bulk of their Motion claiming that authority exists for an interlocutory appeal under 28 U.S.C. § 158(a)(3), which grants parties a limited right to appeal non-final bankruptcy court orders. (Motion, pp. 2-10). But this argument also fails: (i) the Secured Lenders' appeal of venue and subject matter jurisdiction is untimely under the Bankruptcy Rules (regardless of whether the Good Faith Order is final or non-final), nor were these jurisdictional issues even raised in the Good Faith Order, and (ii) the Secured Lenders cannot demonstrate that the remaining questions merit interlocutory appeal under the governing standard set forth in 28 U.S.C. § 1292(b).

**C.     Waiver Of The Right To Appeal Venue And Subject Matter Jurisdiction**

16.     Bankruptcy Rule 8001(a) requires that an appeal as of right under 28 U.S.C. § 158(a)(1) shall be filed within the time permitted under Bankruptcy Rule 8002(a), which is within 14 days of the date of the entry of the judgment, order or decree appealed from. The same 14 day requirement applies to interlocutory appeals pursuant to Bankruptcy Rule 8001(b). The Secured Lenders  waited over six weeks to file the Notice of Appeal and Motion as to subject matter jurisdiction and venue, and therefore the appellate court is without jurisdiction to hear these questions on appeal. *E.g., In re Don Vicente Macias, Inc.*, 168 F.3d 209 (5th Cir. 1999) (holding that an appellate court does not have subject matter jurisdiction over untimely appeals).

17.     The Secured Lenders cannot feign surprise over the Court's June 24 findings and emergency orders, including the June Cash Collateral Orders.  The Court, with the Secured Lenders' knowledge and agreement in open court, bifurcated the issues of subject matter jurisdiction and venue from the Secured Lenders' bad faith filing allegations, and proceeded to conducted an extensive evidentiary hearing on the former on June 24.[5]  All issues going to the Debtors' good faith or bad faith were heard at a three day trial commencing on July 16.

18.     The Court found that it had subject matter jurisdiction (and by necessity, venue), two predicates to approving and entering orders granting certain of the Debtors requested emergency relief.[6]  The opening decretal sentence to each order states that it was entered "[f]or the reasons set forth on the record on this date."[7]  Reference to the record was deemed sufficient by counsel of one of the Secured Lenders, Cathay United Bank:

> Court:  Mr. Parham, do you need any additional Findings of Fact or Conclusions of Law in case you want to take some sort of an immediate appeal of this? Otherwise, I'm just going to refer in the Order to the Findings and Conclusions that were reached on the Record.
>
> Mr. Parham:  No, Your Honor.  I think that they are fine.

---

[5]     The Court reminded the Secured Creditors at the good faith trial that the:

> [S]ubject matter jurisdiction hearing [was] timed as requested by the lenders and now we're having a good/bad faith hearing timed as requested by the lenders. And I understand the lack of preparation, but you all got to pick how you want to take your shots, and I don't know why you get to change it now.

(Tr. 536:8-15 [7-17-2013]).

[6]     The Court's June 24, 2013 minute order also makes clear that the Court found that it had subject matter jurisdiction to enter orders granting the Debtors' emergency relief.  A minute entry may constitute a dispositive order for notice of appeal purposes if it: (1) states that it is an order; (2) is mailed to counsel (applicable here by BLR 5005-1(b)); (3) is signed by the clerk who prepared it (made applicable here by Sections 4.A. and 8.A of the District Court's *Administrative Procedures for Electronic Filing in Civil and Criminal Cases*); and (4) is entered on the docket sheet.  *See, e.g., In re Cahn*, 188 B.R. 627, 630 (9th Cir. B.A.P. 1995).

[7]     *See, e.g.*, Docket Nos. 33 and 34.

12

(Tr. 301:15-21 [6-24-2013]).   Counsel to yet another Secured Lender, Mega International Commercial Bank, openly acknowledged the Court's jurisdiction at the time of drafting the emergency order enforcing and retaining the automatic stay, stating "everyone recognizes this Court has jurisdiction over this bankruptcy case."[8]  (Tr. 324-2-7 [6-24-13]).  The Secured Lenders also acknowledged without reservation the Court's jurisdiction in their Motion to Dismiss, as follows: "This Court has subject matter jurisdiction to consider and determine the [Motion to Dismiss] pursuant to 28 U.S.C. §§ 157 and 1334." (Motion to Dismiss, ¶ 4).

19.     Notwithstanding the Court's prior orders, the Secured Lenders made repeated attempts to revisit subject matter jurisdiction at the good faith trial.  For instance, when counsel to Mega International Bank claimed the absence of a signed order on subject matter jurisdiction (Tr. 314-11-13 [7-18-2013]), the Court noted the following:

> I issued a written order that authorized the use of cash collateral. In doing so I made a finding that I had subject matter jurisdiction. I could not have issued the order authorizing the use of cash collateral without making, as a predicate finding, not an order but it's a law finding, that we had subject matter jurisdiction.  And that's why I require [*sic*] the parties that we had to address that issue on that day because it was a predicate for the ruling.  So I'm not going to issue another order on that.
>
> The order authorizing the use of cash collateral had a finding that we had subject matter jurisdiction.  If parties need that to be reconsidered then, again, we'll deal with whether that's appropriate or not.  But I'm not going to issue another order on that.

(Tr. 314:17-315:5 [7-18-2013]).  The Secured Lenders did not appeal any of the emergency orders within 14 days and cannot do so now.  Accordingly, the Secured Lenders have waived their right to challenge on appeal the questions of subject matter jurisdiction and venue.

---

[8]     Entered as Docket No. 23.

13

**D.    The Court Did Not Determine Jurisdiction Or Venue In The Good Faith Order**

20.    The Secured Lenders impermissibly overreach with the scope of their Motion.  The Motion, as discussed above, specifically identifies 7 questions to be presented on appeal.  Four of these questions address jurisdiction or venue, and one raises international comity.   The Motion to Dismiss, however, sought to dismiss these Chapter 11 Cases pursuant to sections 105(a), 305(a), 349 and 1112(b) of the Bankruptcy Code, based on, among other things, (i) "cause," as evidenced by alleged bad faith in filing the Chapter 11 Cases and/or "manufactured" jurisdiction in bad faith; (ii) absence of a reasonable likelihood of rehabilitation, (iii) inability to effectuate a plan, (iv) the availability of other forums, and (v) the best interests of creditors.  (Motion to Dismiss, p. 2).  The Motion to Dismiss does not make a single reference to jurisdiction (other than it was allegedly manufactured in bad faith), venue or international comity.

21.    The Good Faith Order tracks the Motion to Dismiss and does not make any findings or conclusions as to the five questions raised in the Motion.  In fact, the Good Faith Order does not make a single reference to 11 U.S.C. § 109, or 28 U.S.C. §§ 1334 and 1408.  As a result, the Notice of Appeal and the Motion must be denied to the extent they go beyond the scope of the order to be appealed from, i.e., the Good Faith Order.  *Cf. Faulkner v. Kornman,* 2012 WL 293230, at *4 (Bankr. S.D. Tex. 2012) (finding that questions of whether the court had subject matter jurisdiction to enforce a final judgment were "not appropriate for certification because the Contempt Order did not involve a determination of subject matter jurisdiction").

**E.    The Secured Lenders Cannot Satisfy the Standard for an Interlocutory Appeal**

22.    The Secured Lenders bear the burden of showing with respect to the remaining issues on appeal that exceptional circumstances exist to warrant leave to appeal an

14

interlocutory order from the Bankruptcy Court. *See, e.g., In re Royce Homes LP*, 466 B.R. 81, 94 (S.D. Tex. 2012) ("Interlocutory bankruptcy appeals should be limited to cases presenting exceptional circumstances. Speer, as the movant, bears the burden of establishing such exceptional circumstances.") (internal citations omitted). As noted by the District Court, "[b]ecause interlocutory appeals interfere with the overriding goal of the bankruptcy system, expeditious resolution of pressing economic difficulties, they are not favored." *Smith v. AET Inc.*, 2007 WL 1644060, at *5 (*quoting In re Hunt Int'l Res. Corp.*, 57 B.R. 371, 372 (N.D. Tex. 1985)). Thus, "interlocutory appeals are 'sparingly granted' and reserved for 'exceptional' cases." *In re Hallwood Energy, L.P.*, 2013 WL 524418, *2 (N.D. Tex. Feb. 11, 2013); *Wells Fargo Bank, N.A. v. Jones*, 391 B.R. 577, 585 n. 24 (E.D. La. 2008) (the guiding principle for interlocutory bankruptcy appeals is that "[g]enerally, a district court should grant leave sparingly, since interlocutory appeals should be the exception, rather than the rule.") (internal citations omitted).

23.     Although section 158(a) of the Bankruptcy Code does not provide a standard to use in determining whether to grant leave to appeal, many district courts have adopted the standard under 28 U.S.C. § 1292(b), which addresses interlocutory appeals from district court orders. *See, e.g., Powers v. Montgomery*, 1998 WL 159944, *2 (N.D. Tex. April 1, 1998) ("While there is no set standard in this Circuit for determining whether to grant leave to appeal, the Fifth Circuit has acknowledged that the large majority of district courts faced with the problem have adopted the standard under 28 U.S.C. § 1292(b) for interlocutory appeals from Bankruptcy Court orders."); *see also, Ichinose v. Homer National Bank*, 946 F.2d 1169, 1177 (5th Cir. 1991) (noting that a "vast majority of district courts" have adopted the section 1292(b) test and assuming without deciding that the section 1292(b) test applies).

24.     The Secured Lenders' burden under the 1292(b) test is to show the existence of three factors:  (1) a controlling question of law is involved; (2) there is substantial ground for difference of opinion as to that question of law; and (3) an immediate appeal will materially advance the ultimate termination of the litigation.  *See* 28 U.S.C. § 1292(b); *Ichinose*, 946 F.2d at 1177.  The absence of any one of these factors is fatal to a motion for leave to appeal an interlocutory order.  *See Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, 2011 WL 610016, *4 (N.D. Tex. Feb. 14, 2011) ("Every ground in § 1292(b) must be met in order for the interlocutory appeal to be considered; these are not factors to be weighed and balanced."); *In re Red River Energy, Inc.*, 415 B.R. 280, 284 (S.D. Tex. 2009) ("Because the basic policy of appellate jurisdiction strongly disfavors piecemeal appeals, all three of these criteria must be met before an order is properly certified for interlocutory appeal."); *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) (leave to appeal under section 1292(b) is rarely granted and "strictly limited to the precise conditions stated in the law.").

> #### *a.     The Secured Lenders Cannot Identify Any Questions Of Law As To Which There Are Substantial Grounds For Difference Of Opinion*

25.     The first two elements of section 1292(b) will be addressed first.  A controlling "question of law" goes to the "question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine rather than to whether the party opposing summary judgment had raised a genuine issue of material fact."  *See Ahrenholz v. Bd. of Trustees of the Univ. of Illinois,* 219 F.3d 674, 676 (7th Cir. 2000).  The term "question of law" does not mean a question of fact.  *See Ryan v. Flowserve Corp.*, 444 F.Supp.2d 718, 722 (N.D. Tex. 2006) ("[T]he issue for appeal must involve a question of law-not fact."); *Clark–Dietz & Assoc. v. Basic Construction*, 702 F.2d 67, 69 (5th Cir. 1983) (holding that "fact-review" issues are not appropriate for appeal under section 1292).  "Instead, what the framers of § 1292(b) had in mind

16

is more of an abstract legal issue or what might be called one of 'pure' law, matters the court of appeals 'can decide quickly and cleanly without having to study the record.'" *McFarlin v. Conseco Services, LLC*, 381 F.3d 1251, 1258 (11th Cir. 2004) (citing *Ahrenholz v. Bd. of Trustees of the Univ. of Illinois*, 219 F.3d at 677); *Morgan v. Ford Motor Co.*, 2007 WL 269806, at *2-3 (D.N.J. Jan. 25, 2007) (holding that questions "in which the exercise of the district court's direction [is] necessarily intertwined with its understanding of the facts of the case" are "not controlling questions of law") (quotation marks and citations omitted).

26.     The second factor, a "substantial ground for difference of opinion," exists where "a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Flowserve Corp.*, 444 F.Supp.2d at 723-24; *see In re Worldcom, Inc.*, 358 B.R. 76, 79 (S.D.N.Y. 2006) (substantial difference of opinion exists only if there is "a genuine doubt as to whether the bankruptcy court applied the correct legal standard."); *In re Magic Rests., Inc.*, 202 B.R. 24, 26 (D. Del. 1996) ("a judicial conflict on the issue is required" for a substantial ground).  "[S]imply because a court is the first to rule on a question or counsel disagrees on the applicable precedent does not qualify the issue as one over which there is substantial disagreement." *Flowserve Corp.*, 444 F.Supp.2d at 724; *In re Flor*, 79 F.3d 281, 284 (2d. Cir. 1996) (stating that "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion.").  "It is the duty of the district judge . . . to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a substantial ground for dispute." *In re Flor*, 79 F.3d at 284.  Nor does a claim that the bankruptcy court's opinion was

incorrect rise to the level of substantial grounds for difference of opinion. *See Sims v. Sunnyside Land, LLC*, 425 B.R. 284, 295 (W.D. La. 2010) ("Mere disagreement with the court's determination does not create a 'substantial grounds for difference of opinion.'"); *In re Advanced Marketing Servs., Inc.*, 2008 WL 5680878, at *2 (D. Del. Apr. 3, 2008) ("[A] party's disagreement with a court's decision does not demonstrate a substantial ground for difference of opinion."); *In re IBI Sec. Serv., Inc.*, 174 B.R. 664, 670 (Bankr. E.D.N.Y. 1994) (same).

27.     Of their questions presented in the Motion, the Secured Lenders offer up the following three "questions of law" in alleged support of their interlocutory appeal that, in realty, masquerade as impermissible questions of fact or do not present substantial grounds for difference of opinion.

28.     First question: "relevance of non-debtor assets in assessing the debtor's "financial condition and motives."" (Motion, p. 8). The Secured Lenders contend that there is no "case law" to support alleged argument (supposedly adopted by the Court) that a court may consider non-debtor assets pledged after the filing to satisfy dismissal for cause under section 1112(b) of the Bankruptcy Code based on the "debtor's financial condition, motives, and the local financial realities." *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73 (5th Cir. 1986). According to the Secured Lenders, it follows that there is substantial ground for difference of opinion on this issue given the alleged lack of authority. The Secured Lenders' semantics turn the Court's finding on its head. Specifically, the Court made a *factual* finding that the Debtors' possessed additional collateral to satisfy "the principal underlying *Little Creek*," i.e., a debtor cannot "come in" with a "piece of real estate that's underwater" and "offer nothing to try and shore things up except we're going to impair the lender." (Tr. 303:13-25) [7-18-2013]). The Court went on to find that the additional collateral would be available to fill any shortfalls in the Debtors' businesses:

> I find that the Debtors have arranged to bring in an outside value to help bridge those gaps. The outside value may take the form of restricted stock or unrestricted stock or airplanes or cash or something else. But I find that by bringing in additional value the Debtors will create a pool of assets against which borrowings reasonably be expected to be approved by the Bankruptcy Court on motion.

(Tr. 309:19-310:1 [7-18-2013]). The Court's findings have nothing to do with a controlling question of law.

29.     Dismissal under *Little Creek* and similar cases turns on the totality of the circumstances and otherwise involves a "conglomerate of factors rather than any single datum." *Little Creek*, 779 F.2d at 1072-73; *In re Mirant Corp.*, No. 03-46590, 2005 WL 2148362, at *6 (Bankr. N.D. Tex. Jan., 26, 2005) (describing the "totality of circumstances" test of *Little Creek* and its brethren). The Court applied the "totality" standard here (Tr. 303:13-17; 304:19-21 [7-18-13]), which by its very definition permits the Court to consider a non-exhaustive list of factors and criteria to determine good faith. The Debtors' access to new collateral was one such criteria. The Court also found as discussed above that such access satisfied the overarching principal of *Little Creek* – filing chapter 11 without any ability to "shore up" the distressed business may constitute grounds for dismissal. To foreclose a Court's ability to consider new assets or collateral (as well as the financial condition of the entities pledging or offering them) in connection with a chapter 11 reorganization would lead to absurd results, as section 363 asset sales, post-petition financing and new-value plans of reorganization would be provide grounds for dismissal. For this reason, even if the Court's consideration of new collateral is a matter of first impression, it cannot constitute a controlling question of law, much less one that presents a "substantial dispute" warranting an interlocutory appeal.

30.     Second Question: "Standard for determining whether there is a "reasonable likelihood of rehabilitation." (Motion, p. 8). The Secured Lenders argue that a

substantial ground for difference of opinion stems from the Court's alleged application of a more

"relaxed standard" to determine if a debtor has a "reasonable likelihood of rehabilitation" under

section 1112(b)(4)(A) of the Bankruptcy Code.  The Secured Lenders contend that the relaxed

standard is not supported by Fifth Circuit case law, with a specific reference to *In re Humble*

*Place Joint Venture*, 936 F.2d 814-18 (5th Cir. 1991).

   31. To the contrary, the Court's consideration of a broad range of factors to

determine good faith squarely comports with the totality of circumstance standard set forth in

*Little Creek* and used in *Humble Place*.  The Fifth Circuit in *Humble Place* is completely silent

on whether a relaxed standard should or should not apply in the early stages of a case.  Here, the

Court determined that the Debtors at this "early stage" are not required to demonstrate a "more

likely than not" standard to reorganize.  (Tr. 304:9-14 [7-18-2013]).  The Court instead applied a

standard that is "higher than futility" but "lower than a more likely standard."  (Tr. 304:15-19 [7-

18-2013]).  As the Court correctly noted, "it's a totality of circumstances measure."  (Tr. 304-19

[7-18-2013]).

   32. The Secured Lenders believe, albeit incorrectly, that each non-delineated

factor or consideration by the Court as part of its totality of circumstances analysis under *Little*

*Creek* constitutes a *per se* controlling question of law that presents a substantial ground for

difference of opinion.   Such a conclusion is antithetical to the Court's ability to conduct an "on-

the-spot evaluation" that is "based on a conglomerate of factors rather than on any single datum."

*Little Creek*, 779 F.2d at 1072-73; *see also In re Briscoe Enters.*, 994 F.2d 1160, 1165-66 (5th

Cir. 1993) ("As numerous courts have explained, 'the court need not required a guarantee of

success . . .. Only a reasonable assurance of commercial viability is required.").  As a result, the

Secured Lenders are unable to provide any support that the Court's findings constitute

substantial ground for difference of opinion warranting an interlocutory appeal.  Not only does

the Court's finding fall *within* Fifth Circuit "totality" precedent, the Secured Lenders do not provide any authority that the alleged "relaxed standard" as part of a totality of circumstances review is disputed in any other court.

33.     The Secured Lenders add that there is a substantial ground for difference of opinion "regarding the extent to which the Vantage stock escrow proposal" may support a finding that the Debtors can rehabilitate even under a relaxed standard. (Motion, p. 9). The Secured Lenders cite several cases for the proposition that bankruptcy courts are generally opposed to "visionary schemes for rehabilitation." *Id*. What the Secured Lenders ignore, however, is that the Court's findings as to the Vantage shares or any other collateral package constitute factual findings in support of good faith, as opposed to pure questions of law. (*See* Tr. 309:19-310:1 [7-18-2013]). Accordingly, the question of the whether the Vantage shares or other collateral support a good faith finding represents an impermissible question of fact that is not subject to interlocutory appeal.

34.     Third Question: "Whether venue or jurisdiction can be established with de minimis assets." (Motion, p. 9).   The Secured Lenders contend that the "Bankruptcy Court effectively held that a debtor contemplating bankruptcy can ensure venue or jurisdiction by structuring its dealings artificially to create a basis for jurisdiction (and venue), without any business purpose, as long as the transactions themselves are valid." (Motion, p. 9). The Secured Lenders go on to argue that the Court's finding of subject matter jurisdiction and venue conflicts with case law. The Secured Lenders are simply wrong.

35.     As an initial matter, the Secured Lenders waived (as discussed above) the right to appeal the Court's finding of subject matter jurisdiction when they filed the Notice of Appeal and Motion well past the deadline to do so under the Bankruptcy Rules. There is no merit to resurrecting the Secured Lenders right to appeal these issues at this late date.

36.     Second, even if timely, the Court's finding of subject matter jurisdiction and venue was clearly a question of fact as opposed to a pure question of law.  At the June 24 first day hearing, the Debtors presented multiple grounds to find subject matter jurisdiction including, without limitation, property in the United States in the form of leases, accounts receivable, and professional fee retainers.  Of these, the Court found subject matter jurisdiction based on the Debtors' fee retainers, with particular emphasis on the Debtors' retainer with AlixPartners, the Debtors' financial advisors.  (Tr. 234:14-240:13 [6-24-2013]).  As found by the Court:

> AlixPartners is on the hook for $100,000 worth of work, having gotten a $100,000 retainer.  And that being on the hook, i.e. a duty to provide $100,000 worth of work in exchange for the retainer belongs to all the Debtors.  It's property.  It's property in the United States.  It's enforceable here by an oral agreement.  I don't really have much question about that.  I don't think that that was paid artificially.
>
> ***
>
> Alix, we have a different situation.  They got right on the eve of bankruptcy a brand new 100,000-dollar retainer that was new cash.  And that new cash was fully reserved for post work.  It's a different situation.  And that was not done artificially, I don't think.  At least I heard no evidence of that.   It was done because the financial advisor wouldn't do work without a retainer.  Bracewell, for some reason, is doing work without a retainer.  I'll leave that up to somebody else to figure out why they're doing that.  But Alix is doing the work with a retainer and wouldn't do it without it.  It's real property and I don't think it's artificial property.  It may still go to a good faith/bad faith question.   I'm not ruling that out, but it is of a different character.

(Tr. 239:5-12; 239:21-240:9 [6-24-2013]).

37.     At the good faith trial, the Court specifically made a factual finding that the Debtors' property in the United States in the form of the AlixPartners' fee retainer was not manufactured or artificially created for the purpose of subject matter jurisdiction:

> [N]othing about the AlixPartners retainer, that I have seen in the
> evidentiary record, was done in bad faith. I just reject that. They
> got paid a retainer. That all looked pretty normal to me. We went
> through about six versions of the AlixPartners documents. I saw
> nothing extraordinary or unusual or creative or – I don't mean that
> pejoratively – but I didn't see that facts were being created.

(Tr. 301:15-302:1 [7-18-2013]). Accordingly, as factual findings the question of subject matter

jurisdiction is not subject to interlocutory appeal.

   38.   Finally, if the Secured Lenders contend that the Court applied the wrong

legal standard under 11 U.S.C. § 109 or 28 U.S.C. § 1334 to determine jurisdiction, they fail to

cite a single case in support. In *In re Head*, 223 B.R. 648, 652 (Bankr. W.D.N.Y. 1998), the

debtor's alleged "remote or inchoate *claim*" to an insurance trust fund was found to be "too

tenuous, too inchoate, and too contrived" to rise to the level of an ownership interest in property,

and it was unclear to the court if the "claim" was even located in the United States (emphasis in

italics added). In *In re Yukos Oil Co.*, 321 B.R. 396, 407 (Bankr. S.D.N.Y. 2005), the court

found subject matter jurisdiction under section 109(a) of the Bankruptcy Code based on funds

deposited prior to the petition date with a bank located in the United States. The Court in *Yukos*

went on to find that the funds "were transferred for the primary purpose of attempting to create

jurisdiction in the United States Bankruptcy Code," and when combined with numerous other

findings held that the cases were filed in bad faith. *Id*. at 411. Here, the Court specifically made

a factual finding that the Debtors did <u>not</u> use the AlixPartners' retainer to engineer or create

subject matter jurisdiction. The Secured Lenders apparent disagreement with the Court's finding

does not morph such finding into a question of law that presents a substantial ground for

difference of opinion. Accordingly, the Secured Lenders are unable to satisfy the first two

necessary factors of the section 1292(b) test governing interlocutory appeals.

> **b.      Granting Interlocutory Appeal Will Not Materially Advance The Ultimate Termination Of The Litigation**

39.      In support of the final 1292(b) test, the Secured Lenders claim that granting the appeal will alleviate (i) the "substantial risk of irreparable harm" to their collateral through the continued accrual of administrative expenses in these Chapter 11 Cases (Motion, p. 2), and (ii) the "serious risk[s]" imposed on their collateral by denying them the "ability to enforce their contractual right to seize" such collateral. (Motion, p. 10). But Courts routinely reject the proposition that potential litigation expenses, here in the form of administrative expenses, are sufficient to justify interlocutory review. *See, e.g., First Am. Bank of New York v. Century Glove, Inc.*, 64 B.R. 958, 961 (D. Del. 1986) ("Potential litigation burdens do not outweigh the strong policy against piecemeal appellate review."); *Bishop v. Best Buy, Co. Inc.*, 2011 WL 4011449, at *15 (S.D.N.Y. Sept. 8, 2011) (alleged concerns over additional litigation and costs "is a truism applicable to virtually motion for interlocutory appeal . . .."; *North Fork Bank v. Abelson*, 207 B.R. 382, 391 (E.D.N.Y. 1997) ("If the Court allowed such an appeal at this time based on that argument, interlocutory appeals would become commonplace in the federal courts.").

40.      Further, if the Secured Lenders are granted leave to appeal and they are successful on appeal, the bankruptcy cases will be dismissed, but the piecemeal litigation to enforce those rights will just be getting started with the Debtors' numerous other creditors. This does not satisfy the final section 1292 requirement that the appeal "materially advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292; *see also In re Payroll Exp. Corp.*, 921 F.Supp. 1121, 1126 (S.D.N.Y. 1996) (if other claims "will continue regardless of the disposition of this issue, certification would not materially advance termination of this litigation."); *In re Barsan Contractors*,  2010 WL 3907116, *7 (D.N.J. Sept. 30, 2010) ("[A]n

exercise by the Bankruptcy Court of permissive abstention might result in the action proceeding in a non-bankruptcy court, rather than termination of the litigation.  A mere change in forum would not materially advance termination of litigation of the Amended Complaint.")

      41.    Finally, the conclusory risk of harm to the Secured Lenders' collateral is, standing alone, no different than the risk incurred by secured creditors in virtually every single chapter 11 case and does not rise to the level of an exceptional circumstance.  Further, Court has granted the Secured Lenders adequate protection under section 361 of the Bankruptcy Code with respect to each and every cash collateral order entered to date.  And the Good Faith Order demands that the Debtors' post at least $40,750,000 in additional collateral to be used as (among other things) adequate protection for the Secured Lenders.  The Secured Lenders in one breath complain that the posting of such new collateral constitutes grounds for interlocutory appeal (as described above), but in the next argue that the Debtors' alleged inability to adequately protect the Secured Lenders' assets as a result of these Chapter 11 Cases also weighs in favor of appeal.  The Secured Lenders inconsistent and 'see what sticks' argument amply demonstrates their inability to satisfy any of the criteria used to evaluate interlocutory appeals.  Accordingly, the Motion should be denied.

WHEREFORE, for all of the reasons stated above, the Committee asks the Court (i) to find that the Good Faith Order is not a final order, and therefore not subject to appeal as of right under 11 U.S.C. § 158(a)(1), (ii) to find that any appeal of subject matter jurisdiction (or venue) to be untimely, (iii) if it finds that the Good Faith Order is non-final, to deny the Secured Lenders leave to appeal the Good Faith Order, and (iv) to grant such other and further relief as the Court may deem just and proper.

Dated: New York, New York
August 20, 2013

KELLEY DRYE & WARREN LLP

By: /s/ Craig A. Wolfe
    Craig A. Wolfe
    Jason Alderson
101 Park Avenue
New York, New York 10178
Telephone:  212-808-7800
Facsimile:  212-808-7897

*Proposed Co-Counsel to the Official Committee of Unsecured Creditors of TMT USA Shipmanagement LLC, et al.*

-and-

SEWARD & KISSEL LLP
John R. Ashmead
Benjamin Blaustein
One Battery Park Plaza
New York, New York 10004
Tel.: (212) 574-1200
Fax: (212) 480-8421

*Proposed Co-Counsel to the Official Committee of Unsecured Creditors of TMT USA Shipmanagement LLC, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2013, I caused true and correct copies of the *OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OPPOSITION TO SECURED CREDITORS' APPEAL AS OF RIGHT AND MOTION IN THE ALTERNATIVE FOR LEAVE TO APPEAL*, on all parties receiving notice via the court's ECF noticing system, and via email upon the following parties:

evan.flaschen@bgllp.com
trey.wood@bgllp.com
robert.burns@bgllp.com
jason.cohen@bgllp.com
ecolumbus@winstead.com
jmelko@gardere.com
david.parham@bakermckenzie.com
ckelley@mayerbrown.com
FHyman@mayerbrown.com
MLotito@mayerbrown.com
christine.a.march@usdoj.gov

/s/ *Jason Alderson*
Jason Alderson

**<u>Appendix A</u>**

**July 23, 2013 Good Faith Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**ENTERED**
**07/23/2013**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **TMT USA SHIPMANAGEMENT LLC** | § | **CASE NO: 13-33740** |
| | § | |
| **A WHALE CORPORATION** | § | **CASE NO: 13-33741** |
| | § | |
| **B WHALE CORPORATION** | § | **CASE NO: 13-33742** |
| | § | |
| **C WHALE CORPORATION** | § | **CASE NO: 13-33743** |
| | § | |
| **D WHALE CORPORATION** | § | **CASE NO: 13-33744** |
| | § | |
| **E WHALE CORPORATION** | § | **CASE NO: 13-33745** |
| | § | |
| **G WHALE CORPORATION** | § | **CASE NO: 13-33746** |
| | § | |
| **H WHALE CORPORATION** | § | **CASE NO: 13-33747** |
| | § | |
| **A DUCKLING CORPORATION** | § | **CASE NO: 13-33748** |
| | § | |
| **F ELEPHANT CORPORATION** | § | **CASE NO: 13-33749** |
| | § | |
| **F ELEPHANT INC.** | § | **CASE NO: 13-33750** |
| | § | |
| **A LADYBUG CORPORATION** | § | **CASE NO: 13-33751** |
| | § | |
| **C LADYBUG CORPORATION** | § | **CASE NO: 13-33752** |
| | § | |
| **D LADYBUG CORPORATION** | § | **CASE NO: 13-33754** |
| | § | |
| **A HANDY CORPORATION** | § | **CASE NO: 13-33755** |
| | § | |
| **B HANDY CORPORATION** | § | **CASE NO: 13-33756** |
| | § | |
| **C HANDY CORPORATION** | § | **CASE NO: 13-33757** |
| | § | |
| **B MAX CORPORATION** | § | **CASE NO: 13-33758** |
| | § | |
| **NEW   FLAGSHIP   INVESTMENT   CO.,** | § | **CASE NO: 13-33759** |
| **LTD.** | § | |
| | § | |
| **RORO LINE CORPORATION** | § | **CASE NO: 13-33760** |
| | § | |

1 / 3

| | | |
|---|---|---|
| UGLY     DUCKLING     HOLDING | § | CASE NO: 13-33761 |
| CORPORAITON | § | |
| | § | |
| GREAT ELEPHANT CORPORATION | § | CASE NO: 13-33762 |
| | § | |
| TMT PROCUREMENT CORPORATION | § | CASE NO: 13-33763 |
| | § | Jointly Administered Order |
| Debtor(s) | § | |
| | § | CHAPTER 11 |

## ORDER

For the reasons stated on the record, the Joint Emergency Motion for Entry of an Order Dismissing with Prejudice the Debtors' Chapter 11 Case Pursuant to Sections 105(a), 305(a), 349, and/or 1112(b) of the Bankruptcy Code, (ECF No. 67), is granted, in part, and denied, in part.

1.      The cases of TMT Shipmanagement LLC, (Case No. 13-33740), and F Elephant Corporation, (Case No. 13-33749), are dismissed.

2.      No other cases are dismissed.

3.      Certain Debtors violated the Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection, (ECF No. 43), by arranging for ECB International LLC ("ECB"), to pay wages in an approximate amount of $750,000 directly to the crews of three Whale vessels.[1]  If ECB reduces any amount that it owes to a Debtor on account of all or a portion of this $750,000 advance:

A.      The Debtor receiving less than full payment must cause a non-Debtor entity to deposit, in cash, an amount equal to the reduction (the "Recovery Amount").

B.      The amount received from the non-Debtor entity as the Recovery Amount will be deposited into the Debtor's cash collateral account and be subject to any lien held by the respective lender.

C.      The Debtor must receive the Recovery Amount within 30 days of the date on which the original payment from ECB should have been received.

4.      The Debtors must cause non-estate property (the "Good Faith Property") with a fair market value of $40,750,000 to be provided to the Estates:

A.      The Good Faith Property must be provided to the Estates, jointly, not later than August 20, 2013.

---

[1] Pursuant to the Time Charter Party with ECB, the owner of the ship is responsible for paying for the crew wages that were paid with the $750,000. *See* Lender's Exhibit 200, Paragraph 5. If ECB advanced the $750,000 in wages, it may be entitled to a credit for the payments. *See* Lender's Exhibit 200, Paragraph 6.

B.      Not later than August 6, 2013, the Debtors must file a proposed form of Order to establish the Court's control over the Good Faith Property.

C.      If the Debtors cause the Good Faith Property to be property other than cash, then the Good Faith Property must include at least 25,000,000 shares of the common stock of Vantage Drilling Company.

D.      If the Court determines that the initial Good Faith Property has a fair market value of less than $40,750,000, the Debtors will have an additional 30 days after such a determination to supplement the Good Faith Property such that it has a Fair Market Value of at least $40,750,000.

E.      The Good Faith Property will constitute a pool of assets to:

    (i)      ensure compliance with court orders;

    (ii)     provide a fund for payment of any sanctions ordered by the Court against one or more Debtors or their principals, including any daily coercive sanctions ordered by this Court;

    (iii)    serve as collateral for a working capital loan to one or more Debtors, if ordered by the Court;

    (iv)     satisfy any amounts arising under § 507(b) of the Bankruptcy Code, including without limitation any failure of adequate protection from the use of cash collateral;

    (v)      collateralize an advance of any amounts due under paragraph 3 of this Order; and,

    (vi)     serve any other purpose as may be ordered by the Court from time-to-time after notice and hearing.

F.      The Good Faith Property may be withdrawn or applied only after notice and hearing.

SIGNED **July 23, 2013.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

**Appendix B**

**Excerpts of First Day Hearing Transcript
Dated June 24, 2013**

1  comprehensive discovery generating massive expenses from

2  Debtors whose cash to pay those expenses is frozen by the

3  lenders who's saying, "They don't belong here anyway."  If

4  they believe there's no personal jurisdiction, they should

5  stand by that and not take advantage of this Court's

6  discovery rules.  If they acknowledge personal jurisdiction

7  by --

8          THE COURT:  You haven't --

9          MR. FLASCHEN:  -- focusing on bad faith --

10         THE COURT:  Yeah.

11         MR. FLASCHEN:  -- they can do all the discovery

12 they want.

13         THE COURT:  No.

14         MR. FLASCHEN:  Personal jurisdiction is not a

15 Debtor factual issue.  It is a lender factual issue.

16         THE COURT:  It may be.  But realistically, to give

17 you two days, I can give you July 16th and the 17th, unless

18 Ms. Dolezel tells me I'm wrong about that, but I think we

19 can probably clear out those two days.  That's a week later

20 than what we talked about, but it's going to be murder

21 really to get you two days in that week.  So that's pretty

22 quick.

23         Is there any real complaint about a July 16th and

24 17th hearing date?

25         MR. FLASCHEN:  I had one final concern.

1   to contest subject matter jurisdiction.

2            THE COURT:  Yeah.  But here's the problem I'm

3   going to throw back at Counsel.

4            MR. KELLEY:  Sure, certainly.

5            THE COURT:  And we can bifurcate subject matter

6   from bad faith if we need to, but I think there is a good

7   argument that we have to cross the subject matter

8   jurisdiction issue before we can even grant emergency

9   relief, but I've got an emergency, according to Counsel,

10  which means subject matter jurisdiction will be first thing

11  this morning.

12           And what I don't want to do is to impose on

13  Counsel, if they want to sort of stipulate to a temporary --

14  the entry of temporary and binding orders while we figure

15  that out and, if not, I think it's more than fair to say we

16  have to cross that threshold and we will, and I don't know

17  what will happen with that.  But if we do cross it, it will

18  then be subject then to the later bad faith hearing.

19           But I can't just wait -- let the emergency wait

20  until the 16th at which point, you know, what have we done?

21  We've done nothing.

22           So I think probably you all are right and we

23  should start with the subject matter question and reach that

24  determination.  I do want to hear people argue against that

25  and then bifurcate subject matter from bad faith, which I

1  was hoping we could combine, but having listened to

2  arguments, that may not make sense -- and make the Debtor

3  start with subject matter.

4         MR. MELKO:  There is -- I just -- I know there's

5  others present and waiting.  Just there's also in this

6  dismissal issue a third issue, which is -- and it's been --

7  and there are reported opinions on this where Courts have

8  also found -- I mean, you've got a case, the Court found

9  that it had jurisdiction and the filing was proper, but

10 because the Order was on a personal issue, the -- there's no

11 effect --

12        THE COURT:  Right.

13        MR. MELKO:  -- practical effect of Chapter 11,

14 Your Honor.  There are more recent opinions.  I think in the

15 *Bear Stearns* cases and some other hedge fund cases where

16 Cayman-based hedge funds filed Chapter 11 Petitions in

17 New York.  The Courts said, "Yeah, okay, fine, you

18 established the minimum under -- to be a Debtor under 109,"

19 but essentially -- it's not out of the comity, but it's out

20 of almost like a forum non-conveniens that the Creditors

21 were everywhere else but the U.S. and on that basis, sort of

22 went a third basis of not just bad faith.  They used --

23        THE COURT:  Okay.  Well, we use "bad faith" or --

24 in a broad sense.  That -- those won't go to subject matter

25 jurisdiction, I don't think.  I'm not trying to give any --

1   it's -- we're a few hours into the case.  I don't want

2   anybody to waive their substantive arguments except that

3   subject matter jurisdiction may be one that we have to cross

4   first.

5           MR. PEREZ:  And I hate to sound like a broken

6   record, but I think our facts with respect to subject matter

7   jurisdiction may be different.  In March, we -- they

8   basically told the Court, "We have no money, you know, sell

9   it," so it's very -- I don't understand the bona fides of

10  paying a retainer when they weren't even paying their crew

11  in March of this year.  So again, that's --

12          THE COURT:  I'm not sure that goes to subject

13  matter jurisdiction.  That goes to whether there is, in

14  fact, a *rem* -- to take *in rem* jurisdiction over, but not

15  whether we have a case.  And I'm not yet crossing the

16  threshold as to whether we have cases by Debtors and that's

17  the first step, I think.  So that'll be number one this

18  morning then.

19          You said you're ready.  They're telling me that --

20          MR. FLASCHEN:  Well, we're ready, Your Honor.

21  Here is my question for the Court and for Counsel.  Well, we

22  have the lease, for example.  You have representation of

23  Counsel and we have Counsel who can testify as to the

24  retainer, is the best way to deal with that is to return

25  this afternoon with the Lease, with the Engagement Letter,

1   with an affidavit of our Chief Financial Officer that the

2   money is in Houston so we can -- we the Certificate of

3   Incorporation for TMT USA so we can show the connections.

4          THE COURT:  Well, I think the burden of proof is

5   on you to prove subject matter jurisdiction and I'm not

6   going to tell you how to prove it.  I will let you prove it

7   how you want to prove it.

8          MR. FLASCHEN:  Okay.  Your Honor, we propose to

9   return this afternoon and put on evidence as to our

10  connections to the U.S. and to Houston.

11         THE COURT:  All right.

12         MR. FLASCHEN:  Okay.

13         THE COURT:  Anybody have a problem doing -- start

14  making the first event at 1:30?  And I think I'll be back

15  by 1:30.  If not, it'll be very shortly thereafter to deal

16  with subject matter jurisdiction as the first order of

17  business?

18     (No verbal response.)

19         THE COURT:  Okay.  What else can we do this --

20         MR. SPEAKER:  That's fine with us.

21         THE COURT:  What else can we do this morning that

22  would be productive, anything?

23         MR. FLASCHEN:  If I can just finish with the

24  context, Your Honor?

25         THE COURT:  Sure, sorry.

1          -- and this is a direct quote, "and you know what

2          that means."

3                So at least the *C Ladybug* and additionally, the

4  *A Whale* have absolutely critical things that couldn't even

5  wait till Thursday, if that's where Your Honor ended up

6  concluding we should do.

7                For the main event here, we -- Mr. Wood wisely

8  will take over because we have actual evidence and witnesses

9  in two forms of --

10                THE COURT:  We do that in Texas, yeah.

11                MR. FLASCHEN:  -- the first is the basics of the

12  jurisdictional assets, what's here, that kind of thing, but

13  the main event will be AlixPartners.  What they will testify

14  to is a critical need today of about $16 million.

15                THE COURT:  I'd like to start with only the

16  jurisdictional question.  Let's determine whether we have

17  subject matter jurisdiction and even if it means recalling

18  witnesses, we'll recall the witnesses.

19                MR. FLASCHEN:  Okay.

20                THE COURT:  Because I think the argument made this

21  morning which I sustained is we have to start by determining

22  if we --

23                MR. FLASCHEN:  Okay.

24                THE COURT:  -- have subject matter jurisdiction.

25  Any determination that we make that we don't have subject

1   matter jurisdiction, you're gone and any decision we make

2   that we do will then be subject to a later hearing on

3   dismissal based on bad faith, *forum non conveniens* or other

4   related kind of issues that the case shouldn't be allowed to

5   proceed for various reasons, as opposed to subject matter

6   jurisdiction.

7           MR. FLASCHEN:  Thank you, Your Honor.

8           THE COURT:  But I do want to start with subject

9   matter jurisdiction only --

10          MR. FLASCHEN:  Okay.

11          THE COURT:  -- to see if we can move any --

12          MR. FLASCHEN:  To avoid what may be the annoyance

13  of me popping up now and then, I'll finish the thought and

14  then sit down and we'll deal with both of those issues, the

15  16 million today, another 3 million between now and the 16th

16  mostly related to crew.  Some of it wages, past wages, the

17  argument that they're being -- and I know there's press on

18  the phone, but the crew can do things to vessels when they

19  become desperate and we think it's in everyone's interest.

20  I want to make that argument just to raise the point.  I'll

21  now turn it over to Mr. Wood, first to address

22  jurisdictional issues.

23          THE COURT:  Thank you.  Mr. Wood?

24          MR. WOOD:  Good afternoon, Your Honor.

25          Trey Wood on behalf of the Debtors.

 1 | last point?

 2 |             THE COURT:  Sure.

 3 |             MR. PEREZ:  I apologize.

 4 |             FURTHER CLOSING ARGUMENT ON BEHALF OF BHP

 5 |             MR. PEREZ:  Your Honor, the fact that somebody

 6 | puts money on your behalf in a bank account, that doesn't

 7 | make it your asset.  And there is -- there's really no

 8 | evidence that because of third party -- and I think the

 9 | evidence is clear that non-Debtors put that money in.  Just

10 | because a non-Debtor puts money in a bank account, that

11 | doesn't make you have an asset in the United States.

12 |             THE COURT:  Thank you.

13 |                       COURT'S RULING

14 |             THE COURT:  All right.  I think this is a very

15 | difficult decision.  I'm going to end up finding there's

16 | jurisdiction and I'm not going to find that there is good

17 | faith jurisdiction.  And we're going to determine the good

18 | faith later.

19 |       The good faith is going to have a couple of

20 | components to it.  One is was the case itself commenced with

21 | a good faith purpose?  I suspect the Debtor is going to have

22 | a much easier burden there than was jurisdiction established

23 | in good faith.  And that's one that I think will be harder.

24 | I don't know whether it will be impossible.  I think those

25 | are different questions and I'm not sure what the law is on

1   establishment of jurisdiction in good faith rather -- versus

2   a good faith purpose in the case.

3           Let me tell you-all why I'm going to find

4   jurisdiction.  And I will say I don't like the law here.

5   But I'm not going to make law just because I don't like law.

6           The test in 109 -- Well, first of all,

7   jurisdiction is under 1334.  And under 1334 we have

8   jurisdiction over cases that are filed.  But we wouldn't

9   exercise that jurisdiction over someone that isn't eligible

10  to be a Debtor, and that's commonly called jurisdiction in

11  the case law.  I think it is a slightly different animal

12  than 1334 jurisdiction.  But, nevertheless, if there's

13  someone here not eligible to be a Debtor, I'm not going to

14  issue any orders that would pertain to that entity.  So I do

15  want to figure out under 109 whether these entities are

16  eligible to be a Debtor.

17          You can be a Debtor under 109(a) if you reside

18  here; they don't.  If you have a domicile here; they don't.

19  If you have a place of business here.  As I indicated

20  before, the Debtor argues it has a place of business because

21  it has a lease, and without regard to whether the lease is

22  in evidence, there was enough testimony that the Debtor --

23  each Debtor has tried to be a lessee here.

24          Simply having a lease doesn't create a place of

25  business.  There may be an intention to have a place of

1  business.   There may be somebody moving here that's going to

2  occupy that and have a place of business.   There may be a

3  hope to have an L&G business at some point in the future,

4  but that's not a place of business.   I think that the

5  statute would require a present place of business, and the

6  hope to have one, I find, is not a place of business.

7         The final one is -- I think we can exclude the

8  municipality qualification.   So the final one is property in

9  the United States.   I find that the Debtors, all of them,

10 have interests in two kinds of property in the

11 United States.   Although I don't really like the fact that

12 simply the existence of property in the United States can be

13 jurisdictional in terms of eligibility, the -- 100 percent

14 of the cases that have made this decision have said that it

15 can be.   And I'm simply not going to create new law there.

16         Now, *Ukos*, which is from this jurisdiction, was

17 well thought out by Judge -- now Judge Paul, at the time

18 Judge Clark -- goes through the proper analysis on all this.

19 And ultimately found that although there was subject matter

20 jurisdiction the case would be dismissed for other reasons.

21 And we may ultimately find that as well.

22         Here's the two asset hooks that I think are there

23 that means that the Debtors have property in the

24 United States:

25         One is the Bracewell retention.   I read the

1  contract as unambiguously giving each entity that made the

2  deposit a legal property interest in the retainer.  It

3  doesn't matter to me that there may be non-Debtors that also

4  have a legal property interest.  That's not part of the

5  question.  It doesn't matter to me whether I can measure the

6  exact amount of the retainer.  That's not the question.

7        The question is does each Debtor have property in

8  the United States?  Now, the argument has been made that

9  because the firm is writing off a portion of the bill, that

10 that was done to have property in the United States solely

11 for jurisdictional purposes.  That's going to go to good

12 faith/bad faith, potentially.  But I don't accept the

13 argument that in terms of having property it matters how you

14 got property.  If someone gifts you property, i.e. from a

15 write-down of a bill, it's nevertheless your property.  And

16 if they gifted you the property in order to get large future

17 legal bills, that may go to good faith/bad faith, but it

18 doesn't go to whether or not you have property in the

19 United States.  You do.

20        The Jay Alix situation, though, is, frankly,

21 completely different.  And that's the second property hook.

22 And it, frankly, does not have the taint of the Bracewell

23 property.  And let me explain why.

24        The undisputed testimony is that Alix

25 International has done work for quite a few months.  And

1   that work was performed out of the New York office, although

2   Alix International is a London-based company.  And so there

3   is a long-standing relationship with -- long-standing

4   meaning a several month relationship that was not done in

5   necessary anticipation of a bankruptcy case.  And they did

6   work and they ran up a bill.

7            We then have an Alix affiliate that's going to do

8   the bankruptcy work.  It's undisputed that $100,000 was

9   transferred and that that $100,000, although transferred

10  into an international account that is located in the

11  United States, that that account in the United States is

12  being held for the benefit of payment of future bills by

13  Alix, the US entity.  And by Alix, the US entity which is

14  committing to do the work, whether they have a written

15  retainer or not.

16           And I accept fully the argument that under these

17  circumstances it's not unusual for a firm to begin work

18  without the written retainer.  That's the testimony and it's

19  undisputed.  And they've agreed to look to that $100,000.

20  And whoever's name it's in, it's being held so that the

21  Debtors can have a financial advisor.  The right to that

22  financial advisor, whether we denominate that right as being

23  100,000 in cash held in trust for the financial advisor, or

24  simply the right because of now the obligation of Alix

25  Partners to look to Alix International to fund the money is

1    property that exists in the United States for each entity.

2           And let me be clear.  If Alix International

3    decides to take money that the testimony is they received in

4    trust and apply it to their prior bill rather than using it

5    for Alix Partners, that's their problem.  AlixPartners is on

6    the hook for $100,000 worth of work, having gotten a

7    $100,000 retainer.  And that being on the hook, i.e. a duty

8    to provide $100,000 worth of work in exchange for the

9    retainer belongs to all the Debtors.  It's property.  It's

10   property in the United States.  It's enforceable here by an

11   oral agreement.  I don't really have much question about

12   that.  I don't think that that was paid artificially.

13          I am concerned that the Bracewell matter was done

14   artificially.  But to expect -- And the reason why those are

15   different is the Bracewell retainer is paid against work to

16   be done, including bankruptcy work.  And, essentially, pre-

17   petition Bracewell runs up a higher bill than the retainer,

18   writes-off part of it.  All of that was done in

19   contemplation of the bankruptcy.  The write-off was done in

20   contemplation of the bankruptcy, too.

21          Alix, we have a different situation.  They got

22   right on the eve of bankruptcy a brand new 100,000-dollar

23   retainer that was new cash.  And that new cash was fully

24   reserved for post work.  It's a different situation.  And

25   that was not done artificially, I don't think.  At least I

1  heard no evidence of that.  It was done because the

2  financial advisor wouldn't do work without a retainer.

3  Bracewell, for some reason, is doing work without a

4  retainer.  I'll leave that up to somebody else to figure out

5  why they're doing that.  But Alix is doing the work with a

6  retainer and wouldn't do it without it.  It's real property

7  and I don't think it's artificial property.  It may still go

8  to a good faith/bad faith question.  I'm not ruling that

9  out, but it is of a different character.

10         So those are my findings.  I'm going to exercise

11  authority and jurisdiction until such time as we have our

12  good faith/bad faith hearing and we're going to proceed with

13  the case.

14         Do you-all need time to talk on that basis or do

15  you-all want to proceed with the Evidentiary Record on what

16  emergencies --

17         MR. FLASCHEN:  I only have a question, Your Honor.

18  The hearing the 16th and 17th, would you welcome or would

19  you discourage pre-hearing briefs on these issues?

20         THE COURT:  You know, I've got no particular view

21  about it.  If you-all file a brief, I'll read it.

22         MR. FLASCHEN:  Thank you, Your Honor.

23         THE COURT:  If you don't file one, I'll listen to

24  the argument.  I don't plan to rush through this anymore

25  than I've rushed you-all this afternoon.  I think everybody

1   motion to use cash collateral.  We, earlier today, required

2   the Debtor to limit the emergency to essentially what's

3   going to occur between now and Thursday at midnight in terms

4   of an emergency.  So, that's all that we're considering at

5   this point.

6          We have jurisdiction over this under 20 USC

7   Section 1334.  The use of cash collateral is a core matter

8   under 20 USC Section 157.

9          I'm going to authorize the use of cash collateral

10  and I'm going to state the reasons why.

11         I find that a reasonable and prudent Debtor would

12  treat the communications received from third parties as an

13  emergency and would believe that the vessels that are at

14  issue here -- the C Ladybug and the A Whale vessels -- are

15  in dire straits and that each vessel is in danger of

16  incurring significant damage, either intentional or

17  unintentional damage, if the emergency crew wages and the

18  bunkers and lubes are not provided for.

19         I find that those damages, if the lenders are

20  under-secured, would injure the lenders; and if the lenders

21  are over-secured they have an equity cushion and it doesn't

22  really matter.

23         So, I do find that there is either adequate

24  protection for being over-secured or a necessity of

25  protecting the vehicles if the lender is under-secured.

1  interest to try and get all the facts out.  So, it is

2  appreciated.

3          MR. PARHAM:  Thank you, Your Honor.

4          MR. FLASCHEN:  Your Honor, if you want to walk

5  through this order now and finish up because we're almost to

6  the home stretch.  And we all want --

7          THE COURT:  I want to do this Order now.

8          MR. FLASCHEN:  Thank you, Your Honor.

9          MR. COHEN:  That might be cash management, Judge?

10         THE COURT:  Right.

11         MR. COHEN:  The second to the -- or third to the

12 last interim cash.  So, that's our full-fledged usual order.

13         THE COURT:  Okay.  I'm not going to use that.

14     (Laughter.)

15         THE COURT:  Mr. Parham, do you need any additional

16 Findings of Fact or Conclusions of Law in case you want to

17 take some sort of an immediate appeal of this?  Otherwise,

18 I'm just going to refer in the Order to the Findings and

19 Conclusions that were reached on the Record.

20         MR. PARHAM:  No, Your Honor.  I think that they

21 are fine.

22         THE COURT:  You may disagree with what I've done.

23 I'm not asking you to agree to it.  I just want to know if

24 you need anything more so that if you -- if your client,

25 when you do get instructions, wants it appealed that we have

1   helpful.

2           MR. KELLEY:  Your Honor, while everyone in the

3   Courtroom recognizes this Court has jurisdiction over this

4   bankruptcy case, that last decretal paragraph, given the

5   other Court proceedings, seems to be suggesting that if

6   there's any encroachment, you're sending a message to the

7   other Courts your jurisdiction is going to govern.

8           Given the purpose of this order and how it's going

9   to be sent around, we have problems with the last decretal

10  paragraph because of how it's going to mean, with respect to

11  jurisdiction between the two -- between multiple actions and

12  proceedings that are ongoing right now.

13          How would this language be read with respect to

14  the other arrest proceedings that have already been

15  commenced?  I understand the scope of the stay, Your Honor,

16  but this comes across like a message from this Court that

17  this Court is wrestling the jurisdiction away from them and

18  I know that that's a particular concern of this Court and I

19  didn't want to see that paragraph misconstrued in that

20  fashion.

21          MR. FLASCHEN:  Your Honor, we find the paragraph

22  remarkably unobjectionable.  But since it is the last

23  comment, we're happy to delete it because this Court does

24  retain jurisdiction in any event.

25          I would ask, especially, the United States Trustee

**<u>Appendix C</u>**

**Excerpts of Second Day of Trial
on Good Faith Trial Dated
July 17, 2013**

1  of that original hearing is wrong, because I know it is late

2  and it's been a few weeks.

3          My recollection is that the lenders as a group

4  asked me to bifurcate the hearing, that they did not want to

5  proceed on good faith/bad faith at the initial hearing.

6          MR. MELKO:  Right.

7          THE COURT:  Nor did they want to postpone

8  proceeding on subject matter jurisdiction to a good

9  faith/bad faith hearing.  So we had a subject matter

10  jurisdiction hearing timed as requested by the lenders and

11  now we're having a good faith/bad faith hearing timed as

12  requested by the lenders.

13          And I understand the lack of preparation, but you-

14  all got to pick how you want to take your shots, and I don't

15  know why you get to change it now.

16          MR. KELLEY:  With all due respect, Your Honor.  We

17  had heard statements that morning from Counsel that were not

18  in the filing papers, and on behalf of our clients we

19  couldn't just agree to those facts without hearing evidence

20  of those facts.  And so we said, what they're saying, if

21  that's true, might give rise to subject matter jurisdiction

22  but we haven't seen anything like that, and Your Honor said,

23  that's a fair point, let's put the evidence on because I at

24  least need to find out whether I've got subject matter but

25  you get to reserve the good faith issues.

<u>**Appendix D**</u>

**Excerpts of Third Day of Trial
on Good Faith Trial Dated
July 18, 2013**

1           THE COURT:  Are you going to have anything on the

2    *F Elephant* that you redirect her about?

3           MR. FLASCHEN:  No.

4           THE COURT:  All right.  Are you going to have

5    anything --

6           MR. FLASCHEN:  I'm sorry.  No, Your Honor.

7           THE COURT:  Are you going to have anything on TMT

8    let's say that you redirect her about?

9           MR. FLASCHEN:  No, Your Honor.

10          THE COURT:  All right.  I'm --

11          MR. PEREZ:   I'm just going to talk about the *F*

12   *Elephant*.

13          THE COURT:  On my own motion, at the conclusion of

14   the Plaintiffs' case or the Movant's case with respect to

15   the *F Elephant* and with respect to TMT USA, I'm going to

16   find that they have failed to demonstrate that either the

17   *F Elephant* case or the TMT USA case, which is the Houston

18   entity, are filed in good faith.

19          As to the other entities, I'm not going to make my

20   own motion, but I don't want to waste time on something

21   where I already know what I'm going to do with the

22   conclusion of their case.

23          With respect to the *F Elephant*, I find that there

24   is no reasonable prospective reorganization, but I listened

25   to the testimony by the Debtor's witnesses.  They've not

1  suggested any reasonable prospect of how to deal with that.

2  It is unknown whether it has already been foreclosed or not.

3  In terms of meeting a burden of proof of demonstrating that

4  there's any good faith capability of dealing with *F Elephant*

5  of reorganizing, having money to deal with it, the proof is

6  simply absent, it is not there.

7       With respect to TMT USA, the evidence is

8  unambiguous that there was no bankruptcy purpose that was

9  being served by the filing of TMT USA.

10       I find that the TMT USA entity had no debt that it

11  was trying to protect, it had no creditors it was trying to

12  protect from so the TMT USA case also was not filed in good

13  faith as to the creditors to be stayed -- or, excuse me,

14  with respect to the creditors generally.

15       And so I see no reason to leave either of those

16  two cases for further evidence or discussion at the

17  conclusion of the Debtor's cases.

18       With respect to the other cases, as I said, I'm

19  not going to make my own motion on them at this point.  I'm

20  just trying to expedite things and get on through things so.

21       MR. PEREZ:   Thank you very much, Your Honor.

22       May I be excused very quickly?

23       MR. SPEAKER:   Thank you, Your Honor.

24       THE COURT:   Yes, sir.

25       MR. PEREZ:   Thank you.

1  reorganization.

2          It is up to the Congress to determine whether the

3  Courts of the United States will be as open as I believe

4  they have written in the statute.  It is not up to me to

5  determine the wisdom of that.

6          The issue before us today is whether in invoking

7  that jurisdiction it has been invoked in good faith on both

8  a subjective and an objective basis.  The results of this

9  hearing are, frankly, a surprise to me.  I began the hearing

10 believing that the Debtors would fail.  I conclude the

11 hearing by finding that these cases are filed in both

12 subjective and in objective good faith.  This will not,

13 however, be a ruling without a big burden on the Debtors.

14 The Debtors have each consented to our personal jurisdiction

15 over them and over their assets, and I intend to enforce

16 that strictly.

17         I'll make a side comment.  I am quite impressed

18 with Mr. Su and the *A Whale's* involvement in the Macondo

19 spill, and that makes me impressed with him, and it even

20 underscores the interrelated and international scope of

21 these businesses.  I am impressed that Mr. Su is not a

22 stranger to Houston, who regularly conducts businesses here,

23 and that he has, unlike me, visited all 50 states of the

24 United States.

25         But those factors, although interesting, and

1  diverted to pay wages.  That may have been a legitimate
2  thing to do from a business point of view, but everybody's
3  going to understand that the orders are going to be
4  enforced.  If the Debtors can persuade the chartering
5  companies not to make the deduction, this may be a no-harm-
6  no-foul situation.  But if there's a deduction the money's
7  coming back in.

8          In a few minutes we're going to talk about the
9  airplane and the stock, and it can come from those things,
10 but it's going to come in.  It's going to come in in cash
11 and there's going to be 30 days to get it fixed.  And if
12 it's not fixed those cases in which the Court's order was
13 violated will be dismissed for violation of the Court's
14 order.

15         There's been an allegation that the AlixPartners
16 retainer was handled in a manner that was not in good faith.
17 The AlixPartners retainer may be problematic if I miscalled
18 the subject matter jurisdiction question, a question that
19 I'm not revisiting today.  But nothing about the
20 AlixPartners retainer, that I have seen in the evidentiary
21 record, was done in bad faith.  I just reject that.  They
22 got paid a retainer.  That all looked pretty normal to me.
23 We went through about six versions of the AlixPartners
24 documents.  I saw nothing extraordinary or unusual or
25 creative or -- I don't mean that pejoratively -- but I

1    didn't see that facts were being recreated.

2            If you'll notice, the last one of those

3    agreements, prior to the filing of the case, indicated that

4    the retainer would be used for all of the Debtors.

5            The 345 issue by the United States Trustee, you

6    know, we don't get 345 motions in every case, but it's not

7    that the Debtor is saying we're not going to comply with

8    this if the Court orders us to.  The Debtor has asked for

9    relief under section 345.  Section 345 provides that the

10   Court for cause can grant relief.  I don't know whether

11   we're going to grant relief or not, but it's simply not

12   indicative of somebody not acting in good faith to have to

13   show cause under section 345.  It simply doesn't affect our

14   determination.

15           With respect to the *Little Creek* factors.  First,

16   I find that the *Little* Creek case is by analogy applicable

17   to this case, and I reject the Debtor's position that it is

18   inapplicable.  But having applied it to this case, I find

19   that this case was not filed in good faith under the *Little*

20   *Creek* factors.

21           MR. FLASCHEN:  Your Honor, was not filed in bad

22   faith?

23           THE COURT:  Was not filed in bad faith -- excuse

24   me -- under the *Little Creek* factors.  In particular, I note

25   that *Little Creek* dealt with real property that deals with

1  the ship's mortgage.  In this case the principal

2  amortization on these notes is very short.  It's a seven

3  year principal amortization.  The useful life of the vessels

4  is approximately 25 years.  So unlike *Little Creek*, where

5  you had a long principal amortization, here we have a very

6  short one.  And I think when you apply one of the most

7  important factors in *Little Creek* which is, what's the cash

8  flow, I find that on a normalized basis -- if we can get to

9  normalcy and we'll deal with that in a few minutes -- that

10  these ships will have a substantial amount of positive cash

11  flow.  And that substantial positive cash flow runs counter

12  to a negative *Little Creek* finding.

13        Moreover, the principal underlying *Little Creek*

14  is, we don't let you come in here with empty pockets.  You

15  come in and you have a piece of real estate that's

16  underwater and you offer nothing to try and shore things up

17  except we're going to impair the lender.

18        In this case the Debtors jointly, acting through

19  their principal, have offered, and in a few minutes we'll

20  hear, that they will bring substantial collateral in to

21  these cases.  That substantial collateral that's being

22  brought in -- and I'm using the word "collateral" a bit

23  colloquially -- will shore up those cases in some manner.

24  And again, remove the case from *Little Creek* because of the

25  bringing in of other assets to shore up this situation.

1          Is the case filed an object of good faith?  We

2     begin by saying what I think that standard is.  And I

3     appreciated all the bank's counsel recognizing that I think

4     the hearing margin moved to an objective good faith case

5     from a subjective good faith case.  I agree with you-all.  I

6     think this is by far the harder call.  The subjective part

7     was, for me, relatively straight forward that these things

8     were done in good faith.

9          The standard for whether it's filed in good faith

10    at this early stage isn't, have the Debtors shown more

11    likely than not that they will achieve confirmation.  I

12    think the Debtor's brief properly points out that we don't

13    hold Debtors to that standard in the first 30 days of the

14    case.

15         The standard is, however, somewhere more than

16    futility, and probably more like is there a reasonable

17    possibility that the Debtors can reorganize.  So I think

18    it's higher than futility, it's lower than a more likely

19    standard.  It's a totality of the circumstances measure.

20    Was the case filed with a meaningful hope of reorganization,

21    is the way that I will put it.

22         Although I didn't admit Mr. Swick as an expert in

23    maritime transportation industry, I think his testimony is

24    quite persuasive on the difficulties that these Debtors will

25    face and make this a tough decision.  So I am not, by

1   revenues that are forecast out of those three, that

2   approximately six months or slightly more than six months of

3   revenue would be sufficient to pay the restart costs, and

4   that it is reasonable to conceive of priming to the extent

5   of future revenue.  You will notice that none of my findings

6   that I'm making find that it is likely that the Debtors will

7   be able to prime the lenders as to their ships.  I continue

8   to believe it is unlikely that the Debtors will prevail on

9   priming the lenders as to their ships.  Obviously I'm not

10  ruling that out as a possibility, but it forms no basis of

11  my findings because I think the possibility is relatively

12  minimal.

13          That still leaves a cash shortage.  It leaves a

14  cash shortage because we still haven't gotten from here to

15  there.  The Whales may have some excess money, some of the

16  Handys may have some excess money, but more money is

17  certainly going to be needed.  Certainly with respect to the

18  *A Duckling*, more money is needed.

19          I find that the Debtors have arranged to bring in

20  an outside value to help bridge those gaps.  The outside

21  value may take the form of restricted stock or unrestricted

22  stock or airplanes or cash or something else.  But I find

23  that by bringing in that additional value the Debtors will

24  create a pool of assets against which borrowings might

25  reasonably be expected to be approved by the Bankruptcy

1   Court on motion.

2           With respect to that, and this is the final part

3   of the ruling, we need to be satisfied that the assets are

4   brought to this case in the form of stock or airplanes or

5   cash or something else of substantial value will provide

6   substantial value.  Mr. Swick is right, this thing is

7   undercapitalized right now, and the only way to have enough

8   capital is going to be to bring some in.  It doesn't

9   necessarily need to be brought in in cash if its collateral

10  can be borrowed against the cash.

11          I will give the Debtor 30 days to bring in an

12  amount that I determine has an estimate value, not an

13  estimated borrowing value but an estimated fair value, of

14  $40,750,000.  It used to say 40 million.  750 is because of

15  the diversion of funds.

16          I recognize that the impairment of the $25 million

17  -- excuse me, the 25 million shares of stock may reduce its

18  value.  So the way that I believe this best gets implemented

19  is that I'm giving the Debtors 30 days to bring in

20  $40,750,000 in value.  If the Debtors bring in their 25

21  million shares of stock and if the Court determines that the

22  25 million shares of stock do not have $40,750,000 of value,

23  I will give the Debtors another 30 days to supplement it

24  with the difference.

25          By way of example, if we determine -- and this is

1          MR. COLUMBUS:  Thank you, Your Honor.  I'll just

2   note it is a high priority issue for my clients, so I zeroed

3   in on that.

4          THE COURT:  And it should be, and I understand

5   that, and I don't mean to foreclose their ability to fully

6   contest that at a future hearing and it's not foreclosed.

7          MR. COLUMBUS:  Thank you, Your Honor.

8          THE COURT:  Thank you.  Mr. Kelley.

9          MR. KELLEY:  Your Honor, this isn't going to

10  relate to findings as to this but, I'm not trying to create

11  any sort of procedural benefit here.  But at this point in

12  time the Court has not entered a signed order on the first

13  day of hearing on subject matter jurisdiction.

14          Does the Court intend to have this conclude that

15  hearing when it enters this order or is the Court going to

16  enter a written order at all?

17          THE COURT:  I issued a written order that

18  authorized the use of cash collateral.  In doing so I made a

19  finding that I had subject matter jurisdiction.  I could not

20  have issued the order authorizing the use of cash collateral

21  without making, as a predicate finding, not an order but

22  it's a law finding, that we had subject matter jurisdiction.

23  And that's why I require the parties that we had to address

24  that issue on that day because it was a predicate for the

25  ruling.  So I'm not going to issue another order on that.

1          The order authorizing use of cash collateral had a

2   finding that we had subject matter jurisdiction.  If parties

3   need that to be reconsidered then, again, we'll deal with

4   whether that's appropriate or not.  But I'm not going to

5   issue another order on that.

6          I did not give the Committee an opportunity to

7   request additional findings, nor did I give the United

8   States Trustee, and let me see if either of you-all need

9   additional finding --

10         MR. WOLFE:  Your Honor, the Committee has no

11  additional requests for findings.  Thank you.

12         THE COURT:  Ms. March?

13         MS. MARCH:  Your Honor, I would just ask

14  clarification.  With regard to 345, I'm assuming that the

15  Court's rulings today have no effect base on the Debtor's

16  motion.

17         THE COURT:  Absolutely.  Absolutely not.  My only

18  finding is, it's okay to ask.  I didn't find relief will be

19  granted to them, but it's okay for them to ask.

20         MR. MELKO:  Your Honor --

21         THE COURT:  Mr. Melko.

22         MR. MELKO:  -- I've got a question about the form

23  of collateral and what it's available for.  And specifically

24  I heard the reservation of rights under the Republic of

25  China laws that all -- I think all these banks are ROC.