**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| TMT PROCUREMENT CORPORATION, *et al.*,[1] | § | Case No.: 13-33763 |
| | § | |
| | § | |
| Debtors. | § | (Jointly Administered) |

**EMERGENCY MOTION OF MEGA INTERNATIONAL COMMERCIAL BANK CO.,
LTD., PURSUANT TO 11 U.S.C. §§ 105(a) AND 362(d) FOR ENTRY OF
ORDER GRANTING RELIEF FROM AUTOMATIC STAY**

**NOTICE UNDER BLR 9013-1(b) AND 9013-1(i)**

THERE WILL BE A HEARING ON THIS MOTION ON AUGUST 28, 2013, AT 8:00 A.M. IN COURTROOM 404 AT THE U.S. BANKRUPTCY COURT, 515 RUSK AVENUE, HOUSTON, TEXAS 77002.

THIS IS A MOTION FOR RELIEF FROM THE AUTOMATIC STAY. IF IT IS GRANTED, THE MOVANT MAY ACT OUTSIDE OF THE BANKRUPTCY PROCESS. IF YOU DO NOT WANT THE STAY LIFTED, IMMEDIATELY CONTACT THE MOVING PARTY TO SETTLE. IF YOU CANNOT SETTLE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY AT LEAST 7 DAYS BEFORE THE HEARING. IF YOU CANNOT SETTLE, YOU MUST ATTEND THE HEARING. EVIDENCE MAY BE OFFERED AT THE HEARING AND THE COURT MAY RULE.

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A

---

[1]     The Debtors in these Chapter 11 cases (the "Cases") are: (1) A Whale Corporation; (2) B Whale Corporation; (3) C Whale Corporation; (4) D Whale Corporation; (5) E Whale Corporation; (6) G Whale Corporation; (7) H Whale Corporation; (8) A Duckling Corporation; (9) F Elephant Inc.; (10) A Ladybug Corporation; (11) C Ladybug Corporation; (12) D Ladybug Corporation; (13) A Handy Corporation; (14) B Handy Corporation; (15) C Handy Corporation; (16) B Max Corporation; (17) New Flagship Investment Co., Ltd.; (18) RoRo Line Corporation; (19) Ugly Duckling Holding Corporation; (20) Great Elephant Corporation; (21) TMT Procurement Corporation.

The following Debtors are referred to herein as the "**Mega Bank Debtors**":   C Whale Corporation; D Whale Corporation; E Whale Corporation; G Whale Corporation; H Whale Corporation; A Duckling Corporation; A Ladybug Corporation; Ugly Duckling Holding Corporation; Great Elephant Corporation; and TMT Procurement Corporation.

RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED.  IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER.  IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED; YOU SHOULD FILE AN IMMEDIATE RESPONSE.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

## MOTION

1.      Mega International Commercial Bank Co., Ltd., both in its capacity as an individual lender as well as its role as agent bank in those certain syndicated facilities related to certain of the above-captioned debtors and debtors in possession (collectively, "**Mega Bank**"), through its undersigned counsel, hereby files this emergency motion (the "**Motion**") for entry of an order granting relief from the automatic stay pursuant to 11 U.S.C. §§ 105(a) and 362(d).

## JURISDICTION[2]

2.      Jurisdiction over these matters is alleged to be proper pursuant to 28 U.S.C. §§ 157 and 1334, and, if so, this is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these Chapter 11 cases in this District is alleged to be proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in this Motion are Sections 105(a) and 362 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 4001 of the Federal

---

[2]      Mega Bank files this Motion with complete reservation of its rights to all issues on appeal.

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Bankruptcy Local Rule ("**BLR**") 4001-1.

## FACTUAL BACKGROUND

**I.      Prepetition Loan Facilities, Defaults, and Accelerations**

3.      Mega Bank, in its capacity as lender, arranger, agent and/or security trustee, is party to certain credit facilities (the "**Credit Facilities**") with certain of the Mega Bank Debtors (the "**Borrowers**") as follows:

- A Duckling Corporation, pursuant to that certain Loan Agreement (as supplemented, amended, restated, or varied) dated as of April 6, 2010, by and between A Duckling Corporation, as Borrower; Ugly Duckling Holding Corporation, Taiwan Maritime Transportation Co., Ltd., and Mr. Hsin Chi Su, as Guarantors; and Mega Bank, as Lender; and pursuant to related loan documents;

- TMT Procurement Corporation, pursuant to that certain Facility Agreement (as supplemented, amended, restated, or varied) dated as of July 4, 2012, made between TMT Procurement Corporation, as Borrower, A Ladybug Corporation, Taiwan Maritime Transportation Co., Ltd., and Mr. Hsin Chi Su, as Guarantors; and Mega Bank, as Lender; and pursuant to related loan documents;

- C Whale Corporation, pursuant to that certain Facility Agreement (as supplemented, amended, restated, or varied) dated June 21, 2010, made between C Whale Corporation, as Borrower; Great Elephant Corporation, as English Guarantor; Mega Bank and Chinatrust Commercial Bank Co., Ltd. ("**Chinatrust**"), as Arrangers; Mega Bank, as Agent and Security Trustee; and the lenders from time to time party thereto; with Taiwan Maritime Transportation Co., Ltd., and Mr. Hsin Chi Su, as Taiwanese Guarantors; and pursuant to related loan documents;

- D Whale Corporation, pursuant to that certain Facility Agreement (as supplemented, amended, restated, or varied) dated September 28, 2010, made between D Whale Corporation, as Borrower, Ugly Duckling Holding Corp., as English Guarantor; Mega Bank and Chinatrust, as Arrangers; Mega Bank, as Agent and Security Trustee; and the lenders from time to time party thereto; with Taiwan Maritime Transportation Co., Ltd., and Mr. Hsin Chi Su, as Taiwanese Guarantors; and pursuant to related loan documents;

- E Whale Corporation, pursuant to that certain Facility Agreement (as supplemented, amended, restated, or varied) dated October 25, 2010, made between E Whale Corporation, as Borrower; Ugly Duckling Holding Corp., as English Guarantor; Mega Bank and Chinatrust, as Arrangers; Mega Bank, as Agent and Security Trustee; and the lenders from time to time party thereto; with Taiwan Maritime Transportation Co., Ltd., and Mr. Hsin Chi Su, as Taiwanese Guarantors; and pursuant to related loan documents;

- G Whale Corporation, pursuant to that certain Facility Agreement (as supplemented, amended, restated, or varied) dated March 9, 2011, made between G Whale Corporation, as Borrower; Ugly Duckling Holding Corp., as English Guarantor; Mega Bank, Chinatrust, and First Commercial Bank ("**First Bank**"), as Arrangers; Mega Bank, as Agent; Chinatrust, as Security Trustee; and the lenders from time to time party thereto; with Taiwan Maritime Transportation Co., Ltd., and Mr. Hsin Chi Su, as Taiwanese Guarantors; and pursuant to related loan documents; and

- H Whale Corporation, pursuant to that certain Facility Agreement (as supplemented, amended, restated, or varied) dated June 7, 2011, made between H Whale Corporation, as Borrower; Ugly Duckling Holding Corp., as English Guarantor; Mega Bank, Chinatrust, and First Bank, as Arrangers; Mega Bank, as Agent; First Bank, as Security Trustee; and the lenders from time to time party thereto; with Taiwan Maritime Transportation Co., Ltd., and Mr. Hsin Chi Su, as Taiwanese Guarantors; and pursuant to related loan documents.

The obligations under each Credit Facility are secured by, among other things, a fully perfected, first preferred mortgage on the relevant vessel. The TMT Procurement Corporation facility relates to the *M/V A Ladybug*, the owner of which, A Ladybug Corporation, has provided, in addition to a fully perfected, first preferred mortgage, (i) an assignment of earnings, (ii) an assignment of charter, (iii) an assignment of insurance, (iv) an assignment of requisition compensation, and (v) a charge over earnings account. Each of the other facilities is further secured by, among other things, (i) assignments of earnings, (ii) assignments of charter, (iii) assignments of insurance, (iv) assignments of requisition compensation, and (v) pledges over retention account by the respective Debtor.  See Schedules of Assets and Liabilities, at ECF

Nos. 177, 186, 188–89, 191, 193, 196 (listing principal balances of non-contingent, liquidated, and undisputed secured claims of Mega Bank against the Borrowers).[3]

4.      Each of the Borrowers has defaulted under its respective Credit Facility, and all amounts owing thereunder have been accelerated.  As of the Petition Date, the Mega Bank Debtors were indebted to Mega Bank and the other lenders under the facilities in the approximate aggregate principal amount of not less than $415.5 million plus accrued interest, fees and costs.  Id.

**II.      Prepetition Arrests**

> **A.      Vessel at Issue:  *M/V C Whale* in Singapore**

5.      On or about February 28, 2013, KPI Bridge Oil Limited (incorporated in the Cayman Islands) ("**KPI**"), a bunker supplier to the vessel (and currently a member of the Official Committee of Unsecured Creditors appointed in these Cases), commenced admiralty *in rem* proceedings (ADM 65/2013) against the owners of the vessel, and, on March 1, 2013, caused the vessel to be placed under arrest in the port of Singapore under the custody of the Admiralty Sheriff of the High Court of the Republic of Singapore (the "**Singaporean Court**").  See Declaration of Yap Fook Ken Regarding Singapore Law ("**Yap Declaration**") at ¶ 2.[4]

6.      About one month later, on or about March 27, 2013, (approximately three months prior to the Petition Date) while the vessel remained under arrest by KPI, Mega Bank brought *in rem* proceedings against the *M/V C Whale* (ADM 88/2013) in order to protect its interests in that vessel.  Id. ¶ 3.  To be clear, under Singaporean law, Mega Bank did not arrest the vessel in

---

[3]      Mega Bank reserves all rights in respect of its claims against the Debtors.

[4]      The Yap Declaration is attached as Exhibit 1 to Mega Bank's *Notice of (i) Intention to Raise Issues About Singaporean Law and (ii) Filing of Yap Declaration* filed substantially contemporaneously herewith.

ADM 88/2013 whether at that time or at any time thereafter.  Id.  As of the date of the filing of this Motion, the vessel remains under arrest solely in KPI's action by KPI (ADM 65/2013).  Id.

7.     On or about April 1, 2013, Mega Bank applied to the court for leave to intervene in ADM 65/2013.  Id. ¶ 4.  Because Mega Bank as mortgagee has an interest in the vessel which was brought under arrest in KPI's action (ADM 65/2013), Mega Bank was granted leave by the Singaporean Court to intervene in KPI's action.  On April 5, 2013, Mega Bank entered an appearance as an intervener in KPI's arrest proceeding.  Id. ¶ 5.

8.     Apart from Mega Bank, another entity, Gunvor Singapore Pte Ltd. ("**Gunvor**") has likewise intervened in KPI's action (ADM 65/2013) purportedly to protect its interests in its claim(s).  Id. ¶ 6.  Gunvor's application to intervene in KPI's action was made on or about March 14, 2013, several weeks before Mega Bank made its application to intervene on April 1, 2013. Id.

9.     On or about April 10, 2013, Gunvor and another entity, Clearlake Shipping Pte Ltd. ("**Clearlake**"), filed an *in rem* writ of summons (ADM 102/2013) against the owners of the *M/V C Whale* before the Singaporean Court.  Id. ¶ 7.

10.    On or about May 23, 2013, two more entities, BP Taiwan Marketing Limited ("**BP Taiwan**") and BP Marine Limited ("**BP Marine**," and together with BP Taiwan, "**BP**") filed an *in rem* writ of summons (ADM 142/2013) against the owners of the *M/V C Whale* before the Singaporean Court.  Id. ¶ 8.

11.    For reasons unknown to Mega Bank, the claims of Gunvor, Clearlake, and BP Taiwan are not listed on the schedules of liabilities of C Whale Corporation ("**CWC**") [Dkt.

No. 186].  Nor have these entities been joined to the Debtors' adversary proceeding requesting turnover of the *M/V C Whale*.[5]

12.    On or about July 3, 2013, the crew of the *M/V C Whale* filed an *in rem* writ of summons (ADM 221/2013) against the owners of the vessel before the Singaporean Court.  Id. ¶ 9.

13.    To summarize, there are five actions presently pending before the Singaporean Court against the owners of the *M/V C Whale* (in chronological order):  (1) KPI's prepetition action (ADM 65/2013); (2) Mega Bank's prepetition action (ADM 88/2013); (3) Gunvor and Clearlake's prepetition action (ADM 102/2013); (4) BP's prepetition action (ADM 142/2013); and (5) the crew's postpetition action (ADM 221/2013).  Id. ¶ 11.

14.    Under applicable Singaporean law, upon arrest of a vessel, the Admiralty Sheriff of the Singaporean Court takes custody of the vessel, *in custodia legis*.  Id. ¶ 12.  The Admiralty Sheriff has complete control of the custody of the vessel.  Id.  With respect to the *M/V C Whale*, the Admiralty Sheriff has incurred substantial expenses in furtherance of the arrest, maintenance, and preservation of the vessel while in its custody.  Id. ¶ 28.

15.    On or about May 10, 2013, the Singaporean Court issued an Order of Court in KPI's action (ADM 65/2013) for the appraisement and sale of the vessel (the "**Sale Order**").  Id. ¶ 13.  Pursuant to the Sale Order, the Admiralty Sheriff of the Singaporean Court advertised the vessel for sale on or about June 24, 2013, and invited interested buyers to submit their bids for the purchase of the vessel not later than July 8, 2013.  Id.  Although the Sale Order was granted upon Mega Bank's application, it was an order made by the Court for the benefit of maritime creditors who have an *in rem* claim against the vessel.  Id.  The Admiralty Court sale has the

---

[5]    See C Whale Corp. v. Active Tankers Shipmanagement S.A., Adv No. 13-3141 (Bankr. S.D. Tex.).

unique effect of "washing the ship clean" of all the claims and liens with which it is encumbered. As well as enabling the future operation of the vessel free from the risk of arrest, the clean title created by the Admiralty Court sale may also attract a premium from prospective buyers. In addition, in light of the expenses absorbed in large part by Mega Bank (and which enjoy potentially the highest priority of and for repayment) for preservation of the vessel, it was necessary to commence efforts to sell the vessel before the available monies expired and to obtain satisfaction of the mounting debts. It is not open to Mega Bank to unilaterally withdraw the Sale Order; there are now multiple parties involved. Id. ¶¶ 16–27.

16.     As this Court is aware, on or about June 20, 2013, the Debtors, including the Mega Bank Debtors, filed for protection under Chapter 11 of the U.S. Bankruptcy Code and the instant cases were commenced. Since that time, Mega Bank has not taken any action in the Singaporean proceedings that would violate or be deemed to have violated the automatic stay of Section 362 of the Bankruptcy Code. Despite the Debtors' contentions to the contrary, these ongoing judicial proceedings involve foreign law applicable to multiple parties for which the governing court—not unlike this Court—exercises its authority and power to implement measures and apply the governing, applicable maritime law, intended to provide protections and remedies for the creditors of that particular Debtor and repayment of same in accordance with the rank and priority of such claims under the governing, applicable maritime law, with respect to the vessel in question.

17.     On or about July 3, 2013, Debtor CWC, though its Singaporean counsel, filed an urgent application to the Singaporean Court for a stay of proceedings for forty-five (45) days in large part on account of these Chapter 11 cases. Id. at ¶ 14. As this Court might expect and in respect of Section 362 of the Bankruptcy Code, Mega Bank has taken no action in respect of

CWC's application for a stay of proceedings except in accordance with and pursuant to the terms of this Court's Order entered August 5, 2013 [Dkt. No. 175].  Id.  Mega Bank has not opposed CWC's application for a stay of proceedings and has cooperated with the Singaporean Court, the Admiralty Sheriff, and CWC to provide information, pay necessary costs Mega Bank believed were required and protected the vessel, and otherwise has allowed Debtors over two months to develop a plan and raise cash by which it could approach Mega Bank with a proposal as to how to address the proposed release of the vessel.  Id.

18.     Upon hearing the Stay Application on July 3, 2013, and July 4, 2013, the Singaporean Court directed, *inter alia*, that (i) there be no further action regarding the sale of the *M/V C Whale* until further order and (ii) the Sheriff may receive bids for the vessel but that there be no acceptance of bids until further order.  Id.  The stay application was then adjourned with the stay of proceedings being extended on an *ad hoc* basis at each adjourned hearing.  Id.  At the most recent hearing on the adjourned stay application on August 7, 2013, the Singaporean Court further extended the stay of proceedings until August 30, 2013.  Id.

19.     As of August 7, 2013, the Admiralty Sheriff is understood to have received two sealed bids for the purchase of the vessel, due to expire at 6:00 p.m. (local time) on August 7, 2013.  Id.  According to inquiries made with the Admiralty Sheriff on August 16, 2013, the two bidders have opted to extend their bids rather than withdraw, notwithstanding the Singaporean Court's direction at the August 7, 2013 hearing that the bidders may be released from their bids.  Id.

20.     Although Debtor CWC has not done so, under Singaporean law, a party wishing to release a vessel shall apply for release in the action in which the warrant of arrest was issued.  Id. ¶ 19.  The applicant will need to notify all the other parties to the action of its application to

release the vessel.  Id. ¶ 20.  If all the other parties to the action consent, the release may be issued in accordance with Singaporean law.  Id.  If one or more of the other parties to the action do not consent, then the release may not be issued unless the Court so orders.  Id.  Nevertheless, it is noteworthy that Debtor CWC has not made any application to the court with the initial and direct jurisdiction over the vessel (the Singaporean Court) for the release of the vessel; instead, Debtor CWC sought a stay of proceedings without objection of Mega Bank.  Id. ¶¶ 14, 19.

21.     Notwithstanding the consent of all the other parties to the action, however, before a release is issued in response to such a hypothetical application, the applicant must give notice to any party that has filed a caveat against the vessel.  Id. ¶ 21.  "A person who desires to prevent the release of any property under arrest in an action in rem and the payment out of Court of any money in Court representing the proceeds of sale of that property must file in the Registry a caveat in Form 166 and the caveat so filed shall be entered in the record of caveats."[6]  Id. ¶ 16 (quoting Order 70 Rule 13 of the Singapore Rules of Court).  The filing of a caveat against release of a vessel is a procedural act done to preserve the caveator's option to apply for an arrest of the vessel in the event the vessel is released from arrest by the arresting party.  Id. ¶ 18.  In the event the arresting party wishes to release a vessel from arrest, the arresting party will be required to formally notify the caveator, so that the caveator may exercise its option to either apply for an arrest of the vessel or withdraw its caveat.  Id. ¶¶ 18, 20–21.  If a caveator refuses to withdraw its caveat, the court may only order a release of the vessel if it determines that the caveator did not have a sufficient reason for procuring the entry of its caveat, such as having an improper claim.  Id. ¶ 21.

---

[6]     To the extent required by Rule 44.1 of the Federal Rules of Civil Procedure, Mega Bank hereby notifies this Court and all parties in interest that Mega Bank wishes the Court to take notice of and apply Singaporean law to the issues associated with the *M/V C Whale*.

22.     In practice, the notice procedure is used as a mechanism to notify a caveator to (if it so wishes) arrest the vessel in the caveator's own action.  Id. ¶ 22.  The caveator typically will withdraw the caveat in the arresting party's proceeding but simultaneously apply for a fresh warrant of arrest to be issued against the vessel in its own action.  Id.

23.     To date, six (6) caveats against the release of the vessel have been filed in the Singaporean Court:  CAVA 17/2013 by Mega Bank (prepetition); CAVA 19/2013 by the crew of the vessel (prepetition); CAVA 25/2013 and CAVA 26/2013 by BP (prepetition); CAVA 61/2013 by Clearlake (postpetition); and CAVA 61/2013 by Gunvor (postpetition).  Id. ¶ 15.  Clearlake and Gunvor, each a foreign creditor, filed their caveats in the postpetition period on or about August 7, 2013.  Id.

24.     If Debtor CWC wishes to procure the release of the *M/V C Whale* from arrest in Singapore, it will have to either settle or secure the claim of those parties who are not bound by the Chapter 11 Proceedings; otherwise, CWC would run the risk that such creditors would arrest the *M/V C Whale* in their own action upon the *M/V C Whale* being released from arrest in KPI's action.  Id. ¶ 26.

25.     Even further, CWC will also need to pay the Sheriff's expenses and commission incurred in connection with the arrest, maintenance, preservation and release of the *M/V C Whale*.  Id. ¶ 27.  Since the time the *M/V C Whale* was arrested on March 1, 2013, substantial expenses have been incurred by the Admiralty Sheriff toward the arrest, maintenance, preservation and sale of the *M/V C Whale*.  The estimated amount of Sheriff's expenses up to August 31, 2013, is SGD $4,322,349.89 (or approximately USD $3,457,879.91 based on the exchange rate of USD $1.00 to SGD $1.25).  Id. ¶ 28.  CWC's Chapter 11 Proceedings have delayed the court sale process and caused arrest costs to increase substantially.  Id.  The

"automatic stay" has in this way reduced the value available to all parties.  Id.  The proceedings

before the Singapore Court to sell the vessel are at an advanced stage and given that the buyer of

the *M/V C Whale* would obtain the vessel free and clear of all liens, charges, claims and

encumbrances from the Admiralty Sheriff, it is expected that the sale would, as described above,

attract a premium on the price.  Id.  If the *M/V C Whale* were now to be released, the costs (in

particular the Sheriff's expenses) incurred towards achieving an Admiralty Court sale of the *M/V*

*C Whale* at a premium and with a clean title would have been entirely wasted, and the *M/V*

*C Whale* will remain at risk of arrest from foreign creditors.  Id.

26.    The Singapore Admiralty Court has extensive experience in dealing with

admiralty and shipping cases, including but not limited to mortgage enforcement actions and the

judicial sale of vessels.  Id. ¶ 29.  Since 2006, the Singapore Admiralty Court has sold more than

seventy (70) vessels by way of judicial sale.  Id.

27.    As of the Petition Date, Debtor CWC owed Mega Bank and other lenders not less

than $63 million in principal, plus interest and other amounts, under its loan facility.

28.    As stated previously, the crew of the vessel, BP, Clearlake, and Gunvor are not

named as defendants in the Debtors' Amended Complaint to Compel Turnover and for

Temporary and Permanent Injunctive Relief [Adv. Dkt. No. 6] (the "**Amended Complaint**"). As

this Court has recently ruled at the hearing on the Debtors' *Amended Expedited Motion to*

*Approve Share Escrow Agreement* [Dkt. No. 250], relief against a party may not be obtained

unless that party is properly joined to that action.

29.    Similarly, the Debtors have not moved in this Court to enforce the *Order*

*Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code Enforcing and Restating*

*Automatic Stay and Ipso Facto Provisions* [Dkt. No. 23] (the "**Comfort Order**") against the

crew of the vessel, BP, Clearlake, Gunvor, or KPI (the applicant for arrest and a member of the Committee in these Chapter 11 cases). For the reasons Mega Bank has stated more fully in its objection to the Debtors' motion in that regard [Dkt. No. 261], that creative effort to avoid a matter that is more properly subject to an adversary proceeding is, at best, incomplete for failing to (i) recognize the procedural and substantive facts and (ii) identify and join all parties to obtain complete relief before the Court.

        **B.**      **Vessel at Issue:** *M/V E Whale* **in South Africa**

        30.      As of the Petition Date, the *M/V E Whale* had been detained at Cape Town, South Africa, for more than one year, since May 2012, when the vessel was first arrested by Brazil Holdings Ltd. ("**Brazil Holdings**") in respect of a charterparty dispute. See Declaration of Craig Neil Cunningham Regarding South African Law at ¶ 4.[7] On May 27, 2013, the vessel was released from the Brazil Holdings arrest, but not before subsequent arrests commenced and seized control of the vessel. Id. Since the beginning of April 2013, four additional arrests have been undertaken in respect of the *M/V E Whale* in the High Court of South Africa (Western Cape High Court) (the "**South African Court**"). Id. ¶¶ 4–6. The *M/V E Whale* vessel remains under arrest off the port of Cape Town. Id.

        31.      On or about April 3, 2013, the crew of the vessel—comprising the crew on board and certain repatriated crew members—arrested the vessel and commenced the first proceeding *in rem* for unpaid crew wages, in addition to Brazil Holdings' arrest. Id. ¶ 5.

---

[7]      The Cunningham Declaration is attached as Exhibit 1 to Mega Bank's *Notice of (i) Intention to Raise Issues About South African Law and (ii) Filing of Cunningham Declaration* filed substantially contemporaneously herewith.

32.     More than two months prior to this bankruptcy filing, on or about April 18, 2013, following a notice of default and acceleration, Mega Bank arrested the vessel and commenced an *in rem* action against the vessel.  Id.

33.     On or about April 27, 2013, Dolphin Offshore (Pty) Ltd. ("**Dolphin Offshore**"), a South African corporation operating in Cape Town as a ship's chandler and supplier, arrested the vessel and commenced the third *in rem* action for unpaid costs for stores, provisions, and supplies to the vessel.  Id.  On June 21, 2013, Cape Town Suppliers & Exporters (Pty) Ltd. ("**Cape Town Suppliers**"), a South African corporation operating in Cape Town as a ship's chandler and supplier, arrested the vessel and commenced a fourth action *in rem* for claims on account of unpaid provisions (e.g., food and general wares).  Id. ¶ 6.

34.     There are a number of additional creditors, such as Smit Amandla Marine (Pty) Ltd. and Titan Helicopters, with offices in Cape Town who may consider arrests of the vessel for services rendered and goods supplied to the vessel since January 2013.[8]  Id. ¶ 7.

35.     It also is possible for a creditor that has an *in rem* claim against another TMT owned or controlled vessel (whether a Debtor or a non-Debtor) to arrest the *M/V E Whale* as an associated ship in accordance with applicable South African law.  Id. ¶ 8.  In addition, claims arising against TMT and TMT-controlled entities arising out of agreements for the charter of an associated vessel may give rise to the charterers' ability to arrest the *M/V E Whale* as an associated ship.  Id. ¶ 9.

36.     Applicable South African law provides that if, at any time, a ship (in respect of which the claim arose) was the subject of a charter party, the charterer or sub-charterer, as the

---

[8]     To the extent required by Rule 44.1 of the Federal Rules of Civil Procedure, Mega Bank hereby notifies this Court and all parties in interest that Mega Bank wishes the Court to take notice of and apply South African law to the issues associated with the *M/V E Whale*.

case may be, is deemed to be the owner of the ship concerned in respect of any relevant maritime claim for which the charterer or the sub-charterer, not the owner, is alleged to be liable.  Id. ¶ 10.

37.     In the circumstances, any creditor having a claim against TMT as charterer of their vessel may arrest the *M/V E Whale* as an associated ship as security for those disputes.  Id. ¶ 11.  The Brazil Holdings arrest was such an associated ship arrest.  Id.  As with direct *in rem* claimants, under applicable South African law, creditors with a claim against the vessel as an associated ship may arrest the vessel at any time while she is under another arrest, or, if released from the current arrests, before she leaves the jurisdiction.  Id.

38.     The Sheriff of the South African Court, in accordance with applicable South African law, has the custody and control of the vessel while under arrest.  Id. ¶¶ 19–20.  The Sheriff is in possession of the vessel from the time of her arrest and directs her movements, custody and care and is ultimately responsible for her care and custody while under arrest.  Id. ¶ 21.  As such, any access to the vessel by arresting creditors and third parties, requests from the vessel for provisions, matters pertaining to the crew and any items in relation to the preservation of the vessel must be done in consultation with the Sheriff, who will make a determination as to what actions may be taken.  Id.

39.     Under applicable South African law, upon the furnishing of "security," the further arrests of a vessel by the same creditor arising out of the same claim will be precluded.  Id. ¶¶ 22–23; see also Declaration of Joelle Louise Downes Regarding South African Law ¶¶ 3–5 [Dkt. No. 116-1].  This may not apply when an arresting creditor releases the vessel without security being furnished for its claims.  See Cunningham Declaration ¶ 23.  A further arrest, effected before security is furnished in respect of the first arrest, or where the first arrest is withdrawn, will thus not be prohibited under South African law.  Id.

40.     If Mega Bank is ordered to release the vessel without the necessary security being furnished for all or a portion of its current claims *in rem* against the vessel, and if the vessel sails before Mega Bank is able to re-arrest, whether for its claims arising out of the facility agreement or otherwise, it will not only lose its opportunity to obtain security for its claims but also the ability to recover those costs it has incurred in respect of the preservation of the vessel since arresting the vessel in April 2013.   Id. ¶ 24.   These costs include the costs of supplying provisions (food, etc.) and bunkers to the vessel and paying the crew's arrear and ongoing wages. Id.

41.     Applicable South African law specifically contemplates the filing of these Chapter 11 cases:

> Any property arrested in respect of a maritime claim or any security given in respect of any property, or the proceeds of any property sold in execution or under an order of a court in the exercise of its admiralty jurisdiction, shall not, except as provided in section 11 (13), vest in a trustee in insolvency and shall not form part of the assets to be administered by a liquidator or judicial manager of the owner of the property or of any other person who might otherwise be entitled to such property, security or proceeds, and no proceedings in respect of such property, security or proceeds, or the claim in respect of which that property was arrested, shall be stayed by or by reason of any sequestration, winding-up or judicial management with respect to that owner or person.

Id. ¶ 25 (quoting Admiralty Jurisdiction Act 105 of 1983 § 10 (S. Afr.)).

42.     The Admiralty Jurisdiction Act 105 of 1983 of South Africa (the "**Admiralty Jurisdiction Act of South Africa**") provides that any property already under arrest, such as the *M/V E Whale*, shall not vest in a "trustee in insolvency and shall not form part of the assets to be administered by a liquidator or judicial manager of the owner of the property <u>or of any other person who might otherwise be entitled to such property</u>."  Id. (emphasis added).  From the time of the first arrest in April 2012 (Brazil Holdings), the vessel shall not, except as provided in

16

section 11 (13) of the Admiralty Jurisdiction Act of South Africa, vest in a "trustee in insolvency" or form part of the assets to be administered by any person who might otherwise be entitled to such property (*i.e.*, EWC as debtor in possession). Id.  Section 11 of the Admiralty Jurisdiction Act of South Africa provides for the ranking of claims, and subsection 13 provides that "[a]ny balance remaining after the claims mentioned in paragraphs *(a)* to *(e)* of subsection (4) [*e.g.*, "a claim in respect of costs and expenses incurred to preserve the property in question," "a claim in respect of any mortgage," and "a claim in respect of any maritime lien on the ship"] and the claims mentioned in subsection (11) [*i.e.*, associated ship claims] have been paid, shall be paid over to any trustee, liquidator or judicial manager who, but for the provisions of section 10, would have been entitled thereto or otherwise to any other person entitled thereto." Admiralty Jurisdiction Act of South Africa § 11 (13).  EWC's estate, at best, has a contingent remainder interest in the proceeds of sale of the vessel, after satisfaction of Mega Bank's claim in full.

43.     Even if Mega Bank were to release the vessel from the current arrest before security is furnished, the vessel would nevertheless remain under arrest by the crew, Dolphin Offshore, and Cape Town Suppliers as well as being open to further arrests by any other creditors who either have direct or associated claims but which have not yet commenced proceedings by the arrest of the vessel.  See Cunningham Declaration at ¶ 28.  Unless paid, the claims of the crew, Dolphin Offshore, and Cape Town Suppliers are and will remain unaffected by the Debtors' bankruptcy filings. Id. ¶¶ 25–28.

44.     In addition, the Sheriff, as the custodian of the vessel, is entitled to remuneration for services rendered to the vessel for the preservation thereof from the time of her arrest until

final release and is therefore also a creditor of the vessel.  Id. ¶ 29.  The Sheriff is thus also entitled to payment for such services rendered before the vessel is free to sail.  Id.

45.     Any arresting creditors may apply at any time for the court to order the judicial sale of the vessel under applicable South African law.  Id. ¶ 30.  Prior to the Petition Date, on May 20, 2013, Mega Bank commenced a sale application proceeding in the South African Court. Mega Bank has taken no actions in the South African proceeding since the commencement of these Cases.  Id. ¶ 2.  On the request of EWC and by agreement between the parties to the South African proceeding, the hearing of the sale application has been postponed to November 12, 2013.  Id.

46.     If, however, Mega Bank were to release the vessel from arrest, the remaining creditors—the crew, Dolphin Offshore, and Cape Town Suppliers—could, and likely would, seek an order for the judicial sale of the vessel.  Id. ¶ 30.  Any such sale order in which Mega Bank is not included would prejudice Mega Bank's position as the major creditor.  Id.

47.     The Debtors have not named the crew of the vessel, Dolphin Offshore, and Cape Town Suppliers in their Amended Complaint nor are they listed as parties to the action for which a preliminary injunction is being sought by Debtors.  The Debtors also have not moved to enforce the Comfort Order against the crew of the vessel, Dolphin Offshore, and Cape Town Suppliers, other parties who have arrested the vessel and who, under the theories espoused by Debtors, have the same type of "possessory" interest Debtors allege (incorrectly) that Mega Bank possesses.

48.     As of the Petition Date, EWC owed Mega Bank and other lenders not less than $73.28 million in principal, plus interest and other amounts, under its loan facility.

C.      **Vessel at Issue:  *M/V A Duckling* in the PRC**

49.     Zhejiang Eastern Shipyard Co., Ltd. ("**ZESCO**"), and Xiamen Hailong Manning

Service Co. Ltd. ("**Hailong**"), each incorporated in the People's Republic of China (the "**PRC**")

and listed on the Debtors' *Consolidated List of Creditors Holding 30 Largest Unsecured Claims*

[Dkt. No. 10], commenced arrest proceedings against the *M/V A Duckling* on May 9, 2013, and

May 16, 2013, respectively, in the Qingdao Maritime Court.  See Declaration of Guangwei Sun

(the "**Sun Declaration**") at ¶ 3.[9]  ZESCO commenced its proceeding for unpaid vessel repair

fees but later withdrew its arrest on or about July 18, 2013.  Id.  On August 8, 2013, in possible

violation of the automatic stay, ZESCO filed an application to re-arrest the vessel.  Id.  The

Qingdao Maritime Court issued an arrest order shortly thereafter.  Id.  In its second arrest,

ZESCO asserts a claim in the amount of $300,000.00.  Id.  Hailong commenced its proceeding

for unpaid crew wages and crew agency fees.  Id.  The *M/V A Duckling* remains under arrest in

the port of Yantai, PRC, under the supervision of the Qingdao Maritime Court.  Id.  Mega Bank

has not commenced any arrest proceedings in the PRC.  Id.

50.     On information and belief, the Debtors' alleged local counsel has made no formal

appearance before the Qingdao Maritime Court on A Duckling Corporation's behalf, much less

defended its interests in that proceeding.  Id. ¶ 4.

51.     In accordance with applicable PRC law, the maximum period of arresting a ship

for maritime claim preservation is thirty (30) days save where the arresting party commences

litigation or arbitration proceedings within that period or the arrest is applied for during the

---

[9]      The Sun Declaration is attached as Exhibit 1 to Mega Bank's *Notice of (i) Intention to Raise Issues About PRC Law and (ii) Filing of Sun Declaration* filed substantially contemporaneously herewith.

litigation or arbitration.[10]  Id. ¶¶ 10–11.  If, upon the expiration of the period mentioned above, the arrested party fails to provide security and it is inappropriate to maintain the arrest any longer, the maritime claimant, after having commenced litigation or arbitration, may apply in writing to the maritime court which arrested the ship for court auction of the ship.  Id. ¶ 11.

52.    Here, the current active arrest is Hailong's arrest, which has been effective since July 18, 2013, when ZESCO withdrew its original arrest.  Id. ¶ 12.  As no security has been provided by A Duckling Corporation (as owner of the *M/V A Duckling*) within thirty (30) days after Hailong's arrest, and Hailong has already brought a substantive claim before Xiamen Maritime Court, Hailong would be entitled to apply to the Qingdao Maritime Court to sell the ship if Hailong can demonstrate that the urgency and need for such sale, including, among other things, the reduction of the market value of the ship for a prolonged arrest and the safety of the ship on account of the owner failing to provide bunkers.  Id.

53.    Because, among other things, there is no applicable bilateral treaty between the PRC and the U.S., the Qingdao Maritime Court very likely will not recognize or enforce this Court's orders.  Id. ¶ 6–9.

54.    Based on the testimony of Lisa Donahue of AlixPartners, the Debtors' proposed financial advisor, during the hearing on dismissal, this Court found that "the [*M/V*] *A Duckling* has inadequate cash collateral to meet its restart costs."  Tr. of H'rg, July 18, 2013, at 307:21–23. "It is short by over $100,000 in having adequate cash to restart."  Id. at 307:23–24; see also id. at 309:17–18 ("Certainly with respect to the *A Duckling*, more money is needed.").

---

[10]    To the extent required by Rule 44.1 of the Federal Rules of Civil Procedure, Mega Bank hereby notifies this Court and all parties in interest that Mega Bank wishes the Court to take notice of and apply PRC law to the issues associated with the *M/V A Duckling*.

D.      **Vessel at Issue:  *M/V A Ladybug* in Malta**

55.     Unlike other vessels in TMT's fleet, there is no retention account for the *M/V A Ladybug*, and A Ladybug Corporation has $0.00 in its operating account.

56.     The vessel is not under hire and is (and has been) left idle and exposed off the coast of Malta.  It has been reported that, due to inability to pay for fuel, the *M/V A Ladybug* was adrift at sea, and it created such a danger, that a salvage operation was called to secure the vessel and tow it to anchorage.  Similarly, the Maltese authorities have apparently provided fuel and supplies to the vessel once it was secured.  It also has been reported that on or about August 14, 2013, the captain and crew requested the issuance of a warrant for the vessel's arrest from a Maltese court and that the Maltese court issued the warrant for her arrest shortly thereafter.  In light of the other charges incurred, other parties are expected to join the arrest shortly, and certainly before the vessel would be released.

57.     This Court has observed certain of the emergencies related to the *M/V A Ladybug*. The first emergency was a request for payment of a Gard P&I insurance premium that was due on the Petition Date.  This premium was at issue in the Debtors' emergency motion filed on July 3, 2013 [Dkt. No. 65].  Because there is no cash collateral to pay the premium, Mega Bank objected to the request [Dkt. No. 76].  Mega Bank has repeatedly inquired about the status of P&I insurance coverage on the vessel.  Despite the emergency that the Debtors presented before this Court and the lack of authority to use cash collateral (which does not exist), the Debtors have informed Mega Bank that the vessel remains insured.  It is understood that either Mr. Su or a non-Debtor entity has paid this expense.

58.     Similarly, the Debtors requested urgent payment of certain communication expenses on account of the *M/V A Ladybug* and certain other of Mega Bank's vessels.  The Debtors informed Mega Bank that the communication service providers would terminate

services for all relevant vessels—including non-Debtor vessels—for nonpayment.  The Debtors subsequently filed an emergency motion on account of these expenses [Dkt. No. 145], but the Debtors made no request in their emergency motion for the *M/V A Ladybug* expense.  Mega Bank understands why the expense would be omitted from their emergency motion:  no cash collateral is available to pay the expense.  Still, the *M/V A Ladybug* expense, on account of the same services by the same providers, was no less critical to the vessel than the other communication expenses subject to the motion.  The Debtors informed Mega Bank that communication services remain in effect.

59.     As of the filing of this Motion, Mega Bank only has received cash projections for the vessel through August 30, 2013.  Overall, the projections show cash losses only.  The Debtors have no plan to pay crew wages, bunkers, or other critical expenses, such as insurance premiums and communications expenses, attendant to owning and operating a vessel under these extraordinary circumstances, the non-payment of which place the vessel and its crew at serious risk.

## ARGUMENT

60.     Section 362(d)(1) of the Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the [automatic] stay . . . by terminating, annulling, modifying, or conditioning such stay for cause, including the lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362(d)(1).  The party opposing relief from the automatic stay has the burden of proof on all issues other than the issue of the debtor's equity in property.  Id. § 362(g).

61.     "Cause" exists to allow Mega Bank to continue with admiralty court sales of the ships and to participate in future foreign arrest proceedings.  The Debtors' ships cannot trade freely because they are encumbered with the claims of legions of maritime creditors.  The

Debtors' Schedules of Assets and Liabilities include over 260 non-priority claims, which the Debtors acknowledge may be secured by maritime liens. In addition, the Schedules are incomplete as they omit claims, such as Clearlake, Gunvor, and BP Taiwan, as observed previously. Inevitably, given the longstanding decline of TMT, there will be further claims against the vessels which have not yet come to light, potentially leading to further arrests, whether in this port or other ports should any vessel be released. The use of the cash collateral to pay claims also may encourage other claimants to come forward, setting in motion a chain of events which severely prejudices the bank lenders.

62.     In contrast, admiralty court sales transfer all claims against the vessel to the sale proceeds. In so doing, court sales deliver a clean title to the buyer, maximizing available value and enabling the vessel to resume trading, without risk of arrest. This effect of an admiralty court sale is recognized worldwide as a matter of international judicial comity, and buyers in the shipping industry are familiar with the concept of the admiralty court sale and its procedures.

63.     Despite the scope of the automatic stay, the reality is that the Debtors' business is exclusively foreign in nature, and foreign maritime lien claimants, whether subject to the jurisdiction of this Court or not, may arrest the Debtors' vessels in foreign jurisdictions. The admiralty courts of such jurisdictions, which are seized of the vessels, also may not recognize this Court's orders, given the fact that these Chapter 11 filings have not been made at the place of incorporation of the Debtors, and that the case has practically no connection to the U.S.

64.     Millions of dollars have already been expended on the court sales, and that money will be entirely wasted if the sales do not proceed.

65.     Regarding future foreign arrest proceedings, Mega Bank faces a "catch-22": either sit back and watch its collateral be detained in foreign jurisdictions and eventually sold

free and clear of its liens and claims or affirmatively prosecute its interests against the vessel at risk of sanctions of this Court.  "Cause" clearly exists to modify the automatic stay and prevent this inequitable situation that has been forced upon Mega Bank.

66.     Similar relief has been granted in other bankruptcy cases.  In the bankruptcy cases of Hellenic Lines, the bankruptcy court vacated the automatic stay to the extent of permitting maritime lien claimants "to intervene or participate in any action, existing or future, against any assets, including vessels, of Hellenic wherever they might be found."  Morgan Guar. Trust Co. of N.Y. v. Hellenic Lines Ltd., 38 B.R. 987, 990 (S.D.N.Y. 1984).  The bankruptcy court vacated the stay to the extent as follows:

> Acknowledging that courts of admiralty outside the United States may not recognize the jurisdiction of United States Bankruptcy Courts with respect to the disposition of vessels free and clear of maritime liens and in an effort to maximize the proceeds from the sale of the vessels arrested in this and other actions, Judge Lifland, in an order filed January 20, 1984, further vacated the automatic stay and permitted any party having a claim against fourteen Hellenic vessels, including the INNOVATOR, the STAR, the IDEAL, and the SPIRIT, the vessels arrested in this action, to "take any and all steps necessary to protect and enforce their rights and interests in the aforementioned Vessels, including the commencement and prosecution of Admiralty Proceedings in courts of competent jurisdiction, sale of the aforementioned Vessels and the distribution of the proceeds of such sales.

Id. at 990–91.

67.     Mega Bank respectfully submits that "cause" exists to grant such relief and that the Debtors cannot adequately protect Mega Bank's interests in its vessels from the actions of foreign creditors in foreign courts.

68.     Mega Bank has and continues to work with the Debtors in good faith during the pendency of these Chapter 11 Cases.  To that end, Mega Bank is not seeking to rush to a foreign court upon commencement of a postpetition, third party proceeding; instead, Mega Bank seeks

entry of an order that would (i) allow Mega Bank to intervene and/or participate in current arrest proceedings to protect and preserve its rights in respect of the orders of those foreign courts (orders to which, Mega Bank respectfully submits, this Court should extend comity) and (ii) allow Mega Bank to intervene and/or participate in future proceedings commenced by third-parties to protect and preserve its rights while affording the Debtors an opportunity to release a vessel or other property from such third-party action.

69.    Importantly, the Debtors have failed to seek this Court's authority to retain any local counsel, let alone local counsel in those jurisdictions in which their vessels are subject to arrest.  Accordingly, it remains uncertain, if, and to what extent, the respective Debtors are protecting the interests of their respective estates and constituents from arrests and other actions by foreign creditors.

## I.    The Stay Should Be Modified and/or Lifted to Allow Mega Bank to Participate in Existing Foreign Arrest Proceedings

70.    The stay should be lifted for "cause" to allow Mega Bank to participate in current arrest proceedings because the Debtors cannot adequately protect Mega Bank's interests in those vessels at issue— the *M/V C Whale*, the *M/V E Whale*, the *M/V A Duckling*, and, now, the *M/V A Ladybug*.  The Debtors cannot practically obtain the release of these vessels unless the Debtors satisfy or secure payment of the claims of the other parties to that proceeding; the Debtors would need to pay millions of dollars in respect of all three vessels from the respective retention accounts, notwithstanding Mega Bank's rights to have its claims secured or satisfied in full upon the sale or release of the vessels.

71.    The Debtors cannot protect the vessels from additional claims or caveats that would need to be paid upon release.  The Debtors' proposed use of cash collateral—to pay any and all claims and amounts necessary to procure release of the arrested vessels—simply invites

foreign claimants over which this Court may not have personal jurisdiction to appear in those foreign proceedings and get paid.  More important, the potential claims of creditors of the various Debtors, such as Gunvor and Clearlake (neither of which is listed on CWC's schedules), remain largely unknown.  They have appeared postpetition and will likely attempt to prevent release.

72.     The Debtors cannot protect the vessels from orders of foreign courts, not to suggest that the orders of foreign courts would necessarily be disadvantageous to the process.  To the contrary, admiralty court sales in Singapore and South Africa may maximize the value of the vessels.  The sale orders of these admiralty courts, if these courts choose to proceed with such sales, are recognized worldwide, and they satisfy the expectations of the global shipping market.  Cf. Morgan Guar. Trust Co. of N.Y. v. Hellenic Lines Ltd., 38 B.R. at 998 ("[A]s all parties to these proceedings concede, only an admiralty court can give a title to the ship which will achieve worldwide recognition.").

73.     In any event, the proposed use of cash collateral as set forth in the Cash Collateral Motion is highly extraordinary.  The relevant Debtors are passive, ship-owning special purpose entities with no employees and no management or control of their vessels.  The Whale fleet, for example, is chartered to a non-Debtor affiliate which has not even appeared in these Cases.  Other than the limited cash collateral, the only prospective source of cash for operations is derived through this non-Debtor affiliate's charter parties with third parties – charters which it, and not the Debtors, has negotiated.  In fact, the Debtors likely are without the necessary contractual privity to even enforce breaches under these charters, certainly that is the case for vessels leased through non-Debtor Blue Whale.

74.     Unfortunately, the Debtors do not currently possess enough cash from these arrangements to achieve their goals.  Instead, they propose to use Mega Bank's cash collateral held in "retention accounts."  These retention accounts were not maintained as operating accounts funded with cash flow from operations.  Instead, they were established at the outset of each loan facility for the sole purpose of securing repayment of the underlying loans.  The Debtors propose to use this cash to "kick-start" the vessels in a depressed market.  They want to release certain vessels from arrest and place them, along with many of the other vessels, under the management and control of non-Debtor affiliates who have been absent from these Cases.  To do so would require the payment of significant restart costs together with pre-petition expenses.  This proposed use of cash collateral will effectively deplete these retention accounts, leaving the Debtors with insufficient cash to deliver the vessels to prospective charterers, if any, and realize charter hire in this market.  Moreover, the evidence will show that the Debtors' assumptions on their ability to kick-start their operations and realize meaningful charter hire are fatally flawed.  The Vantage shares cannot adequately provide a source of liquidity for the Debtors' entire fleet of vessels and operations, much less provide adequate protection for use of cash collateral.

75.     "Cause" exists to lift the stay in respect of the *M/V C Whale* at least for the following reasons:  (i) KPI, a member of the Committee, has arrested the vessel; (ii) the Admiralty Sheriff of the Singaporean Court has taken custody and control of the vessel, *in custodia legis*, prepetition; (iii) significant resources have been expended for the protection and preservation of the vessel, and to achieve a clean title for the vessel through an Admiralty Court sale; (iv) the Singaporean Court, prior to the commencement of these Cases, has ordered the sale of the vessel for the benefit of all claimants to the action; (v) the Singaporean Court has a greater

interest in the vessel and its disposition in light of the claims of the vessel's crew and various local creditors, many of which have appeared and participated in the Singaporean proceeding and likely cannot participate in a meeting of creditors, file proofs of claim, or otherwise defend their interests in these Chapter 11 Cases; (vi) this Court should extend comity to the prepetition arrest and sale order of the Singaporean Court; (vii) foreign third party claimants have ignored the potential reach of the automatic stay and have filed caveats against release of the vessel in the postpetition period; (viii) various other third parties, unknown to the Debtors, may appear and prevent the release of the vessel; (ix) this Court very likely has no jurisdiction over those foreign parties; (x) the Debtors cannot adequately protect Mega Bank's interests in the vessel through its proposed use of cash collateral, any alleged equity cushion, any alleged going concern value, or any alleged replacement liens; (xi) Mega Bank would be prejudiced by any such sale without its participation.

76.    "Cause" exists to lift the stay in respect of the *M/V E Whale* at least for the following reasons:  (i) the Sheriff of the South African Court has taken custody and control of the vessel, *in custodia legis*, prepetition; (ii) the Sheriff has had custody and control of the vessel since May 2012; (iii) significant resources have been expended for the protection and preservation of the vessel, and to achieve a clean title for the vessel through an Admiralty Court sale; (iv) the South African Court, prior to the commencement of these Cases, has overseen the arrest of the vessel for the benefit of all claimants to the action; (v) the South African Court has a greater interest in the vessel and its disposition in light of the claims of its crew and various local creditors, many of which have appeared and participated in the South African proceeding and likely cannot afford to participate in a meeting of creditors, file proofs of claim, or otherwise defend their interests in these Chapter 11 Cases; (vi) South African law expressly precludes the

vessel from vesting in EWC's bankruptcy estate or from being administered otherwise than by the South African Admiralty Court; (vii) this Court should extend comity to the prepetition arrest of the vessel, through which the Sheriff has taken custody and control of the vessel *in custodia legis*, and this Court should extend comity to the laws of the South Africa, which, again, preclude the vessel from vesting in EWC; (viii) foreign third party claimants have ignored the potential reach of the automatic stay and have commenced actions *in rem* against the vessel in the postpetition period; (ix) various other third parties, unknown to the Debtors, may appear and prevent the release of the vessel on account of direct or associated claims against the vessel; (x) this Court very likely has no jurisdiction over those foreign parties; (xi) the Debtors cannot adequately protect Mega Bank's interests in the vessel through its proposed use of cash collateral, any alleged equity cushion, any alleged going concern value, or any alleged replacement liens; (xii) there is no purpose for a stay of the South African proceedings to November 12, 2013, when applicable nonbankruptcy law precludes this Court from authorizing EWC to use the vessel as property of its bankruptcy estate (because it is not property of EWC's bankruptcy estate); and (xiii) Mega Bank would be prejudiced by the sale of the vessel without its participation.

77.    "Cause" exists to lift the stay in respect of the *M/V A Duckling* at least for the following reasons:  (i) this Court has found that the Debtors have insufficient cash to restart vessel operations; (ii) the Debtors have proposed no business plan to Mega Bank or this Court, and no business plan exists, to enable the vessel to be released and restarted; (iii) the vessel remains defenseless in the Qingdao Maritime Court because the Debtors have not appeared in that court to defend the vessel from sale; (iv) foreign third-party creditors have arrested the

vessel in the post-petition period; and (v) this Court very likely has no personal jurisdiction over such creditors.

78.     For the foregoing reasons, the Debtors cannot adequately protect Mega Bank's interests in the currently arrested vessels—the *M/V C Whale*, the *M/V E Whale*, the *M/V A Duckling*, and *M/V A Ladybug* —and therefore the stay should be lifted to allow Mega Bank to participate and/or intervene in those proceedings, as appropriate, to exercise its rights in full.

## II.     The Stay Should Be Lifted to Allow Mega Bank to Exercise its Rights With Respect to the *M/V A Ladybug*

79.     The stay should be lifted for "cause" to allow Mega Bank to exercise its rights and remedies with respect to the *M/V A Ladybug*.  It has been reported that the vessel was arrested on August 14, 2013, by its crew in respect of a claim for unpaid wages.  Further, in the more than two months since these Cases were filed, A Ladybug Corporation has failed to secure, or even propose, any available liquidity to address the urgent needs of the vessel.  Critical expenses have fallen due during the pendency of these Cases.  Requests for payment of the Gard P&I insurance premium and critical communications expenses have been presented to this Court as emergencies.  Mega Bank is assured by the Debtors that insurance coverage has not lapsed and that communications remain in service, but Mega Bank does not fully understand how the "emergencies" were abated.  If, in fact, a third party is paying these expenses (especially a non-Debtor affiliate), it is curious that this party is not also preventing the arrest of the vessel and paying for the wages and critical needs of the crew stranded on the vessel or otherwise allowing the vessel to drift at sea.

80.     Regardless, Mega Bank only has received cash projections for the vessel through August 30, 2013.  The projections show cash losses only.  The Debtors have no plan to pay crew wages, bunkers, or other critical expenses, such as insurance premiums and communications

expenses, attendant to owning and operating a vessel under these extraordinary circumstances, the non-payment of which place the vessel and its crew at serious risk.  TMT's inability to trade the *M/V A Ladybug* indicates the unwillingness of charterers to hire the vessel from TMT or while under TMT management, given the exposure of arrest.  Borrowing further money to meet operating expenses makes no commercial sense, and erodes the Bank's security.  The vessel needs to be transferred, by way of judicial sale, to a shipowner that is capable of operating the business.  Mega Bank respectfully submits that the stay should be lifted to allow Mega Bank to exercise its rights in respect of the vessel.

**III.    The Stay Should Be Modified and/or Lifted to Allow Mega Bank to Intervene and/or Participate in Any Future Arrest Proceedings**

81.     The stay should be lifted for "cause" to allow Mega Bank to intervene and/or participate in any future proceedings because the Debtors cannot adequately protect Mega Bank's interests in its vessels from the actions of foreign maritime lien claimants and foreign admiralty courts.  This form of relief mirrors that which was granted in <u>Hellenic Lines</u>.  TMT faces the same risks.  The post-petition actions in respect of the *M/V E Whale* by Cape Town Suppliers and the *M/V A Duckling* by ZESCO, as well as the post-petition caveats of Clearlake Shipping and Gunvor in respect of the *M/V C Whale*, all evidence the threat to the entire TMT fleet notwithstanding these Chapter 11 Cases.  Foreign creditors are simply undeterred by the bankruptcy filing in the United States and continue to seek post-petition relief in foreign jurisdictions.

82.     Mega Bank does not seek to rush to the courthouse upon the commencement of any future arrest; rather, the proposed order provides that Mega Bank may intervene or participate in any such action on the earlier of thirty (30) days after commencement of any such action or the date that is seven (7) days before Mega Bank, in its reasonable belief on advice of

foreign counsel, would be prejudiced by failing to intervene or otherwise participate in any such action.  At any time prior to Mega Bank's intervention or participation, Mega Bank shall file with this Court, pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, made applicable to cases under the Bankruptcy Code by Rule 9017 of the Federal Rules of Bankruptcy Procedure, a declaration of foreign counsel of applicable law.  Such declaration shall describe the nature of the foreign action (including identification of the court and case caption) and the relevant dates by which Mega Bank must act in order to protect its interests.  The automatic stay shall not preclude Mega Bank from retaining local counsel to act on its behalf in respect of any such foreign proceeding, and such foreign counsel may be the declarant to the Rule 44.1 declaration. Mega Bank respectfully submits that relief from the automatic stay as described herein is entirely appropriate under the circumstances.

## BASIS FOR EMERGENCY RELIEF

83.    On August 28, 2013, the Debtors will seek to use Mega Bank's cash collateral on a final basis to pay the pre- and post-petition claims of foreign maritime lien claimants to release the vessels.  The Debtors propose adequate protection in the form of alleged equity cushions and going concern values, and, to the extent of any diminution in value, liens on accounts receivable and superpriority administrative expense claims.  Mega Bank disputes the sufficiency of the proposed adequate protection.  The form and substance of the Good Faith Property also will be in dispute.  Accordingly, this Motion shares dispositive, common issues of fact with the matters scheduled for hearing on August 28, 2013, and it would be in the estates' best interest to hear this Motion on an emergency basis to prevent a waste of critical resources if these issues are re-litigated at a later date.

84.    Other circumstances justify emergency relief for at least the following reasons. The Qingdao Maritime Court in the PRC has not stayed its proceedings against the *M/V*

*A Duckling*, the Debtors have not appeared or made any application to that court to defend their interests (or those of Mega Bank's) in those proceedings, and the Debtors cannot afford to place the vessel back into service. The *M/V A Ladybug* has no ability to fund its critical and necessary expenses, and faces risk of imminent or additional arrest(s) in Malta. Lastly, because the *M/V E Whale*, the vessel under arrest in South Africa, is not property of EWC's bankruptcy estate, there is no purpose in delaying its sale any further.

85.     Emergency forward-looking relief is justified because the threat of arrest by foreign maritime lien claimants will pervade for the duration of these Chapter 11 cases. The post-petition actions and caveats of Mega Bank's vessels and the dire situation of the *M/V A Ladybug* substantiate this threat.

86.     The Debtors are not prejudiced by emergency relief. They will present their case on adequate protection on August 28, 2013. If, as Mega Bank expects, the Debtors fail, they will not procure the release of the vessels. If, however, they procure the release of the vessels, Mega Bank's relief will be limited to the proposed forward-looking relief in respect of its collateral, including the released vessels. The proposed order is fair to the Debtors because it provides a mechanism for the Debtors to defend their rights across the globe without prejudicing the rights of their creditors.

## RESERVATION OF RIGHTS

87.     Mega Bank reserves any and all rights to move for any further relief from the automatic stay at any time on any and all grounds.

*     *     *

WHEREFORE, Mega Bank respectfully requests that the Court enter an order granting relief from the automatic stay and granting such further relief as may be just and necessary under the circumstances.

33

Respectfully submitted this 23rd day of August, 2013,

**MAYER BROWN LLP**

By:  /s/ Charles S. Kelley
     Charles S. Kelley
     State Bar No. 11199580
     Southern District of Texas Bar No. 15344
     700 Louisiana Street, Suite 3400

Houston, TX 77002-2730
Telephone:  713 238-3000
Facsimile:  713 238-4888
Email:  ckelley@mayerbrown.com

*and*

Frederick D. Hyman (admitted *pro hac vice*)
Michael F. Lotito (admitted *pro hac vice*)
MAYER BROWN LLP
1675 Broadway
New York, NY 10019-5820
Telephone No.:  212 506-2500
Facsimile No.:  212 262-1910
Email:  fhyman@mayerbrown.com
Email:  mlotito@mayerbrown.com

*Attorneys for Mega International*
*Commercial Bank Co., Ltd.*

## CERTIFICATE OF COMPLIANCE WITH BLR 4001-1(a)(1)

I hereby certify that counsel to Mega Bank has attempted to confer with opposing counsel by email on August 23, 2013, at 10:01 a.m. (Central), 12:06 p.m. (Central), and 12:46 p.m. (Central).  No formal conference has been conducted, and no agreement has been reached on the requested relief.  Opposing counsel contests both the requested relief and an emergency hearing on the Motion.  Counsel to Mega Bank remains available to meet and confer with opposing counsel in good faith to resolve the issues herein.

Dated: August 23, 2013        By:     /s/ Charles S. Kelley
       Houston, Texas                   Charles S. Kelley

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2013, a true and correct copy of the aforementioned

Motion was served (i) in accordance with BLR 4001-1(a)(4) and Rule 4001(a)(1) of the Federal

Rules of Bankruptcy Procedure and (ii) on all parties listed on the Court's ECF noticing system

and by electronic mail as listed in the Debtors' Master Service List [Dkt. No. 247].

Dated: August 23, 2013          By:     /s/ Charles S. Kelley
Houston, Texas                          Charles S. Kelley


A Whale Corporation, B Whale
Corporation, C Whale Corporation, D
Whale Corporation, E Whale Corporation, G
Whale Corporation, H Whale Corporation, F
Elephant Inc., A Duckling Corporation, A
Ladybug Corporation, C Ladybug
Corporation, D Ladybug Corporation, A
Handy Corporation, F Elephant Inc., B
Handy Corporation, C Handy Corporation,
B Max Corporation
5005 Woodway, Suite 230
Houston, TX 77056
*Via First Class U.S. Mail*

RoRo Line Corporation and Great Elephant
Corporation
80 Broad Street
Monrovia, Liberia
*Via International Mail*

Ugly Duckling Holding Corporation
Salduba Building, Top Floor, 53rd Street,
Obarrio
Urbanizacion
P.O. Box 7284
Panama 5, Panama
*Via International Mail*

TMT Procurement Corporation
Ajeltake Road, Ajeltake Island
Majuro, Republic of the Marshall Islands

MH 96960
*Via International Mail*

New Flagship Investment Co., Ltd
12th Floor. No. 167, FuHsin N. Rd
Taipei, Taiwan, R.O.C.
*Via International Mail*

William A. (Trey) Wood, III
Jason G. Cohen
BRACEWELL & GIULIANI LLP
711 Louisiana, Suite 2300
Houston, TX 77002
*Via First Class U.S. Mail*

Evan D. Flaschen
BRACEWELL & GIULIANI LLP
225 Asylum Street, Suite 2600
Hartford, CT 06103-1516
*Via First Class U.S. Mail*

Robert G. Burns
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
New York, NY 10020-1104
*Via First Class U.S. Mail*

Christine March
Office of the U.S. Trustee
515 Rusk Ave., Suite 3516
Houston, TX 77002
*Via First Class U.S. Mail*

Peter A. McLauchlan
John P. Melko
Clinton R. Snow
GARDERE WYNNE SEWELL LLP
1000 Louisiana, Ste. 3400
Houston, Texas 77002
Fax: (713) 276-6131
*Via First Class U.S. Mail*

Erik Weiting Hsu
Eli O. Columbus
WINSTEAD PC
500 Winstead Building
2728 N. Harwood Street
Dallas, TX 75201
Fax: 214-745-5390
*Via First Class U.S. Mail*

Sean B. Davis
WINSTEAD PC
1100 JPMorgan Chase Tower
600 Travis Street
Houston, TX 77002
Fax: 713-650-2400
*Via First Class U.S. Mail*

David W. Parham
BAKER & MCKENZIE LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201
Fax: (214) 978-3099
*Via First Class U.S. Mail*

John R. Ashmead
Benjamin Blaustein
SEWARD & KISSEL, LLP
One Battery Park Plaza
New York, NY 10004
Fax: (212) 901-2110
*Via First Class U.S. Mail*

James S. Carr
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
Fax: (212) 808-7897
*Via First Class U.S. Mail*

China Shipping Car Carrier
c/o Authorized Representative, Interim
Committee Chairman
3rd Floor, #277 Da Lian Road
Shanghai, PR China
Post Code 200082
Telephone: +86-21-65967213
Facsimile: +86-21-65967215
*Via International Mail*

Hyundai Sambo Heavy Industries Co., Ltd.
1700 Yongdang-Ri Sambo-Eup, Youngam-
Gun
Chollanam-Do, Korea
Telephone: +82-52-250-2436
Facsimile: +82-52-250-3060
*Via International Mail*

KPI Bridge Oil Limited and KPI Bridge Oil
Singapore Pte Ltd
c/o Jan Obel
1 Raffles Place, #41-02 OUB Centre
Singapore 048616
Republic of Singapore
Telephone: +65 9833 7883
Facsimile: +65 6220 8155
*Via International Mail*

Omega Bunker S.R.L.
c/o Mario Berghini, Finance Manager
Via Circonvallazione, 6
30171 Venice – Mestre, Italy
Telephone: +39 041 2380411
Facsimile: +39 041 2380440
*Via International Mail*

China Ocean Shipping Agency Shanghai
d/b/a/ Panavico Shanghai
c/o Tao Yangeng, Client Manager
11F No.531 Wusong Road
Shanghai, China
Telephone: +86 21 63231363
Facsimile: +68 21 63291519
*Via International Mail*

Songa Shipping Pte, Ltd.
c/o Ms. Angie Kwek
1 Temasek Avenue #22-05, Millenia Tower
Singapore, 039192 Republic of Singapore
Telephone: +65 6336 3841 /112
Facsimile: +65 6339 0559 (Attn: Angie
Kwek)
*Via International Mail*

Universal Marine Service Co., Ltd.
#330-110, Chunghak-Dong, Young Do-Gu
Busan, Korea
Telephone: +82 51417 9837
Facsimile: +82 51417 9840
*Via International Mail*

David R. Walker
ROYSTON, RAYZOR, VICKERY
&WILLIAMS, L.L.P.
Pennzoil Place
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile: (713) 225-9945
*Via First Class U.S. Mail*

William R. Greendyke
Jason L. Boland
Mark A. Worden
FULBRIGHT & JAWORSKI LLP
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
*Via First Class U.S. Mail*

M/s Gurbani & Co
78, Shenton Way
#31-02 Singapore 079120
Telephone:  +65-6336-7727
Facsimile:  +65-6336-0110
*Via International Mail*