**Exhibit 1**



Fenech
& Fenech
ADVOCATES

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| TMT PROCUREMENT CORPORATION, *et al.*,[1] | § | Case No.: 13-33763 |
| | § | |
| | § | |
| Debtors. | § | (Jointly Administered) |

## DECLARATION OF DR. ANN FENECH REGARDING ARREST OF THE *M/V A LADYBUG* AND MALTESE LAW

I, DR. ANN FENECH, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over the age of 18 years and am otherwise fully competent to make this declaration. I am the head of the Marine Litigation Department and the Managing Partner of Fenech & Fenech Advocates ("**Fenech & Fenech**"), a law firm organized under the laws of Malta in 1891. I founded the Marine Litigation Department at the firm in 1992 and have been actively practicing in maritime law in this firm for 19 years. I have been practicing maritime law for over 25 years. After qualifying as a lawyer in 1986, I joined the shipping and commercial firm of Holman Fenwick and Willan in London, where I stayed until 1991 prior to joining the New Orleans firm of Chaffe, McCall, Phillips Toler and Sarpy. I am currently the President of

[1] The Debtors in these Chapter 11 cases (the "**Cases**") are: (1) A Whale Corporation; (2) B Whale Corporation; (3) C Whale Corporation; (4) D Whale Corporation; (5) E Whale Corporation; (6) G Whale Corporation; (7) H Whale Corporation; (8) A Duckling Corporation; (9) F Elephant Inc.; (10) A Ladybug Corporation; (11) C Ladybug Corporation; (12) D Ladybug Corporation; (13) A Handy Corporation; (14) B Handy Corporation; (15) C Handy Corporation; (16) B Max Corporation; (17) New Flagship Investment Co., Ltd.; (18) RoRo Line Corporation; (19) Ugly Duckling Holding Corporation; (20) Great Elephant Corporation; and (21) TMT Procurement Corporation.

the Malta Maritime Law Association and have spoken in numerous fora both in Malta and abroad on diverse maritime issues as they interface with Maltese law concerning, by way of example only, Actions in Rem, arrest of ships, charterparties, salvage, yachting, piracy and a host of other subjects.

2. In my practice of law, I handle exclusively ship-related issues and have gained extensive experience in the handling of the whole spectrum of ship-related matters, including disputes arising out of charterparties and bills of lading, both in terms of preliminary issues, such as jurisdiction, title to sue, time bar, limitation, as well as issues on the merits; disputes arising out of ship building and ship repair contracts; disputes arising out of salvage, collision, towage and pilotage; the provision of the immediate response and assistance necessary following a casualty and disputes arising out of the casualty; disputes arising out of the carriage of petroleum products and in particular shortage claims, contamination claims, off speck fuel oil, etc; handling the pre-contractual and contractual negotiations between vendors and purchasers in ship sale and purchase contracts; substantial experience in the arrest of vessels and the issuing of other similar procedures with a view to obtaining security for claims and/or defending claims.

3. Recent and current cases in which I am or have been involved include acting for Finaval S.p.a in their action against Scorpio Ship Management, in which case the Court of Appeal in July 2010 awarded Finaval S.p.a $22.5 million—being the highest amount of damages ever awarded by a Maltese Court; acting for the Government of Malta together with the Attorney General of Malta in the defence of a case brought by the European Commission against the Republic of Malta claiming an alleged breach by Malta of Regulation 3577 before the European Courts of Justice—this case was decided in October 2010, whereby the claim of the European



Commission against Malta was dismissed with costs; acting for the Privatisation Unit of the Government of Malta in the privatisation of Malta Shipyards Limited, Manoel Island Yacht Yard, Malta Superyachts Facilities, and the Ta' Xbiex and Msida Yacht Marinas; acting for the gas carrier *Sichem Pandora* in an alleged collision between it and the fishing vessel *Klein Familie* in the English Channel; acting for the owners of the *Coral Water* in a collision with Mare Blu fish farm in Malta.

4. I am attaching hereto a true and correct copy of my detailed curriculum vitae as **Document AF 1.**

5. In such capacity, I am familiar with Maltese shipping law and the Maltese proceeding described herein involving the *M/V A Ladybug.*

6. Although Fenech & Fenech has not yet appeared in any of the arrest proceedings on behalf of Mega International Commercial Bank Co., Ltd. ("**Mega Bank**"), Fenech & Fenech has been retained to represent and consult with Mega Bank in relation to its legal rights and available remedies under Maltese law in relation to the *M/V A Ladybug* (the "**Vessel**"), which is currently within Maltese territorial waters and under arrest pursuant to an action initiated by another creditor and pending in Maltese courts. I submit this declaration on behalf of Mega Bank only. Mega Bank has made no appearance in the current proceedings against the *M/V A Ladybug* in Malta and otherwise has taken no actions in Malta in furtherance of its rights in respect thereof.

7. Fenech & Fenech has been contacted by other creditors in relation to the *M/V A Ladybug* and is representing such other creditors in regards to their rights and remedies. Fenech & Fenech has agreed with each of these clients to keep their matters separate and not to disclose



confidential or privileged information provided by one client in association with this engagement or issues involving the *M/V A Ladybug* to any other. The firm shall treat each of these as separate and distinct engagements.

8. Fenech & Fenech's legal fees are mainly charged to Mega Bank according to the amount of time spent by our lawyers working on the file. There may also be other legal fees due to Fenech & Fenech upon the presentation of certain acts and documentation before the Civil Courts of Malta. These latter fees would be due in accordance to fixed court tariffs. Fenech & Fenech is however not compensated pursuant to any contingency fee arrangement.

9. The Vessel is currently under arrest by two of its creditors, namely by its own crew members collectively and by Transport Malta, the Maltese national maritime administration. The Vessel is within Maltese territorial waters; however, it remains at an offshore anchorage and is therefore not berthed alongside.

10. The Vessel was first arrested by its own crew members on August 14, 2013, by means of precautionary warrant of arrest **number 1223/2013** issued by Judge Tonio Mallia LL.D. (A true and correct copy of the arrest warrant together with a sworn translation is being attached hereto as **Document AF 2**.) This precautionary warrant of arrest was issued in order to secure a claim in the approximate amount of $149,026.46 USD (or EUR 117,656.59) in connection with unpaid wages and salaries outstanding at the date when the precautionary arrest warrant was issued, as well as other expenses related to the repatriation of the crew, judicial costs and expenses, and legal interest. The value of this claim is subject to increase as the crew members continue to accrue their wages and salaries. In addition, I am attaching true and correct copies of actual local on line newspaper articles on the subject as **Document AF 3.**



11. On the same day, copies of the precautionary warrant of arrest (**number 1223/2013**) were served on all local authorities to ensure that the vessel does not leave Maltese territorial waters. The executing Court Marshall also served a copy of the warrant on the Master of the *M/V A Ladybug*, Mr. Abbasi Zafar-Ul-Huda (holder of Pakistani Passport Number CN1017472). The following documents were removed from onboard the vessel:

a. the General Certificate of Nationality (Panamanian Registry Number 000064067);

b. the Load Line Certificate (Numbered 30070); and

c. the Cargo Ship Safety Radio Certificate (Numbered 30070).

These three original ship documents are now deposited in Court and are in the possession of the Registrar of the Civil Courts of Malta. The purpose of the seizure of these documents is to ensure that the Maltese Court is in effective possession of the vessel and from a practical point of view it ensures that the Vessel does not depart Maltese territorial waters while it is under arrest. These documents will only be released once the Court is satisfied that all existing arrest warrants are lifted, or, alternatively, following the sale of the Vessel either by means of a judicial sale by auction or else means of a court approved private sale.

12. On information and belief, it appears that the International Transport Workers' Federation (the "**ITF**") is assisting the crew of the Vessel in pursuing its remedies. In fact, the precautionary arrest warrant was filed in the name of Mr. Paul Falzon (the local ITF representative) acting as the attorney at law for and on behalf of the crew members. The ITF is a federation of transport trade unions, comprising 708 transport trade unions in over 150 countries. The ITF also assists seafarers and today over 600,000 are members of ITF affiliated unions. The ITF is constantly striving to improve working conditions for seafarers and fights for more



international regulation to protect seafarers' rights. The ITF seeks to help all crew members regardless of their nationality or their ship's flag.

13. Pursuant to the provisions of the Maltese Code of Organization and Civil Procedure (the **"COCP")** the crew has twenty (20) days from the date of issuance of the arrest to file an action *in rem* against the vessel (*i.e.*, by the September 3, 2013). On August 23, 2013, Paul Falzon filed such action on the merits on behalf of the crew members. A true and correct copy of the sworn application is being attached hereto as **Document AF 4**. The applicant is declaring under oath that the crew members are owed outstanding wages and salaries and that "notwithstanding the various demands by applicants to the defendant vessel and the owners of the said defendant vessel for the payment of amounts due, defendant vessel still failed to comply." The applicant is therefore asking the Maltese Civil Court (a) to determine that the vessel is the debtor of the applicants in respect of the salaries and wages due to the crew members; (b) to liquidate the amounts due to the applicants including all arrears of wages and salaries due to the applicants; (c) to liquidate amounts due to applicants in relation to repatriation; (d) to liquidate the legal expenses incurred by the applicant; and (e) to order the defendant vessel to pay the applicant all the liquidated amounts. Apart from a copy of the arrest warrant issued by the crew on August 14, 2013, no further documents were annexed to this sworn application. The applicants will most likely produce the documentary evidence to substantiate their claim during the actual proceedings as is typical for such matters. No date has yet been appointed by the Courts of Malta for the first hearing in relation to this action *in rem.*

14. Based on discussions with the Harbour Master Captain David Bugeja and the Chief Executive Officer of Tug Malta Ltd., Mr. Mario Mizzi, I understand the *M/V A Ladybug*



was required to engage a salvor to engage in salvage operations to protect the *M/V A Ladybug* when she started to drag her anchors. Because the *M/V A Ladybug* had limited to no fuel supplies of fuel on board, the Master of the Vessel was unable to control the positioning of the ship with its engines.

15.  Specifically, I understand that on Saturday 10th August 2013, the sea conditions around Malta were rough, and the *M/V A Ladybug* which was anchored at an anchorage area within Maltese territorial waters started to drag her anchors. This proved to be a most dangerous situation for the Vessel given that she had very limited supplies of fuel on board. This needs to be seen in the context of the fact that *M/V A Ladybug* had for a number of weeks before been outside Maltese territorial waters waiting for supplies and bunkers. I understand that notwithstanding repeated demands for such supplies and bunkers, the owners and managers of the *M/V A Ladybug* had failed to supply the vessel with same. The Master of the Vessel therefore started to request Transport Malta for emergency assistance due to the Master's inability to control the vessel. Transport Malta did in fact, on the 29th July 2013, supply the Vessel with both emergency supplies as well as sufficient bunkers to run the generators and emergency equipment.

16.  Subsequently the Master of the Vessel also requested Transport Malta for permission to enter Maltese territorial waters. In the meantime, the Vessel had again run out of provisions and fuel. I understand that on the 9th of August 2013 Transport Malta granted such request and allowed the vessel to shift to Maltese territorial waters. I further understand that on Saturday 10th August 2013, the Vessel started to drag her anchors at the anchorage area. There were and are several other vessels at anchor at the anchorage area and therefore this situation was



a potentially dangerous situation given that the Vessel had very limited amounts of fuel on board which were not sufficient to operate the engines for any length of time. The master communicated a "May Day" signal requesting assistance. He communicated with the Harbour Master who informed him that it was important for the Master to secure the assistance of suitable tugs which would assist in controlling the situation. The Harbour Master was naturally most concerned in view of the fact that there were a number of other vessels at the same anchorage and it was important that the vessel was not left dragging her anchors, out of control and left to the elements within such a close distance from other vessels lying close.

17. The Greek company, Mega Tugs Salvage and Towing, S.A. ("Mega Tugs") signed a Lloyds Open Form ("LOF") on the same day, 10th of August, with the Master of the Vessel. Mega Tugs and her tugs rendered the *M/V A Ladybug* the necessary assistance as part of its salvage operations. The salvor, Mega Tugs, is very likely to be a substantial creditor of the Vessel. At this stage, because there is not yet an arrest warrant requested by the salvor, I am unable to opine on the precise amount of its claim; however, I would expect that, the amount of its claim will be in excess of $1 million USD.

18. On or about Wednesday 18th August, the *M/V A Ladybug* was once again without bunkers, having run out, and began moving heavily. The Master of the Vessel again contacted the Harbour Master who advised the Master that he should contact the same service provider who had previously rendered assistance. I have been informed that Mega Tugs rendered assistance yet again on the basis of a Lloyds Open Form; however, on this occasion, they sub-contracted part of the work to another tug company, Tug Malta Ltd. I have confirmation from the Harbour Master that, even days later, these tugs are still with the Vessel and continuing to



assist the Vessel by securing its movements and repositioning it as required. There is no indication that further bunkers have been provided. As with the previous salvage operation, because there is not yet an arrest warrant requested by the salvor, I am unable to opine on the precise amount the salvor contends it is owed; however, as with the previous salvage operation, I would expect the amount of this claim to be significantly in excess of $1 million USD. The amount increases significantly as the tugs continue to remain with the Vessel. Again these costs may rise even more if the vessel is requested by the Harbour Authorities to move out of Maltese territorial waters given that there is no physical space for the vessel inside Grand Harbour. If the salvors will need to tow her to another port away from Malta that will increase dramatically the salvor's claim.

19. Fenech & Fenech also is assisting Transport Malta, the national maritime administration in relation to their claim against the Vessel. For the avoidance of doubt, Fenech & Fenech submits this declaration and makes all statements herein as Maltese counsel to Mega Bank only. No conflict subsists under applicable Maltese law in relation to our concurrent representation of Mega Bank and Transport Malta. Transport Malta acts and has acted at its own discretion, separate and apart from Mega Bank, and instructs us separately from Mega Bank with regard to our representation of Transport Malta. Mega Bank has not taken any action whatsoever in furtherance of Transport Malta's actions against the Vessel and/or ALC.

20. As of August 26, 2013, Transport Malta's claim stood at an approximate amount of no less than EUR 189,037.37, which was susceptible to increase because Transport Malta continues to provide emergency services and supplies to the Vessel. Transport Malta arrested the vessel on the August 27, 2013, by means of a precautionary warrant of arrest (number



**1266/2013)**. A true and correct copy of the arrest warrant is being attached hereto as **Document AF 5**. As an arresting creditor of the Vessel, Transport Malta also had twenty (20) days from the date of issuance of the arrest to file an action *in rem* against the vessel (*i.e.*, until the September 27, 2013).

21. However, on the 11th of September 2013, Transport Malta were in receipt of payment of outstanding fees for provisions and supplies. As a result of this payment, there is therefore currently nothing owed to Transport Malta other than the daily anchorage costs. To the best of my knowledge, no further precautionary arrest warrants have been issued against the Vessel and there are no other proceedings filed before the Courts of Malta in respect to the Vessel.

22. To the best of my knowledge, ALC or any of its affiliates in bankruptcy do not appear to have appointed any Maltese legal counsel. I find no evidence that they have appeared or filed papers in any of the arrest proceedings before the Maltese Court. I have not been contacted by any Maltese legal counsel who have indicated they represent ALC, either.

23. I have also been asked to provide a general overview outline of Maltese law in relation to the arrest of a vessel, all other legal proceedings leading up to the disposition of the vessel as well as with regards to the distribution of funds amongst creditors:

a. Under Maltese law, a creditor seeking to secure its debt may arrest a vessel to secure a claim *in rem* or alternatively a claim *in personam*. A claim *in rem* is directed towards a ship rather than against any person (the latter would be an action *in personam*). The grounds upon which one may arrest a vessel are dependent on the grounds upon which our courts would exercise jurisdiction, either *in rem*, against the vessel or *in personam* against her owners.



b. Our Code of Organization and Civil Procedure ("**COCP**") lays down the grounds where the Maltese Courts would be vested with jurisdiction *in personam* and those grounds were they would have jurisdiction *in rem*. A true and correct copy of the relevant articles are being attached hereto as **Document AF 7**.

c. The grounds upon which a court will exercise jurisdiction *in personam* are found in Article 742(1) of the COCP and are limited to cases where there is a strong connection between either the debt or the debtors being in Malta or based in Malta.

d. With respect to the jurisdiction *in rem,* the starting point is that the vessel must be physically present within the twelve (12) nautical mile territorial waters of Malta. The grounds for *in rem* jurisdiction are laid down in Article 742B of the COCP. These include most maritime related claims. In addition, in order for there to be jurisdiction *in rem* it is essential that the requirements of Article 742D are satisfied. Article 742D(a) provides that an action *in rem* may be brought before the civil courts of Malta against—

> "*(a) that ship or vessel, where the person who would be liable on the claim for an action in personam ('the relevant person') was, when the cause of the action arose, an owner or charterer of, or in possession or in control of, the ship or vessel, if at the time when the action is brought the relevant person is either an owner or beneficial owner of that ship or the bareboat charterer of it . . . .*

Thus, under our law, in order for a creditor to be in a position to arrest a vessel (to which the claim relates) it is essential that the person who would be liable on the claim for an action *in personam* was when the cause of action arose, the owner or bareboat charterer of, or in possession or in control of, the ship or vessel, and that same person would still be the owner or beneficial owner of that ship or the bareboat charterer at the time when the proceedings are bought. There are only a few exceptions to this rule which does not apply to privileged claims as per article 50 of our Code of Organisation and Civil Procedure and claims relating to possession or ownership, employment or mortgages.

e. The concept of sister ship arrest was incorporated into Maltese Law in 2006 and as such is a relatively new concept under Maltese law. Article 742(D) of our COCP states that an arrest *in rem* pursuant to a claim against the vessel may also be made in the cases mentioned in article 742B(d) to (y), against "*any other vessel of which, at the time when the*



*action is brought, the relevant person is the owner or beneficial owner as respects all shares in it."*[2]

Therefore, if the relevant person at the time when the claim arose in relation to a ship (*i.e.*, the person liable for the claim *in personam*) is also the owner or beneficial owner of another ship, then the creditor may proceed to arrest this other vessel to secure its claim, as long as this other ship is within Maltese territorial waters.

f. Following the arrest of a vessel, the arresting creditor has twenty (20) days within which to either commence an action on the merits before the Civil Courts of Malta, or, alternatively, to commence arbitration proceedings pursuant to an arbitration clause governing the commercial relationship between the creditor and the debtor.

g. Once the creditor has obtained a favourable judgment and provided that the judgment is not appealed from, then the said creditor would obtain an executive title in terms of 253(a) of the COCP, and he may proceed with enforcing it against the arrested vessel.

h. Under Maltese law, an executive title may be enforced in one of two ways against a vessel:

- Judicial Sale by Auction in Malta. Any executive title holder may enforce its rights by summarily demanding the Courts to order the judicial sale of the vessel. The Court will then schedule a date when the judicial auction is to take place, usually between four (4) to six (6) weeks after the demand for such sale is made. The auction, for which there is no minimum reserve price, takes place within the Court building in Republic Street, Valletta. Following the registration of all potential bidders allowed to attend the auction, the vessel is auctioned off to the highest bidder. The successful bidder then has seven (7) days to deposit the realised purchase price into the court's bank account. Once the deposit is made, a lawyer appointed by the Courts will fill out a bill of sale transferring the vessel to the new owners free and unencumbered. This means that all existing creditors will no longer be able to attack the vessel to secure their claim. All claims must be directed towards the sum of money deposited into court. The main benefit of a judicial sale, therefore, is that the purchasers acquire the vessel free and unencumbered in accordance with Maltese law.

---

[2] Article 742D(b), COCP.



- Court-Approved Private Sale in Malta. Alternatively, an executive title holder may enforce its rights by requesting court approval of a private sale. This procedure is a relatively new concept which was introduced into our COCP by virtue of Act XIV of 2006.

  An executing creditor may now apply to the Civil Courts of Malta to sanction the private sale of a vessel in favour of an identified buyer and in consideration of a determined price. Together with this application, the said creditor must attach two appraisements by two independent and reputable surveyors confirming the value of the vessel. The application should also demonstrate to the Court that the said private sale is in the interest of all known creditors and that the price being offered by the proposed buyer is reasonable. As opposed to a judicial sale by auction, this procedure gives the creditor the added comfort in knowing precisely what the purchase price is. The purchase price has to be deposited into court within seven days from the completion of the sale. Pursuant to a court approved private sale, the purchaser acquires the vessel free and unencumbered as in a judicial sale by auction. Fenech & Fenech had acted for the executing bank in the first ever court approved private sale in Malta (*Dr. Ann Fenech in the name of and on behalf of the bank esteru Danske Bank A/S vs. the vessel Thor Spirit* decided by the Civil Court, Frist Hall on 1st December 2011).

  i. Once the purchase price has been deposited in court, following either a judicial sale by auction or a court approved private sale, then all existing creditors of the vessel and the owner *in personam* may direct their claim only against those funds. If there are various creditors, then any one of them may ask the Maltese Civil Courts to open proceedings to determine the ranking of creditors. These proceedings are known as Competition of Creditors proceedings. By virtue of these proceedings, the Court will determine the ranking of all existing creditors paying particular attention to the provisions of Article 50 to 54 of the Maltese Merchant Shipping Act. These articles identify those claims *in rem* which would enjoy relatively high ranking in comparison to other privileged creditors *in rem*.

24. I am also being asked to give an overview of the procedures under Maltese law regarding the enforcement of a foreign mortgage:

  a. One of the heads of jurisdiction *in rem* under Article 742B of the COCP which would in turn allow an arrest is "*any claim in respect of a mortgage, hypothec or charge on a ship or on any share therein.*" Any



      mortgagee, therefore, may arrest a vessel *in rem* in Malta in order to protect its interests when trying to enforce its mortgage security rights.

b. Maltese law holds that a validly registered mortgage is considered an executive title. This essentially means that a mortgagee may immediately proceed with rendering the mortgage enforceable pursuant to the Court authority without the need for a lengthy or protracted court proceedings. In order to render the mortgage enforceable, the mortgagee must present in court a judicial intimation for payment calling upon the debtor to settle all the outstanding indebtedness. This intimation is usually carried out through the filing of a judicial letter, which is then immediately served upon the debtor and the vessel. If no payment is forthcoming within two days from such service, the mortgage is rendered immediately enforceable. The mortgagee may then proceed with all the various available enforcement mechanisms under our law.

c. With respect to a foreign mortgage, Maltese law and specifically Article 49 of the MSA specifies that four requirements must be fulfilled in order for a foreign mortgage to be recognized as a mortgage with the status and all the rights of a Maltese registered mortgage. The foreign mortgage must be:

- validly recorded in the registry of that country where the vessel is registered;
- such registry is a public registry;
- such mortgage appears upon a search of the registry; and
- such mortgage is granted a preferential and generally equivalent status as a Mortgage under the MSA under the laws of the country in which the mortgage is registered.

If the above requirements are satisfied, and subject to the vessel being within the territorial waters of Malta (and therefore giving the Maltese Courts ground for jurisdiction), then the said foreign mortgage may be enforced in Malta. A true and correct copy of this article is being attached hereto as **Document AF 8**.

d. A mortgagee bank may enforce its mortgage by means of either one of the two enforcement procedures discussed above, namely a judicial sale by auction or a court approved private sale.



- Article 42 of our Merchant Shipping Act (a true and correct copy is being attached hereto as **Document AF 9**) also provides a list of rights which the mortgagee may exercise when there is an event of default of any of the terms or conditions of a registered mortgage or of any document or agreement referred to therein (such as the Loan Agreement or Deed of Covenants). Once the debtor is in default, a mortgagee may upon giving notice in writing to the mortgagor be entitled to take possession of the ship or share therein;

- sell the ship or share therein privately (however in such a case the purchaser does not acquire the vessel free and unencumbered and all registered mortgages will remain attached thereto until each one is completely discharged);

- may carry out, in the name of the owner, those things which may be required in order to maintain the status and validity of registration of the ship such as apply for extensions, pay fees and receive certificates.

25. I have also been asked to give my opinion on whether or not a Maltese court will recognize or enforce the orders of the U.S. Bankruptcy Court:

a. Relevant Maltese Domestic Law

Reference must be made to Part II of the Maltese Merchant Shipping Act, which deals with maritime privileges and mortgages. (A copy of the relevant articles is attached hereto as **Document AF 10**.) Article 37A (1) of the Merchant Shipping Act states that:

> *(1) Ships and other vessels constitute a particular class of moveables whereby they form separate and distinct assets within the estate of their owners for the security of actions and claims to which the vessel is subject. In case of bankruptcy of the owner of a ship, all actions and claims, to which the ship may be subject, shall have preference, on the said ship, over all other debts of the estate.*

In accordance with the above quoted Article, under our law, the Vessel should be considered as being separate from the rest of the estate of their registered owner/s. In addition, given that ALC are bankrupt, any action or claim against the Vessel shall have preference on the Vessel over any other debts of ALC.

Article 37C(1) then provides that *"All registered mortgages, any special privileges and all actions and claims to which a vessel may be subject*



*shall <u>not be affected by the bankruptcy of the mortgagor or shipowner happening after the date on which the mortgage was created</u> or the special privilege, action or claim arose, notwithstanding that the owner at the commencement of the bankruptcy had the ship in his possession, order or disposition, or was the reputed owner thereof, and such mortgage, privilege, action or claim shall have preference, on the said vessel, over all other debts, claims or interests of any other creditor of the bankrupt or of any curator, trustee or receiver, acting on behalf of any other creditors."*

From the above article, it is understood under Maltese law that as long as the ship owner is not bankrupt at the time when the mortgage is registered in the Maltese ship registry, then that said mortgage will remain valid and shall not be affected by any subsequent insolvency on the part of the ship owner.

A mortgagee or other privileged creditor should also be able to enforce its mortgage or claims, respectively, through a judicial sale by auction irrespective of the fact that there are pending insolvency proceedings against the ship owner. Article 37C(2) specifically states that any judicial sale proceedings instituted by any registered mortgagee or privileged creditor should "*not be interrupted or in any way hindered by any curator in bankruptcy, whether voluntary or compulsory, or any liquidator or receiver of the shipowner for any cause other than a cause that could be set up by the owner.*"

Lastly, one also finds an express provision in our MSA which provides that all those provisions in the Maltese Companies Act (Chapter 386 of the Laws of Malta) that relate to insolvency do not apply insofar as they are inconsistent with the above provisions of the MSA. In short, Maltese law has given a preference to the actions and remedies against a vessel, over and above insolvency laws or actions.

b. <u>Foreign Insolvency Proceedings within another EU member State</u>

European Council (EC) Regulation No 1346/2000 on insolvency proceedings applies under Maltese Law. This Regulation deals with cross-border insolvency proceedings within the EU and their effects of assets of insolvent companies within the same EU. Kindly note that under European law, the principle of direct effect applies in respect to EC Regulations; this means that an EC Regulation applies directly in all Member States with immediate effect as from its date of entry into force, without the need for any domestic legislation implementing the same



Regulation. Indeed, Malta does not have any legislation which incorporates Regulation No 1346/2000.

Reference here should here be made to a relatively recent judgment decided in the names of *The Foreign Economic & Technical Co-Operation Company of China et v. MV Beluga Sydney,* wherein the learned Judge presiding over the case made reference to both Article 37 of the MSA quoted above as well to Article 5 (1) of EC Regulation 1346/2000 EC, which reads as follows:

> *1. The opening of insolvency proceedings shall not affect the rights in rem of creditors or third parties in respect of tangible or intangible, moveable or immoveable assets - both specific assets and collections of indefinite assets as a whole which change from time to time - belonging to the debtor which are situated within the territory of another Member State at the time of the opening of proceedings.*

The court after examining the above mentioned Article 5 stated that:

> *To this Court, this means that the mere fact alone that insolvency proceedings were commenced against the owner of the vessel in Germany (where it has its seat and principle place of commercial activity) doesn't mean that the proceedings taken in Malta by the executing creditor in respect to their claims in rem over the arrested vessel must be also stopped.*

The presiding Judge ultimately decided that the executing creditor may proceed with its claim *in rem* against the vessel irrespective of the insolvency proceedings of the owning company in Germany.

That said, one should note however that EC Regulation 1346/2000 has a limited scope of application insofar as it only applies to scenarios where insolvency proceedings are commenced before the Courts of an EU Member State. In this particular case, I have been advised that ALC has commenced an insolvency proceeding in the U.S. Accordingly, we believe that Regulation 1346/2000 with respect to EU Insolvency Proceedings would not apply in the present scenario.

c. Foreign Insolvency Proceedings outside of the EU

Malta is not a party to any other international insolvency treaty or memoranda of understanding regarding cross-border insolvency



proceedings. In fact, Malta has not adopted the UNCITRAL Model Law on Cross-Border Insolvency.

Accordingly, if a Maltese Court were to examine whether or not it should recognize the effects of any non-EU foreign insolvency proceedings here in Malta, it would need to look at our domestic law and conflicts of law rules. Given the Vessel is currently in Maltese territorial waters and is under arrest before a Maltese Court, the Maltese Court is likely to find that domestic Maltese law governs the treatment and rights in the Vessel, rather than the US insolvency proceedings.

In my view a Maltese Court would not recognize non-EU foreign insolvency proceedings because as already stated under Maltese law (and more specifically Article 37A-37C and Article 49 of the MSA) insolvency proceedings do not restrict a mortgagee from enforcing its mortgage. To my knowledge no Maltese Court has enforced the orders of a US Bankruptcy Court in the context of a vessel arrested in Malta facing in rem claims.

d. Conclusion

On the basis of the above, it is my view that a Maltese court entertaining a claim for the enforcement of a mortgage or any privilege claim in Malta against a vessel, including the *M/V A Ladybug*, would not entertain a US Bankruptcy Court order prohibiting creditors from taking action against the Vessel and would proceed to follow Maltese law to require the sale of the Vessel upon application and supporting evidence.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of September, 2013, at Malta.

[signature]

Dr. Ann Fenech