**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **In Re:** | § | **Chapter 11** |
| | § | |
| **TMT PROCUREMENT CORP.,** *et al.,*[1] | § | **Civil Action 4:13-cv-02301** |
| | § | **Bankr. Case No. 13-33763** |
| | § | |
| **DEBTORS.** | § | **Jointly Administered** |

**EMERGENCY MOTION FOR DEBTOR IN POSSESSION
POSTPETITION SECURED FINANCING AND RELATED RELIEF**

By this Motion, the Debtors request:

(a)     authorization for the Debtors to borrow up to $20 million in principal amount of postpetition financing (the "<u>DIP Facility</u>"), including up to $6 million on an interim basis on the terms and conditions set forth in the binding Term Sheet[2] attached hereto and as summarized in this Motion;

(b)     authorization for the Debtors to grant the liens and security interests to the DIP Lender as provided for in the Term Sheet and to perform such other and further acts as may be necessary or appropriate in connection therewith;[3]

(c)     authorization pursuant to Bankruptcy Code §§ 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) to grant certain liens and superpriority claims to the DIP Lender to secure the Debtors' obligations under the Term Sheet;

(d)     authorization for the DIP Lender to accelerate the maturity of the DIP Facility and terminate the commitments under and in accordance with the Term Sheet upon the occurrence and continuance of a Termination Event,

---

[1] The Debtors in these chapter 11 cases are: (1) A Whale Corporation; (2) B Whale Corporation; (3) C Whale Corporation; (4) D Whale Corporation; (5) E Whale Corporation; (6) G Whale Corporation; (7) H Whale Corporation; (8) A Duckling Corporation; (9) F Elephant Inc.; (10) A Ladybug Corporation; (11) C Ladybug Corporation; (12) D Ladybug Corporation; (13) A Handy Corporation; (14) B Handy Corporation; (15) C Handy Corporation; (16) B Max Corporation; (17) New Flagship Investment Co., Ltd; (18) RoRo Line Corporation; (19) Ugly Duckling Holding Corporation; (20) Great Elephant Corporation; and (21) TMT Procurement Corporation.

[2] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Term Sheet.

[3] The Debtors and DIP Lender have agreed that the Term Sheet sufficiently describes the term and conditions of the secured debtor in possession credit facility, such that the Term Sheet, together with the DIP Orders, shall comprise the full DIP Facility.

#4378654.2

subject to the provisions of this Motion and any order granting this Motion; and

(e)     an order scheduling, pursuant to Bankruptcy Rule 4001, scheduling a final hearing (the "Final Hearing") for consideration of a final order (the "Final DIP Order") authorizing and approving the relief requested in this Motion to become effective pursuant to the Final DIP Order.

## I.  RELEVANT BACKGROUND

2.      On June 20, 2013 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court"). Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors are operating their business and managing their property as debtors in possession. The Debtors' chapter 11 cases are being jointly administered for procedural purposes. No trustees or examiners have been appointed in these chapter 11 cases.

3.      On July 9, 2013, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in these chapter 11 cases.

4.      On September 13, 2013, this Court withdrew the reference to the Bankruptcy Court of the Chapter 11 Cases [ECF 18[4]], such that the Chapter 11 Cases, including all adversary proceedings and contested matters, are currently pending in this Court.

5.      Each Debtor-owned vessel is financed under a separate credit facility. Together, the lenders under the various credit facilities are referred to in this Motion as the "Prepetition Secured Parties." The Prepetition Secured Parties were granted liens on, and security interest in certain property of certain Debtors under the respective credit facilities.[5]

---

[4] All references to "ECF" are to the docket in this Court. All references to "Docket No." are to the docket in the Bankruptcy Court.

[5] The Debtors reserve all rights as to the allowability of any Prepetition Indebtedness, any potential defenses or counterclaims thereto, or the allowability, perfection and non-avoidability of any of the Prepetition Secured Parties' asserted security interests in the Prepetition Collateral.

#4378654.2

6.      On June 27, 2013, the Bankruptcy Court approved the *Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection* [Docket No. 43]. Thereafter, the Bankruptcy Court approved (i) the *Supplemental Order Authorizing Use of Cash Collateral and Granting Adequate Protection* dated August 6, 2013 [Docket No. 200], (ii) the *Second Supplemental Order Authorizing Use of Cash Collateral and Granting Adequate Protection* dated August 14, 2013 [Docket No. 251], (iii) the *Third Supplemental Order Authorizing Use of Cash Collateral and Granting Adequate Protection* dated August 27, 2013 [Docket No. 335], (iv) the *Fourth Supplemental Order Authorizing Use of Cash Collateral and Granting Adequate Protection* dated September 10, 2013 [Docket No. 403], and (v) the *Order Authorizing Use of Cash Collateral for C Whale Corporation and Partitioning the Vantage Stock* dated September 10, 2013 [Docket No. 429] (the "C Whale CCO"). On September 16, 2013, this Court approved the *Order Granting Continued Cash Collateral Use* [ECF 37] (together with each of the cash collateral orders referred to in the preceding two sentences, and as amended, supplemented or otherwise modified from time to time, the "Cash Collateral Order"). Other than the use of proceeds of the DIP Facility for the purposes set forth in this Motion, nothing herein is intended to modify the Cash Collateral Order.[6]

7.      On July 23, 2013, the Bankruptcy Court entered the *Order* [Docket No. 134] (the "Good Faith Order") granting, in part, and denying, in part, the Prepetition Secured Creditors' motion to dismiss the Chapter 11 Cases.

---

[6] Although the defined term "Cash Collateral" is used in this Motion for convenience of reference to the cash and other property that the Prepetition Secured Parties assert comprise "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code, the Debtors reserve the right to challenge whether any of the Cash Collateral is, in fact, "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code.

-3-

#4378654.2

8.      On August 26, 2013, the Bankruptcy Court entered the *Order Regarding Shares* [Docket No. 323] (the "Order Regarding Shares") pursuant to which certain share certificates representing 25,107,142 shares of VTG owned by F3 Capital were deposited with the Clerk of the Bankruptcy Court in *custodia legis* pursuant to Paragraph 9 of such Order. On September 16, 2013, and as required by the Order Regarding Shares, F3 Capital deposited a share certificate representing an additional 900,000 shares of VTG owned by F3 Capital (such aggregate 26,007,142 VTG shares, together with such additional VTG shares that are required to be deposited with the Clerk of the Bankruptcy Court by F3 Capital from time to time pursuant to, among other things, the Order Regarding Shares, the DIP Orders, and/or the DIP Term Sheet, the "F3-VTG Shares").

9.      On August 27, 2013, pursuant to the Notice of Acceptance Regarding Shares [Docket No. 347] (the "F3 Acceptance"), F3 Capital unconditionally accepted the terms of the Order Regarding Shares.

**Material Terms of the Proposed Postpetition Financing**

10.     Once all of the Vessels return to operation, the Debtors will be able to generate positive cash flow for each Vessel. In order to achieve this result, however, the Debtors need "bridge" financing. The current interim cash collateral approach is simply not workable, with the Prepetition Secured Parties questioning every single invoice–even if less than $10,000–and not permitting funding on a sufficiently timely basis. Even were these problems to be solved, the Debtors would still need bridge financing to cover, among other things, (i) release and operating costs for certain Vessels that do not have sufficient retention accounts, (ii) release and operating costs for certain Vessels as to which the relevant Prepetition Secured Parties have not agreed to the use of Cash Collateral, and (iii) the mounting estate professional fees as a result of the

-4-

Prepetition Secured Parties' tactics of fighting every single issue raised in these cases and appealing every order adverse to them.

11.     The Debtors have thus concluded that they will require new postpetition financing to meet their ongoing working capital and general business needs while they continue the process of reorganization. Subsequent to the Petition Date, the Debtors have solicited various persons as to a potential DIP facility, leading to serious discussions with two potential lenders in particular.[7] As a result of such solicitation and discussions, the Debtors have selected Macquarie Bank Limited or its designee ("DIP Lender"), and have negotiated and agreed to enter into, subject to Court approval, a binding Debtor in Possession Loan Term Sheet (the "Term Sheet"), which is attached hereto as **Exhibit A**, and which details the terms and conditions of the DIP Facility.

12.     Bankruptcy Rule 4001 requires that motions requesting authority to incur postpetition financing begin with a concise statement of the relief requested, that summarizes the material terms and sets forth where the material terms can be found in the documents. Such summary is set forth below.[8] The Debtors believe that these terms will reasonably address their near-term financing requirements and constitute the best financing option available to them given the circumstances of their business, their capital structure, and these Chapter 11 Cases.

(a)     **The DIP Facility Parties and Other General Terms.** Extensions of credit under the DIP Facility will be made by the DIP Lender or an entity specifically designated by the DIP Lender for that purpose, to each of the Debtors, as borrowers on a joint and several basis. The purposes of the DIP Facility are to provide working capital financing to each of the Debtors that owns a Vessel ("Vessel Debtors") and to all of the Debtors for Court-allowed professional fees and expenses (Term Sheet p. 1-2).

---

[7] Because the Debtors' principal shareholder and/or his insiders expressed a potential interest in providing or participating in a DIP facility, the Debtors efforts have been conducted by AlixPartners and Bracewell & Giuliani, including the negotiation of the final terms of the proposed DIP facility, in coordination with the Committee.

[8] This summary is qualified in its entirety by reference to the provisions of the Term Sheet and any order of this Court relating to the proposed postpetition financing described herein.

(b)     **Total Facility.** The DIP Facility shall be in the total amount of up to $20,000,000. The amount of $6,000,000 shall be available upon entry of an interim order by this Court approving the DIP Facility, which is satisfactory to the DIP Lender. The amount of $14,000,000 shall be drawn, in whole, on the 5th day after entry of a final order by this Court approving the DIP Facility. (Term Sheet p. 2).

(c)     **Conditions to Funding of Second Tranche**. In addition to entry of the Final DIP Order, the DIP Lender has conditioned its commitment and willingness to fund the Second Tranche of $14 million on (i) this Court's leaving undisturbed in all material respects the Order Regarding Shares and the Good Faith Order and (ii) this Court's referral back to the Bankruptcy Court of the Chapter 11 Cases in their entirety. (Term Sheet p. 2-3).

(d)     **Security.** The Borrowers shall provide the DIP Lender with the following forms of security:

(i)     subject to the Carve-Out, a first priority security interest in available unencumbered cash of the Debtors;

(ii)     designation of the DIP Lender as the senior beneficiary of the Order Regarding Shares pursuant to Paragraph 4(B) thereof, and designation of all shares subject to the Order Regarding Shares (other than any Mega C Whale Segregated Shares, to the extent still applicable) as "unsegregated shares" within the meaning of paragraph 5(C) of the Order Regarding Shares to secure the DIP Obligations on a first priority basis (such security, the "First Lien F3-VTG Shares") and otherwise subject to all the terms and conditions of the Order Regarding Shares pursuant to section 364(d) of the Bankruptcy Code;

(iii)     a first priority security interest in (a) all Unencumbered Revenues pursuant to section 364(d) of the Bankruptcy Code and, in (b) all 552 Revenues to the extent and in the amount any DIP Facility proceeds are used by the Debtors on an emergency basis to pay Vessel Expenses;

(iv)     a second priority security interest in all 552 Revenues pursuant to section 364(c)(3) of the Bankruptcy Code;

(v)     second priority mortgages on the Vessels, subject in each case to valid, enforceable and non-avoidable existing mortgages and other maritime liens pursuant to section 364(c)(3) of the Bankruptcy Code;

(vi)     a first priority interest in all other unencumbered assets of the Debtors pursuant to section 364(c)(2) of the Bankruptcy Code;

(vii)     junior liens in all other assets as to which a valid, perfected and lien not otherwise subject to avoidance in favor of a third party existed as of the date the Chapter 11 Cases commenced, as to which assets a junior lien shall be granted pursuant to section 364(c)(3) of the Bankruptcy Code;

(viii)     a second priority security interest in any Mega C Whale Segregated Shares pursuant to section 364(c)(3) of the Bankruptcy Code

-6-

(ix)     any proceeds of, or property and interests recovered in respect of, claims or causes of action of the estates, including those arising under chapter 5 of the Bankruptcy Code (the "Avoidance Action Proceeds") pursuant to section 364(d) of the Bankruptcy Code; and

(x)     pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall be entitled to allowed superpriority expense claim status in the Cases (the "DIP Superpriority Claim") with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code. (Term Sheet p. 4-5).

(e)     **Priorities as to Repayment**. Following the Termination Date, the DIP Obligations shall be repaid out of the Debtors' property, subject to the Carve Out, in the order of priority described in the Term Sheet. (Term Sheet p. 6).

(f)     **Carve Out**.  A "Carve Out" shall be provided and shall consist of (i) all Bankruptcy Court allowed Professional fees incurred prior to the Maturity Date; (ii) $2,500,000 for Debtors' allowed Professional Fees incurred on or after the Maturity Date; (iii) $750,000 for the Committee's allowed Professional Fees incurred on or after the Maturity Date; and (iv) all fees of the U.S. Trustee. In all cases, no proceeds of the DIP Facility may be used for fees and expenses incurred in investigating or challenging or seeking to avoid any DIP Lender claims, rights and remedies. (Term Sheet p. 12).

(g)     **Term.** The maturity date of the DIP Facility is the earlier of (i) September 30, 2014, (ii) if a plan is confirmed, the earlier of (a) the effective date, or (b) the 30th day after entry of the confirmation order, unless a plan is confirmed for fewer than 6 of the Vessel Debtors, (iii) the closing of a sale of substantially all the Debtors equity or assets, (iv) the date of indefeasible prepayment in cash in full of the DIP Facility, (v) any sale or other conveyance of any First Lien F3-VTG Shares, where the proceeds are not used to indefeasible pay in full, in case, the DIP Obligations, (vi) if no Final DIP Order, then the earlier of (a) expiration of the Interim DIP Order, (b) 14 days after the Chapter 11 Cases are referred back in full to the Bankruptcy Court, (vii) the earlier of (a) fourteen (14) days after the date on which the District Court enters an order declining to refer the Chapter 11 Cases back in full to the Bankruptcy Court, and (b) December 31, 2013, if the Chapter 11 Cases have not by then been referred back in full to the Bankruptcy Court, (viii) a determination by the Bankruptcy Court not to enter the Interim DIP Order or the Final DIP Order in form and substance satisfactory to the DIP Lender in its sole discretion; and (ix) the Termination Date (defined below). (Term Sheet pp. 4-5).

(h)     **Interest Rate and Default Rate.** The DIP Facility will bear interest at a base rate of US LIBOR plus 9.00% per annum, with a LIBOR floor of 1.50% (the "Base Rate"), payable monthly in arrears. During the continuance of a Termination Event, amounts outstanding will bear interest at the Base Rate plus 200 basis points. (Term Sheet p. 4).

(i)     **Fees.**

(i)     Debtors will pay DIP Lender a commitment fee equal to (a) 3.0% of the Initial Draw (due and payable upon funding of the Initial Draw), (b) an additional 3.0%

-7-

#4378654.2

percent of the amount of the Second Draw (due and payable upon funding of the Second Draw), (together, the "Commitment Fee"). The Commitment Fee shall be due and payable out of the respective draws, in the sole discretion of the DIP Lender. (Term Sheet p. 3).

(ii)     If the DIP Facility is approved on an interim basis, and even if not approved on a final basis, the DIP Lender shall be entitled, without further order of the Bankruptcy Court, to reimbursement out of the DIP Facility of its reasonable fees and expenses in negotiating and administering this Term Sheet, the DIP Orders and the DIP Facility, including reasonable fees and expenses with respect to any modifications, amendments, waivers, consents, protection, defense and enforcement actions. Such fees shall be no greater than $300,000. (Term Sheet pp. 3-4).

(iii)     If the DIP Facility is not approved on an interim basis because (a) this Court or the Bankruptcy Court (as the case may be, the "Relevant Court") denies the Debtors' motion to approve the DIP Facility, (b) the Relevant Court approves a competing DIP facility, (c) the Debtors withdraw their motion to approve the DIP Facility, or (d) the DIP Lender withdraws the Term Sheet because the Relevant Court is not prepared to approve this Term Sheet or enter the DIP Orders on the terms presented, DIP Lender shall be entitled to a "stalking horse expense reimbursement" fee payable at such time by the Debtors from their Cash Collateral (and, if there are insufficient funds, as such Cash Collateral becomes available) and/or the first draw on any other DIP facility approved by the Court, in an amount equal to its reasonable fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) up to $300,000. (Term Sheet p. 4).

(j)     **Representations and Warranties.** The Term Sheet contains various representations and warranties by the Debtors (to the extent set forth therein), with respect to, among other things, their organization and existence, and ability to enter into the DIP Facility. (Term Sheet p. 16).

(k)     **Covenants.** The Term Sheet contains various covenants with respect to, among other things, the allowed use of proceeds of the DIP Facility, repayment of the DIP Facility, providing information and document execution to facilitate the DIP Facility, and the security underlying the DIP Facility. (Term Sheet p. 15).

(l)     **Termination Events.**  The Term Sheet contains Termination Events that are typical of debtor in possession financing in complex chapter 11 cases (Term Sheet p. 14).

(m)     **Remedies upon Default.** Upon a Termination Event, the DIP Lender may send written notice to the Debtors, with a copy to each Notice Person, terminating the DIP Facility and causing the Maturing Date to occur and an acceleration of all DIP Obligations. (Term Sheet p. 13).

#4378654.2

## II.  BASIS FOR RELIEF

**Request for Approval of the DIP Facility and Related Actions**

13.     As described above, it is essential to the success of the Debtors' chapter 11 cases that the Debtors immediately obtain access to sufficient postpetition financing. The preservation of estates' assets, the Debtors' continuing viability, and their ability to timely reorganize successfully under a plan of reorganization (or maximize values under a liquidating plan of reorganization), all depend heavily upon the approval of the DIP Facility and the related actions requested herein.

14.     The initial draw of $6,000,000 is urgently needed to pay the following:

(a)     The costs of international local counsel to represent the Debtors in preventing the sale of, and securing the release of, arrested vessels. This includes

(i)     Singapore counsel (*M.V. C Whale* and *M.V. Fortune Elephant*),

(ii)     South African Counsel (*M.V. E Whale*),

(iii)     Belgium Counsel (*M.V. C Ladybug*),

(iv)     China Counsel (*M.V. A Duckling, M.V. B Max*)

(v)     Malta Counsel (*M.V. A Ladybug*).

(b)     Restart costs and repositioning costs for the *M.V. A Ladybug*.

(c)     NOS/TMT overhead expenses.

(d)     *M.V. C Whale* restart costs.

(e)     Unforeseen emergency expenses in the aggregate maximum amount of $250,000.

15.     Bankruptcy Code § 364 distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to Bankruptcy Code

-9-

#4378654.2

§ 364(c), a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.

16.     Because the Debtors propose to obtain financing under the DIP Documents that is secured by junior and senior liens with respect to certain of the Debtors' property, the approval of the DIP Facility is governed by Bankruptcy Code § 364(c) and 364(d).

**Financing Under Bankruptcy Code § 364(c)**

17.     Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit, and the proposed borrowing is in the best interests of its estate. *See, e.g., In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Simasko Production Co*., 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); *see also* 3 Collier on Bankruptcy ¶ 364.03, at 364-7-18 (15th ed. rev.).

18.     The statutory requirement for obtaining postpetition credit under Bankruptcy Code § 364(c) is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense." *See Ames Dep't Stores*, 115 B.R. at 37-39 (a debtor must show that it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified*

-10-

*on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Bankruptcy Code § 364(c) must prove that it was unable to obtain unsecured credit pursuant to Bankruptcy Code § 364(b)).

19.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under Bankruptcy Code § 364(c):

- the debtor is unable to obtain unsecured credit solely under Bankruptcy Code § 364(b) (i.e., by granting a lender administrative expense priority);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37-39.

20.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Bankruptcy Code § 364(c). *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* at 1088. Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

#4378654.2

21.     The Debtors had initial conversations with several potential postpetition lenders, none of which were willing to extend credit on an unsecured basis. Based on their discussions with such potential lenders, as well as the poor state of the credit markets, their own assets, and the general state of the maritime shipping industry, the Debtors strongly believe that they are unable to obtain unsecured financing from any capital source.

22.     The Debtors and the DIP Lender have engaged in arm's-length negotiations, resulting in the financing proposal discussed in this Motion and proposed for approval by the Court. Accordingly, the Debtors believe that the terms and conditions outlined in the Term Sheet are reasonable and justified under the circumstances, in that this facility will enable the Debtors to have sufficient liquidity to continue with their operations and the plan process in a manner that will best serve all parties-in-interest herein.

**Financing and Adequate Protection Under Bankruptcy Code § 364(d)(l)**

23.     The Debtors seek approval of the DIP Facility under Bankruptcy Code § 364(d)(l). Specifically, pursuant to the Term Sheet, the DIP Lender would receive a first priority, senior priming lien upon any postpetition revenues for a Vessel that the Court determines comprise "proceeds, products, offspring or profits" or "rents" of such Vessel (such Revenues, "552 Revenues").[9] The DIP Lender would also receive a perfected first priority, senior priming lien upon any First Lien F3-VTG Shares to the extent any adequate protection liens on same have been provided to the Prepetition Secured Parties. All other liens that would be provided to the DIP Lender are either on unencumbered property, such as unencumbered

---

[9] The DIP Facility requires the Debtors to seek, within 7 days after entry of a final order approving the DIP Facility, an adjudication as to whether postpetition revenues come within Bankruptcy Code § 552(b). If such revenues do not come within Bankruptcy Code § 552(b), then they do not comprise "cash collateral" of the Prepetition Secured Creditors within the meaning of Bankruptcy Code § 363(a).

-12-

revenue and all First Lien F3-VTG Shares that are not subject to adequate protection interests, or are junior liens on encumbered property, such as the Vessels.

24.     The statutory requirement for obtaining postpetition credit under Bankruptcy Code § 364(d)(l)(a) is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise." In connection with its efforts to obtain adequate postpetition financing, the Debtors and their advisors do not believe that it would have been possible for the Debtors to obtain postpetition financing absent the granting of a first priority priming lien.

25.     Any secured creditors whose liens are being "primed" postpetition by the DIP Facility under Bankruptcy Code § 364(d) must be provided with adequate protection of their interests in collateral. *See In re Swedeland Dev. Group., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (*en banc*) (noting that adequate protection is required under Bankruptcy Code § 364(d)(l)(B) to ensure that the creditor receives the value for which it bargained pre-bankruptcy).

26.     With respect to the 552 Revenues, if any, prior testimony from AlixPartners has shown $50,000,000 in net cash flow once the Vessels are all operating. Given that there would be no operating revenues at all but for the use of the DIP Facility and the retention accounts, the Prepetition Secured Parties' interest in any 552 Revenues is adequately protected by the reality that there would simply be no 552 Revenues at all but for the DIP Facility and use of cash collateral.

27.     With respect to the First Lien F3-VTG Shares, when this Court determined the number of F3-VTG Shares that would result in a value of not less than $40,750,000, the Court used the then-share price $1.74. As of the close of market on September 27, 2013, the share price was $1.75. Accordingly, even if the DIP Facility were to be repaid entirely out of the First Lien

F3-VTG Shares, there would still be a substantial equity cushion to protect any diminution in value of the Prepetition Secured Parties' retention account as a result of the Debtors' use thereof for operating expenses. This is before even taking into consideration that such use by the Debtors has preserved going concern value, which no one disputes is substantially greater than liquidation value in these cases.

**Protections Under Bankruptcy Code § 364(e)**

28.     The Debtors believe that the terms and conditions of the DIP Facility are the best possible under the circumstances of these cases, and were negotiated in good faith, at arm's-length, and with the assistance of counsel on all sides. Accordingly, the DIP Lender should be provided with the benefit and protection of Bankruptcy Code § 364(e), such that if any of the provisions of any order granting this motion are later modified, vacated, stayed, or terminated by subsequent order of this or any other court, the DIP Lender would be fully protected with respect to any amounts disbursed before such modification, vacation, stay, or termination.

**The DIP Facility is Necessary to Preserve the Assets of the Estates**

29.     It is essential that the Debtors obtain financing necessary to continue, among other things, the orderly operation of the Debtors' businesses and these cases, and to otherwise satisfy their working capital requirements. The DIP Facility also is essential to provide the Debtors' various stakeholders, including customers, employees, vendors, and other key constituencies, with confidence in the Debtors' ability to administer these cases and conclude their reorganization in a timely manner.

30.     Without immediate access to new borrowing relief, the Debtors' business operations and these cases in general could grind to a halt, which would seriously jeopardize the going-concern value of the Debtors' assets. The new liquidity offered by the proposed DIP

#4378654.2

Facility would ensure that the Debtors can maintain their assets and administer these cases through the next several months as the plan process ensues. Thus, approval of borrowing under the Term Sheet and eventual DIP Documents is crucial to maximizing the value of the Debtors' estates.

**The Terms of the DIP Agreement are Fair, Reasonable, and Appropriate**

31.     The proposed Term Sheet provides generally that the security interests and superpriority administrative expense claims granted to the DIP Lenders are subject to the Carve Out described above. In *Ames Department Stores*, the bankruptcy court found that such "carve outs" are not only reasonable but are necessary to insure that debtors' estates are adequately assisted by counsel and other professionals. *Ames*, 115 B.R. at 40.

32.     Likewise, the Debtors believe that the fees and other charges required by the DIP Lender under the Term Sheet are reasonable and appropriate under the circumstances. The proposed fees under the Term Sheet are within the parameters of market fee structures for similar postpetition financing. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Bankruptcy Code § 364. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving a debtor in possession financing facility that included a lender "enhancement fee").

33.     In addition, it is reasonable for the DIP Lender to condition availability of the Second Tranche on (i) this Court's leaving undisturbed in all material respects the Order Regarding Shares and the Good Faith Order and (ii) this Court's referral back to the Bankruptcy Court of the Chapter 11 Cases in their entirety. As to the former, any material alteration to either the Order Regarding Shares or the Good Faith Order could materially effect the credit risk of the DIP Facility. As to the latter, the DIP Lender is accustomed to providing DIP facilities in the

-15-

context of bankruptcy courts that routinely deal with the implementation and enforcement of DIP facilities, matters which district courts simply do not deal with on a routine basis.

**Application of the Business Judgment Standard**

34.     As described above, after appropriate investigation and analysis, the Debtors' management and advisors have concluded that the DIP Facility provides the best alternative available under the circumstances of these chapter 11 cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

35.     The Debtors have exercised sound business judgment in determining that a postpetition credit facility is appropriate and have satisfied the legal prerequisites to incur debt under the Term Sheet. Accordingly, the Court should grant the Debtors the authority to enter into the Term Sheet and obtain funds from the DIP Lender on the secured and administrative superpriority basis described above, pursuant to Bankruptcy Code § 364(c) and (d).

**Request for Modification of the Automatic Stay**

36.     Bankruptcy Code § 362 provides for an automatic stay upon the filing of a bankruptcy case. As summarized above, the proposed Term Sheet contemplates a modification

#4378654.2

of the automatic stay to permit (a) the Debtors to grant certain liens and to perform the Debtors' liabilities and obligations to the DIP Lender, and (b) the exercise of remedies by the DIP Lender following an event of default. Upon the occurrence of an event of default and during the continuance thereof, the DIP Lender is entitled to exercise its rights and remedies as set forth in the Term Sheet.

37.     The Debtors submit that, in the Debtors' business judgment, such provisions are reasonable under the present circumstances. Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Term Sheet.

### III.  INTERIM RELIEF ON AN EMERGENCY BASIS

38.     Pending final approval of the DIP Facility, the Debtors request that this Court authorize the Debtors to borrow under the Term Sheet, on an interim basis, pursuant to Bankruptcy Rule 4001(c)(2), to the extent necessary to avoid immediate and irreparable harm to their business and to these chapter 11 cases prior to any final approval thereof. It is essential to the continued maintenance of the Debtors' assets and these cases that the Court immediately authorize them to borrow up to $6 million pending a final hearing. The Debtors urgently need funds to allow them to meet restart costs for the *M.V. A Ladybug* and *M.V. C Whale*, current overhead expenses, and to pay costs and expenses of international local counsel in order to protect arrested vessels from sale processes and gain release of such vessels so that they can be put back into income generating service, all of which will allow the Debtors to generate necessary funds while they undertake the reorganization process. Thus, the interim relief requested in this Motion, pending a final hearing, is necessary, appropriate, fully warranted, and essential to the Debtors' efforts to maximize the value of their estates in these chapter 11 cases for the benefit of all of their creditors and parties-in-interest.

-17-

39.     Accordingly, pending a final hearing on the Motion, the Debtors respectfully request that the Court hear this motion on an emergency basis and approve the terms of the Term Sheet on an interim basis pursuant to the terms of the proposed Interim Order.

WHEREFORE, premises considered, the Debtors request that this Court enter an Interim Order authorizing the Debtors to obtain the postpetition financing described herein on an interim basis, setting the Motion for a final hearing, and granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

**BRACEWELL & GIULIANI LLP**

By:   */s/ William A. (Trey) Wood III*
   William A. (Trey) Wood III
   Texas Bar No. 21916050
   Trey.Wood@bgllp.com
   Jason G. Cohen
   Texas Bar No. 24050435
   Jason.Cohen@bgllp.com
   711 Louisiana, Suite 2300
   Houston, Texas 77002
   Telephone: (713) 223-2300
   Facsimile: (713) 221-1212

    -and-

   Evan Flaschen
   (*pro hac vice*)
   Evan.Flaschen@bgllp.com
   Goodwin Square
   225 Asylum Street, Suite 2600
   Hartford, CT 06103
   Telephone: (860) 947-9000
   Facsimile: (860) 246-3201

    -and-

#4378654.2

Robert G. Burns
(*pro hac vice*)
Robert.Burns@bgllp.com
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (800) 404-3970

**COUNSEL FOR THE DEBTORS
AND DEBTORS IN POSSESSION**

#4378654.2