**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| TMT PROCUREMENT CORPORATION, | § | Case No. 13-33763 |
| *et al.*, | § | |
| | § | Jointly Administered |
| Debtors.[1] | § | |

**EMERGENCY MOTION OF CATHAY UNITED BANK AND BANK SINOPAC (I) TO COMPEL DISCOVERY AND (II) FOR SCHEDULING AND STATUS CONFERENCE PURSUANT TO BANKRUPTCY CODE § 105(D) ON OCTOBER 15, 2013**

**NOTICE UNDER BLR 9013(B) AND 9013(I)**

THERE WILL BE A HEARING ON THIS MOTION ON <u>OCTOBER 15, 2013</u>, AT 1:30 P.M. IN COURTROOM 404 AT THE U.S. BANKRUPTCY COURT, 515 RUSK AVENUE, HOUSTON, TEXAS 77002.

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED; YOU SHOULD FILE AN IMMEDIATE RESPONSE.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

---

[1] The Debtors in these Chapter 11 cases are: (1) A Whale Corporation; (2) B Whale Corporation; (3) C Whale Corporation; (4) D Whale Corporation; (5) E Whale Corporation; (6) G Whale Corporation; (7) H Whale Corporation; (8) A Duckling Corporation; (9) F Elephant Corporation; (10) A Ladybug Corporation; (11) C Ladybug Corporation; (12) D Ladybug Corporation; (13) A Handy Corporation; (14) B Handy Corporation; (15) C Handy Corporation; (16) B Max Corporation; (17) New Flagship Investment Co., Ltd; (18) RoRo Line Corporation; (19) Ugly Duckling Holding Corporation; (20) Great Elephant Corporation; and (21) TMT Procurement Corporation.

**TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:**

Cathay United Bank, both in its capacity as an individual lender as well as its role as agent bank in those certain syndicated facilities related to certain of the above-captioned debtors and debtors in possession (collectively, "Cathay"), and Bank Sinopac, ("Sinopac" and collectively with Cathay, the "Banks"), through their undersigned counsel, hereby file this Emergency Motion (i) to Compel Discovery and (ii) for Scheduling and Status Conference Pursuant to Bankruptcy Code § 105(d) (the "Motion"). In support of this Motion, the Banks respectfully state as follows:

## MOTION TO COMPEL AND REQUEST FOR 105(D) STATUS CONFERENCE AT OCTOBER 15, 2013 HEARING

1.      Bankruptcy Code § 105(d) states that this Court, on its own motion, or the request of a party in interest, shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case and may issue any order at such conferences to ensure that the case is handled expeditiously and economically. Bankruptcy Code § 105(d).

2.      Furthermore, pursuant to FED. R. BANKR. P. 7030, incorporating FED. R. CIV. P. 30(a), and FED. R. BANKR. P. 7037, incorporating FED. R. CIV. P. 37(d), as well as Bankruptcy Code § 105(a), this Court may order attendance at a deposition.

3.      For the following reasons, the Court should hold a status conference to address the following issues and disputes that directly affect the expeditious and economic handling of these Bankruptcy Cases, and, if necessary, enter such orders as are necessary regarding discovery and scheduling.

*The Debtors' Opposition to Depositions for the RoRo and Tanker Line Managers*

4.      At the hearing conducted on October 9, 2013, the Bankruptcy Court expressed concerns over the Debtors' planned usage of more then $10 million in DIP financing funds to pay restart and repositioning costs for the Debtors' "RoRo" ships (the Ladybugs) as well as the Debtors' tanker fleet.  The Court expressed a desire to see the Debtors' business plans for these vessels, as well as expressing concern over the Debtors' agreements with ECB, Avantgrade and Nasatel.  The Banks also have the same concerns.

5.      Accordingly, on October 11, 2013, the Banks requested that the Debtors agree to produce the line managers for the Debtors' tankers, RoRo's and bulkers. [2]  *See* **Exhibit A** (October 11 letter from John Mitchell to Evan Flaschen).  On October 12, the Debtors responded that they would not agree to produce the line managers for depositions, stating that they "did not know how to respond" and that the Court had already quashed their depositions. [3]  *See* **Exhibit B** (October 12 email from Evan Flaschen to John Mitchell).

6.      Accordingly, on October 13, 2013, the Banks issued deposition notices for the line managers for the tankers and the RoRo's.  *See* **Exhibits C & D**.

7.      The Banks request that the Court address the issue of the Debtors producing the line managers for depositions prior to any interim or final debtor in possession financing hearings, other than the hearing scheduled for October 15, 2013.  The Debtors are having the estates pay these line managers' salaries.  The Debtors also chose to file these Bankruptcy Cases in Houston, Texas.  Further, Nobu Su decided not to put these line managers' employers into

---

[2] The Banks do not seek the deposition of the line manager for the bulkers, as no bulker's serve as collateral for the Banks' claims.  However, the letter was sent on behalf of all secured creditors in these Bankruptcy Cases.
[3] The District Court did quash their depositions, but only with respect to the retrial on good faith, not with respect to debtor in possession financing issues.

chapter 11, but nevertheless continues to utilize these line managers to manage the Debtors' vessels and operations.

8.      The Banks are entitled to depose these individuals, and the Debtors and non-debtor affiliates should cooperate in making them available to the Banks in Houston, Texas.  Key to any request to borrow over $11 million to restart operations of certain vessels and lines is the ability to generate positive income and EBITDA that justifies the borrowings.   The Banks are entitled to depose these individuals regarding the Debtors' plans to operate the vessels.  For this reason, and for the reasons related to the potential trading in Iranian crude (discussed below), the Banks should be given access to the line managers in order to take their depositions.

### The Debtors' Opposition to Any Contact with Nasatel, AvantGrade and ECB

9.      As this Court is well aware, the Banks have legitimate and serious concerns over the Debtors' chartering of the tanker vessels to any of ECB, Nasatel or Avantgrade.  These concerns are many, whether the lack of transparency with respect to who these entities are, their financial ability to pay charter obligations, or the use of the vessels to carry either Iranian or Libyan oil.  These concerns are in this Court's record, and need not be regurgitated here.

10.    As early as August 29, 2013, the Banks sought cooperation from the Debtors in taking a 2004 exam of Nasatel and ECB.  The Debtors' response was that "[t]his would be a declaration of outright war" and that it would equate to a "malicious effort to scare away an excellent customer."  *See* **Exhibit E** (Email exchange between John Mitchell, Evan Flaschen and Trey Wood).

11.    Therefore, the Banks held off, at the Debtors' request, any contact with ECB or Nasatel.

12.    The situation has clearly worsened in the interim, as ECB/Nasatel/Avantgrade are now more than $3 million in arrears to the estates, and as this Court has stated, there are serious

concerns over who these entities are and whether chartering the estates' vessels to them is in the best interests of the Debtors.  So, on October 11, 2013, the Banks again reached out to the Debtors to seek their cooperation in deposing ECB, Nasatel and Avantgrade.  *See* **Exhibit F** (Email from John Mitchell to Evan Flaschen).  This was met by a threat of sanctions from the Debtors if the Banks "spooked" ECB, Nasatel or Avantgrade. *Id.*

13. The Banks' concern over ECB's (or Avantgrade or Nasatel, it is unclear who is using the vessels) has heightened dramatically since learning that the *M/V B Whale* may have been carrying Iranian crude oil.  On October 9, 2013, the Banks made a proffer to this Court regarding the location of the ship on August 31 and September 1, and the lack of information in the "Noon Reports" regarding the vessels the *B Whale* was mooring with and the cargo it was carrying.

14. The Banks asked the Debtors to simply find out the name of the ship that the *B Whale* was moored to from August 30 through September 2, 2013, when off the coast of Iran, and the names of the three (3) ships that subsequently off loaded crude from the *B Whale* off the coast of Malaysia.  This is information that should be readily available to the Debtors, NOS, or Nasatel/ECB/Avantgrade.  To date, the Debtors have not identified the names of the vessels for the Banks.

15. Since October 9, additional facts have been discovered by the Banks that suggest that a party (it is unclear who) may be trying to conceal what the *B Whale* was doing those few days off the coast of Iran.

16. To illustrate, as the Debtors have explained to this Court, the Debtors have produced "thousands of documents" in response to requests made by the Banks.  Those documents are essentially the "Noon Report" emails for the 16 Debtor ships for the last 18

months.  The Noon Report is the daily email sent by the captain to NOS that states where the ship is, by coordinates, and what the ship is doing.  So, when the Debtors assert that they have produced thousands of documents, what they are referring to is the production of daily emails in .pst format from their various ships.

17.     Notably, in these emails produced into the data room set up by the Debtors for document production, are the Noon Reports for the *B Whale*.  There are notable and concerning irregularities related to these emails.

18.     ***August 27 – 29 Noon Reports:***  The Noon Reports for August 27 – 29, 2013 for the *B Whale* do not appear to have any irregularities in them.  These Noon Reports were sent from bwhale@amosconnect.com (the *B Whale* ship email address) to NOS Shipmanagement "Tanker OPS" at tankerop@nosship.com.  *See* **Exhibits G, H & I**.  These emails were produced in "original" format in the data room and recovered by the Banks.

19.     ***August 30 Noon Report:***  The August 30 Noon Report contained irregularities. Rather than an email in the original format similar to the August 27-29 emails, the August 30 Noon Report was an email sent on October 1, 2013, from NOSShipmanagement "Tanker Ops" to Savannah Cheng at Blue Whale Corporation, forwarding the underlying August 30, 2013 Noon Report to Blue Whale.  The Noon Report that was forwarded is in a different format than the August 27 – 29 emails, and as this Court is well aware, when someone forwards an email, the underlying email can be manipulated.  *See* **Exhibit J**.  August 30 was the day before the *B Whale* conducted STS operations off the coast of Iran.

20.     **August 31 Noon Report:**  Also on October 1, 2013, the Noon Report for August 31 appears to have been forwarded from B Whale (bwhale@amosconnect.com) directly to Blue Whale Corp (bw@bwhales.com), rather than NOSShipmanagement "Tanker OPS".  *See* **Exhibit**

**K.**  This is not in the regular practice of sending the Noon Reports, either.  Notably, the report was emailed on October 1, 2013, but the underlying email is not forwarded, as it was on August 30 or September 1 & 2 (as described below).  Instead, the August 31 Noon Report appears to have been "cut and pasted" into the October 1, 2013 email, again making it susceptible to manipulation.

21.     **September 1 & 2 Noon Reports:**   Also on October 1, 2013, NOS Shipmanagement "Tanker OPS" emailed the Noon Reports for the *B Whale*, for August 30 – September 2 to savannah.cheng@bwhales.com, similar to what occurred for the August 30, 2013 Noon Report.  *See* **Exhibits L & M** (emails from Tanker OPS sending the Noon Reports for the *B Whale* to Blue Whale Corporation).   Again, the underlying Noon Reports for these days, the days the *B Whale* was taking on cargo off of Iran, were not produced in original format.  Instead, they are in a different format and were forwarded by NOSShipmanagement, thus making them susceptible to manipulation.

22.     **September 3 – 5 Noon Reports:**  Then, on September 3, 4 & 5, 2013, after the *B Whale* appeared to be under way from the coast of Iran, all activity returned to "normal", that is, the *B Whale's* normal practice prior to loading crude off the coast of Iran.  The original Noon Reports for these days were produced into the data room, under the original format, matching what occurred for pre-August 30 operations.  *See* **Exhibits N, O & P** (original emails again produced).

23.     This raises grave concerns for the Banks, and the appearance is very troubling. Why would NOS be sending the Noon Reports for the days the *B Whale* was off the coast of Iran loading crude to Blue Whale Corporation on October 1, as opposed to producing the original Noon Reports as it had for days prior and subsequent to the days it was conducting STS

operations off of the coast of Iran?  Were the Noon Reports not prepared by the *B Whale* captain, or were they intentionally lost or deleted?   Were the reports modified by Tanker OPS in any way and then sent back to Blue Whale Corporation for production?  Why was the August 31 Noon Report not produced at all, but instead having the text "cut and pasted" into an email from B Whale to Blue Whale Corporation that was sent on October 1?

24.     The Banks need discovery from Nasatel, ECB and Avantgrade as well as the line managers for the tanker vessels immediately.  In addition to a myriad of other issues, to include insurance coverage issues and potentially sanctionable conduct, Avantgrade appears to be ignoring the terms of the *B Whale* charter which expressly prohibits carrying Iranian crude.  *See* **Exhibit Q**, p. 8.

25.     By this request for status conference, the Banks are not asking this Court to order Nasatel, ECB or Avantgrade to do anything.  The Banks will need to seek discovery from them through ordinary means and process.  However, in light of the Debtors' constant protests and now *threat of sanctions* if the Banks so much as request that Nasatel, ECB or Avantgrade agree to a deposition under Bankruptcy Rule 2004, the Banks seek Court permission to contact Nasatel, ECB and Avantgrade either informally or pursuant to the Federal Rules,  without the threat of sanctions or other repercussions from the Debtors.

### *Request for Scheduling Conference Regarding October 23, 2013 Hearing*

26.     The Banks also request a scheduling conference for the October 23, 2013 interim hearing on financing and use of cash collateral.  The Banks' witness, Jim Dolphin, will be unavailable for the hearing as he will be out of the country on business.  The Banks requested that the hearing be moved to October 28, 2013, and the Debtors refused.  *See* **Exhibit B**.

Accordingly, a conference is needed to address the scheduling of the October 23, 2013 interim hearing.[4]

---

[4] In light of the Debtors' refusal to consider a continuance of the hearing, Mr. Dolphin has made arrangements to be in Houston on October 23, if absolutely necessary.

732799-v1\DALDMS
9

## CONCLUSION

WHEREFORE, Cathay United Bank and Sinopac Bank respectfully request that the Court conduct a discovery and scheduling conference on October 15, 2013, and grant each the relief requested herein.

Dated:  October 14, 2013

Respectfully submitted,

*/s/ John E. Mitchell*
David W. Parham (15459500)
John E. Mitchell (00797095)
BAKER & McKENZIE LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 978-3000
Facsimile: (214) 978-3099
david.parham@bakermckenzie.com
john.mitchell@bakermckenzie.com

*Attorneys for*
*Cathay United Bank and Bank Sinopac*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 14, 2013 a true and correct copy of the foregoing Motion was served by the Electronic Case Filing system for the United States Bankruptcy Court for the Southern District of Texas, which gives notice to all parties who have requested ECF notification of this proceeding.

*/s/ John E. Mitchell*
John E. Mitchell