**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

**ENTERED
08/14/2015**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **TMT PROCUREMENT CORPORATION,** *et al* | § | **CASE NO: 13-33763** |
| | § | |
| **C WHALE CORPORATION** | § | **CASE NO: 13-33743** |
| | § | |
| **D WHALE CORPORATION** | § | **CASE NO: 13-33744** |
| | § | |
| **E WHALE CORPORATION** | § | **CASE NO: 13-33745** |
| | § | |
| **G WHALE CORPORATION** | § | **CASE NO: 13-33746** |
| | § | |
| **H WHALE CORPORATION** | § | **CASE NO: 13-33747** |
| | § | |
| **A DUCKLING CORPORATION** | § | **CASE NO: 13-33748** |
| | § | |
| **F ELEPHANT INC.** | § | **CASE NO: 13-33750** |
| | § | |
| **A LADYBUG CORPORATION** | § | **CASE NO: 13-33751** |
| | § | |
| **C LADYBUG CORPORATION** | § | **CASE NO: 13-33752** |
| | § | |
| **D LADYBUG CORPORATION** | § | **CASE NO: 13-33754** |
| | § | |
| **A HANDY CORPORATION** | § | **CASE NO: 13-33755** |
| | § | |
| **B HANDY CORPORATION** | § | **CASE NO: 13-33756** |
| | § | |
| **C HANDY CORPORATION** | § | **CASE NO: 13-33757** |
| | § | |
| **B MAX CORPORATION** | § | **CASE NO: 13-33758** |
| | § | |
| **NEW FLAGSHIP INVESTMENT CO LTD** | § | **CASE NO: 13-33759** |
| | § | |
| **RORO LINE CORPORATION** | § | **CASE NO: 13-33760** |
| | § | |
| **UGLY DUCKLING HOLDING CORPORATION** | § | **CASE NO: 13-33761** |
| | § | |
| **GREAT ELEPHANT CORPORATION** | § | **CASE NO: 13-33762** |

1 / 13

## MEMORANDUM OPINION

Hsin-Chi Su has established that there is a substantial or continuing loss to or diminution of the estate under 11 U.S.C. § 1112(b)(4)(A). The appointment of an examiner under § 1112(b)(1) is in the best interests of the creditors and the estates. The Court has already granted preliminary relief in the form of an examiner; further relief is not appropriate.

### Background

The Debtors filed for chapter 11 bankruptcy on June 20, 2013.[1]  (ECF No. 2458 at 1). Debtors' cases are jointly administered. At the commencement of the cases, the Debtors owned a number of ships, including some of the largest ships in the world. Hsin-Chi Su, also known as Nobu Su, was the direct or indirect owner of all Debtors. Various creditors moved to dismiss the cases, arguing that the cases were filed in bad faith. The Court ruled that the cases had not been filed in bad faith, but required that the Debtors pledge or cause to be pledged a substantial amount of capital to ensure compliance with court orders and to secure post-petition financing.[2] In response, Nobu Su pledged approximately 25 million shares of Vantage Drilling Company (the "Vantage Shares") held by his affiliate (F3 Capital). (ECF No. 323). Su is currently engaged in a dispute with Vantage which has been referred to arbitration. (ECF No. 2458 at 4; ECF No. 2440 at 6). Vantage seeks a judgment imposing a constructive trust over the Vantage Shares.

---

[1] The Debtors are: (1) A Whale Corporation; (2) B Whale Corporation; (3) C Whale Corporation; (4) D Whale Corporation; (5) E Whale Corporation; (6) G Whale Corporation; (7) H Whale Corporation; (8) A Duckling Corporation; (9) F Elephant Inc.; (1) A Ladybug Corporation; (11) C Ladybug Corporation; (12) D Ladybug Corporation; (13) A Handy Corporation; (14) B Handy Corporation; (15) C Handy Corporation; (16) B Max Corporation; (17) New Flagship Investment Co., Ltd.; (18) RoRo Line Corporation; (19) Ugly Duckling Holding Corporation; (20) Great Elephant Corporation; and (21) TMT Procurement Corporation.

[2] F3 Capital later pledged an additional 4 million shares for adequate protection purposes. (ECF No. 545).

Vantage appealed several of this Court's orders that concerned the Vantage Shares. Vantage prevailed and the Fifth Circuit held that this Court erred in issuing orders exercising control over Vantage Drilling Company and the Vantage Shares. *In re TMT Procurement Corp.*, 764 F.3d 512 (5th Cir. 2014). Following remand, this Court issued an order clarifying that the Vantage Shares remained subject to the prior rights, claims, and interests of Vantage as determined by a court of competent jurisdiction. (ECF No. 2323).

On April 8, 2014, A Handy Corporation, B Handy Corporation, and C Handy Corporation confirmed a chapter 11 plan of reorganization. (ECF No. 1355). However, because a condition precedent to the plan's effective date did not occur, the plan was terminated on April 25, 2014. (ECF No. 1445). The Debtors have not confirmed any other plans of reorganization, although new plans have been filed. (ECF Nos. 2374 and 2375). The new plans do not provide for the reorganization of the Debtors as going concerns. (ECF No. 2458 at 5).

All of the Debtors' vessels were sold between April and August of 2014.[3] (ECF No. 2458 at 3). Although the Debtors have no material remaining operating assets, the Debtors, in the aggregate, have approximately $16.5 million in cash, all of which is subject to the lien of Macquarie Bank Limited, the DIP lender. *Id.* The Debtors also possess 3,771,229 of the Vantage Shares and are the pledgees of 15,007,142 additional shares held in the Court's registry.[4] *Id.* All of the remaining shares are subject to Macquarie's lien. The Debtors also hold certain causes of action and rights of recovery, such as arbitration claims involving damaged grain carried by the *B Max*, potential retention of excess proceeds from the sale of *Fortune*

---

[3] Su has appealed the sale orders for the *A Whale*, *B Whale*, *C Whale*, *D Whale*, *G Whale*, and *H Whale*.

[4] 11,282,771 Vantage Shares had previously been sold at an average price of $1.6929 per share. Approximately $17.9 million of the proceeds were applied to principal, interest, and fees under the Macquarie DIP Facility. (ECF No. 2458 at 3).

*Elephant*, disgorgement and disallowance of professional fees, and certain avoidance actions against prepetition lenders, non-debtor affiliates, and trade vendors.  (ECF NO. 2458 at 4; ECF No. 2455).

Because the Debtors have no employees or business operations, they currently have no cash flow from operations.  (ECF No. 2458 at 3).  The Debtors have not incurred any material expenses, other than limited post-closing sale expenses, United States Trustee fees, and professional fees, since September of 2014.  *Id.* at 2.  From November of 2014 to March of 2015, estate and Committee professionals—Bracewell & Giuliani LLP, AlixPartners, LLC, and Kelley Drye & Warren LLP—have incurred $592,646.76 in fees.  (ECF No. 2458-1).  Of these fees, $548,308.61 are currently outstanding.  According to the Debtors, $342,843.00 of the fees would not have occurred but for the litigation caused by Su and F3 Capital.  *Id.*

On May 1, 2015, Su filed a motion to convert all pending cases to chapter 7 pursuant to 11 U.S.C. § 1112(b).  (ECF No. 2415).  Debtors, the Official Committee of Unsecured Creditors, MRMBS II LLC, Macquarie Bank, Bank Sinopac, and Wilmington Trust ("Respondents") all objected to the motion to convert.  The Court held a hearing on the motion to convert on June 12, 2015.  During the hearing, the Court made a preliminary ruling that required the United States Trustee to select an examiner.   Su had expressed concern that Debtors were not properly pursuing avoidance actions before the limitations period was set to expire on June 20, 2015.  The role of the examiner was limited to determining whether estate causes of action had been preserved for timely prosecution and whether the professional fees charged to the estate were reasonable.  (ECF No. 2479).   The United States Trustee selected Attorney Elizabeth Guffy as the Examiner.

Ms. Guffy gave her report orally before the Court on June 19, 2015.  She concluded that counsel for Debtors and the Committee properly investigated potential avoidance actions.  (ECF No. 2520 at 8).  On the same date, the Court issued an order authorizing the Committee to file and prosecute certain avoidance actions belonging to the estate.  (ECF No. 2506).  The Committee and several of Su's non-Debtor affiliates entered into a tolling agreement extending the limitation period for various causes of action to January 31, 2016.  The Court issued a separate order authorizing Ms. Guffy to review the anticipated lawsuits prepared by the Committee.  (ECF No. 2507).

### Analysis

I.      Cause to Dismiss or Convert Under § 1112(b)(4)(A)

11 U.S.C. § 1112(b)(1) provides that "[O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."  Section 1112(b)(4) contains a nonexhaustive list of examples of cause meriting conversion or dismissal.  Su alleges that cause has been met through § 1112(b)(4)(A), which states that a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" constitutes cause.

"The inquiry under § 1112 is case-specific, focusing on the circumstances of each debtor."  *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.),* 808 F.2d 363, 371–72 (5th Cir.1987) (en banc).  While most chapter 11 debtors can effectuate a plan of reorganization in a matter of months, certain debtors

with more complex debt structures or business difficulties may require more time.  *Id.* at 372.
Each debtor's viability and prospects must be evaluated "in light of the best interest of creditors
and the estate."  *Id.*

The party seeking dismissal or conversion bears the burden of proving cause by a
preponderance of the evidence.  *In re Woodbrook Assocs.* 19 F.3d 312, 317 (7th Cir. 1994).  In
order to demonstrate cause pursuant to § 1112(b)(4)(A), the moving party must demonstrate that
there is both (1) a substantial or continuing loss to or diminution of the estate *and* (2) the absence
of a reasonable likelihood of rehabilitation.  *In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51,
61 (6th Cir. B.A.P. 2013).  The loss may be substantial or continuing; it need not be both.  *Id.*
(citing 7 Collier on Bankruptcy ¶ 1112.04[6][a][i] (Alan N. Resnick & Henry J. Sommer eds.,
16th ed. 2014)) ("By the use of the word "substantial" in section 1112(b)(4)(A), Congress has
indicated that a loss need not be continuing in order to satisfy the first prong of this enumerated
cause.").  If the loss is sufficiently large given the financial circumstances of the debtor as to
materially negatively impact the bankruptcy estate and interest of creditors, the loss is
substantial.  7 Collier on Bankruptcy ¶ 1112.04[6][a][i] (Alan N. Resnick & Henry J. Sommer
eds., 16th ed. 2014).  Cause can be shown by demonstrating that the debtor suffered or has
continued to experience a negative cash flow or declining asset values following the order for
relief.  *In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014).  "Negative cash flow alone can
be sufficient cause to dismiss or convert under § 1112(b)."  *In re Miell*, 419 B.R. 357, 366
(Bankr. N.D. Iowa 2009) (citing *Loop Corp. v. United States Trustee,* 379 F.3d 511, 515-16 (8th
Cir. 2004).

Su points to Debtors' Monthly Operating Reports to show that Debtors have suffered a
substantial or continuing loss.  As of July 31, 2013, the MOR indicated that the net equity for all

Debtors was $149,303,179.00. (ECF No. 373 at 5-8). By April 30, 2015, equity had declined to -$333,029,663.00, a decrease of $482,332,842.00.[5] (ECF No. 2454 at 5-8). There is no doubt Debtors have suffered a substantial loss on a pure balance sheet basis.

However, at the June 12, 2015, hearing, the Court questioned whether this loss was actually the result of overly optimistic valuations of the Debtors' vessels. For example, the *A Whale* was valued at $98,784,394.00 the month before it was sold. (ECF No. 2166 at 5). It actually sold for $66,500,000.00, a difference of $32,284,394.00. (ECF No. 2375 at 17). This is particularly significant given that the total decline in A Whale's balance sheet was only $38,845,023.00. Similarly, the *C Ladybug* sold for $33,615,256.00 less than it was valued. (ECF No. 2056 at 6; ECF No. 2374 at 19). C Ladybug's balance sheet declined a total of $39,631,647.00. As the Court stated on the record, "if one were to value an asset at $10 million and it turned out you were wrong, it's worth $2 million, that's not a loss, that's an initial error." (ECF No. 2484 at 20). A significant portion of the $482,332,842.00 balance sheet decrease was likely caused by erroneous initial valuations, making it difficult to rely solely on a balance sheet test to find a substantial loss.

The Debtors' losses were not limited to declining asset values, however. Su urges the Court to consider the Debtors' substantial operating losses as demonstrated by the monthly operating reports. Because any losses due to overvaluation of the vessels are considered a non-operating loss, focusing exclusively operating income or losses provides a more accurate portrayal of their true financial condition. Taken together, the Debtors' operating income for the relevant time period was -$62,062,389.00. The Debtors' operating losses led to a significant decline in their cash positions. At the beginning of the case, the Debtors' had aggregate bank

---

[5] A decrease in equity was not uniform among all Debtors. A Duckling, A Ladybug, and C Ladybug increased in value over this time period.

balances of $49,654,525.00. (ECF No. 373 at 15). By April 30, 2015, this had declined to $16,438,978.00. (ECF No. 2454 at 15). The negative cash flow meant the Debtors continued to accrue additional debt post-petition, which they were unable to pay using estate assets. (ECF No. 2458 at 3) (stating that the Debtors sold 11,282,771 Vantage Shares primarily to pay down the DIP Facility). Negative cash flow and an inability to pay current expenses as they come due can satisfy the substantial loss or diminution of the estate for purposes of § 1112(b). *See Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007); *In re Galvin*, 49 B.R. 665, 669 (Bankr. D.N.D. 1985).

In *Gateway*, the court was presented with a decline in cash positions of $372,557.00 over seven months. 374 B.R. at 564. The court found this, along with evidence of post-petition borrowings of $233,000.00 and the accumulation of administrative expenses, sufficient to establish continuing loss under § 1112(b)(4)(A). *Id.* Similarly, in *In re Om Shivai, Inc.*, the court found negative cash flow for four out of eight months and a net loss of only $3,856.03 sufficient to establish cause.[6] 447 B.R. 459, 464 (Bankr. D.S.C. 2011). Here, seventeen out of twenty-one Debtors have incurred significant operational losses over the life of the case. Cash on hand has declined by more than $33 million and there is some evidence that the Debtors have struggled to pay expenses as they come due. Su has established a substantial loss or diminution to the estates.

Respondents contend that Su is unable to show a *continuing* loss to the estate. Since January 1, 2015, the Debtors have incurred only $28,716.00 in operational losses, all of which are due to a single Debtor. (ECF Nos. 2331 and 2356). All of the vessels have been sold and there are no current operations, meaning there is little risk of negative cash flow going forward.

---

[6] The court also noted that the debtor, whose only asset consisted of a small motel, consistently had low occupancy rates and was in need of significant repairs.

As discussed above, however, the Debtors have incurred $592,646.76 in professional fees from November 2014 to March 2015, although not all fees have been approved by the Court. (ECF No. 2458-1). Su has cited several cases holding that yet-to-be-approved fee applications may constitute a continuing loss for the purposes of § 1112(b)(4)(A). *See, e.g.*, *Morreale v. 2011-SIP-1 CRE/CADC Venture, LLC (In re Morreale)*, 533 B.R. 320, 324 (D. Colo. 2015) (holding that the accrual of attorney's fees alone is sufficient to establish cause); *Gateway*, 374 B.R. at 564 (finding that post-petition professional expenses were a factor in establishing cause).

But analysis under § 1112(b) must take into account the individual circumstances of the debtors. *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 371–72 (5th Cir.1987) (en banc). Debtors have wound down operations and have no tangible assets remaining, save for approximately $16.5 million in cash and the Vantage Shares, both of which are subject to the lien of the DIP Lender. In a case where the debtor has few, if any, tangible assets remaining, the mere accrual of professional fees must be distinguished from actual out-of-pocket losses. *In re Gabriel Technologies Corp.*, 2013 WL 4672785 at *3 (Bankr. N.D. Cal. Aug. 30, 2013). The *Gabriel* court went on to state that:

> Perhaps from an accounting perspective (profit and loss), such accruals would constitute such losses. But the accrual of liabilities are not the same as the incurring of actual out-of-pocket losses, such as the dissipation of assets that diminishes the estate. Leaving the Debtors in possession of the chapter 11 estate is not risking some ever-diminishing pool of assets.

*Id.* This is a similar situation to the one the Court is presented with here, where the remaining assets are relatively stable in value and are no longer being diminished through operational losses.

The Court must also keep in mind the possibility that litigation will bring in substantial assets to the estate. The Debtors have identified five possible avenues for recovery, several of which Su has asserted could generate substantial recoveries for the estate.[7] *See, e.g.*, (ECF No. 2179) ("Mr. Su believes that . . . if the Arbitration Claims are successful, they could generate a substantial sum for the benefit of the estate."). As with any litigation, the Debtors must expend professional fees in search of future recoveries. The Court concludes that the mere accrual of professional fees does not constitute a continuing loss to the estate. *See Gabriel*, 2013 WL 4672785 at *3; *In re Miller*, 496 B.R. 469, 479 (Bankr. E.D. Tenn. 2013).

Although Su has not shown a substantial *and* continuing loss to the estate, there is no requirement that they do so. Cause is defined under the Code as a "substantial *or* continuing loss to or diminution of the estate." Having established a substantial loss to the estate, Su has met the first prong of § 1112(b)(4)(A).

The second requirement of § 1112(b)(4)(A) is the absence of a reasonable likelihood of rehabilitation. Rehabilitation does not mean reorganization, which could involve liquidation. "Instead, rehabilitation signifies something more, with it being described as 'to put back in good condition; re-establish on a firm, sound basis.'" *In re Westgate Properties, Ltd.*, 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010) (quoting *In re V Cos.*, 274 B.R. 721, 726 (Bankr. N.D. Ohio 2002)). "The issue of rehabilitation for purposes of Section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009). Put simply, these Debtors have no business prospects. The Debtors

---

[7] First, the insurance litigation filed under seal in ECF No. 2432. Second, the arbitration claims pursuant to the Court's authorization in ECF No. 2179. Third, the avoidance actions discussed above, several of which have already been filed. Fourth, Su's appeals of the sale orders for several of the vessels. Fifth, Su's claims for disgorgement against former counsel for the Unsecured Creditors Committee.

exist to conclude their own liquidation.  (ECF No. 2433 at 2).  The parties have stipulated that "Debtors are and will remain unable to file Chapter 11 plans of reorganization that provide for the reorganization of the Debtors as going concerns."  (ECF No. 2458 at 5).  Accordingly, Su has established that there is no reasonable likelihood of rehabilitation and have established cause to dismiss or convert under § 1112(b)(1).

      II.      Defenses to Dismissal or Conversion

      Su has made a prima facie case of cause to convert Debtors' cases to chapter 7. However, conversion is not automatic.  Dismissal or conversion is not appropriate if "the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."  11 U.S.C. § 1112(b)(1).  A bankruptcy court is afforded wide discretion in acting upon a request for dismissal or conversion.  *Koerner v. Colonial Bank (In re Koerner)*, 800 F.2d 1358, 1367 (5th Cir. 1986).  Courts should "consider other factors as they arise, and . . . use [their] equitable powers to reach an appropriate result in individual cases." *C-TC 9th Avenue P'ship v. Norton Co. (In re C-TC 9th Avenue P'ship)*, 113 F.3d 1304, 1311 n. 5 (2d Cir. 1997) (citing House Report No. 95–595, 95th Cong., 1st Sess. at 405–6, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6363–64).

      Su has failed to show how either the estate or its creditors will benefit from conversion. The Debtors, the Committee, the DIP lender, and other creditors are united in their opposition to conversion.  It is difficult to understand how conversion would be in the best interest of the creditors if the vast majority of creditors oppose the relief.  Furthermore, Su argues that conversion is necessary because the estate continues to accrue substantial amounts of professionals' fees.  But converting the case to chapter 7 necessitates the appointment of a trustee, who would be forced to expend a significant amount of time and money to become

familiar with a complex case involving litigation spread across several countries. Unfortunately, Su's proposed solution to the continued accrual of professional fees would require the estate to spend even more on professional fees.

Su's concern over the accumulation of professionals' fees is of particular interest given that the majority of the fees appear to be *caused* by Su and F3 Capital. The parties have stipulated that of the $548,308.61 in fees incurred by the estate from November 2014 to March 2015, $342,843.00 are considered "related to Mr. Su." (ECF No. 2458-1). The category "related to Mr. Su," comprising 58% of total fees, consists of (i) the patent litigation pending in the U.S. District Court for the Southern District of Texas; (ii) the appeals of various sale orders also pending before the District Court; (iii) adversarial motions filed in the main bankruptcy case by Su; and (iv) Debtors' motion for a protective order over corporate property. *Id.* The only party seeking conversion in this case has been instrumental in causing the accumulation of professionals' fees. It would be fundamentally unfair to convert the case because of the accumulation of these fees.

The Court has already determined that the appointment of an examiner is in the best interests of the creditors and the estate. The examiner's role is limited to reviewing lawsuits to be filed in January of 2016 against Su's non-debtor affiliates as well as determining whether professionals' fees are charged to the estates are reasonable. (ECF Nos. 2479 and 2507). Fees to the examiner are limited to $15,000.00 between June 12, 2015 and July 11, 2015 plus no more than $5,000.00 in any month thereafter where aggregate professionals' fees topped $100,000.00, or no more than $2,500.00 in any other month. (ECF No. 2479). In his motion to convert, Su alleged that "every month administrative expenses continue to accrue without any additional benefit to the estate." (ECF No. 2415). The examiner provides the estate an independent source

to verify the reasonableness of these administrative expenses.  Additionally, the examiner's fees will be limited compared to the alternative of a costly chapter 7 trustee.

If the Court were presented with a situation where the estates continued to accumulate substantial losses to the detriment of the creditors, and if that accumulation could be avoided by conversion to chapter 7, conversion would be an appropriate remedy.  However, because the Debtors have terminated operations, they have not suffered substantial losses since December of 2014.  "The purpose of § 1112(b)(1) is to preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation."  *Loop Corp. v. United States Trustee*, 379 F.3d 511, 516 (8th Cir. 2004) (internal quotations omitted).  Debtors have conceded defeat and are no longer operating a failing business at the creditors' expense.  The only risk of loss looking forward would be the continued accumulation of professionals' fees, but an examiner is a cost-effective tool to keep fees in check.  Accordingly, the appointment of an examiner is in the best interests of the estates and their creditors.

## Conclusion

The Court will issue an order consistent with this Memorandum Opinion.

SIGNED **August 14, 2015.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE